**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WAYNE BLAND, DANUTA DURKIEWICZ, DAVID BOWLES, and ADAM REYES, individually and on behalf of all others similarly situated, | No. 18-cv-01832 |
| Plaintiffs, | |
| v. | Judge Robert M. Dow Jr. |
| EDWARD D. JONES & CO., L.P. and THE JONES FINANCIAL COMPANIES, L.L.L.P., | Magistrate Judge Daniel G. Martin |
| Defendants. | Jury Trial Requested |

## AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs Wayne Bland, Danuta Durkiewicz, David Bowles, and Adam Reyes,

individually and on behalf of all others similarly situated, by and through their attorneys, Stowell

& Friedman, Ltd., hereby file this Amended Class and Collective Action Complaint against

Defendants Edward D. Jones & Co., L.P. and The Jones Financial Companies, L.L.L.P.

(collectively, "Edward Jones" or "the Firm").

## INTRODUCTION

1.      Edward Jones recruits new trainee brokers, called Financial Advisor ("FA")

Trainees, with promises of extensive training and high pay.  However, the Firm provides no

meaningful training and denies FA Trainees the minimum and overtime wages required by

federal and state law.  Upon hiring, Edward Jones forces all FA Trainees to sign unlawful

contracts agreeing to pay up to $75,000 in so-called "training costs" if they leave the Firm for

any reason, as most will be forced to do, but continue selling securities or insurance products

within three years after the Firm deems they "can sell."  Edward Jones knows that a majority of

the FA Trainees it recruits will not survive the three-year "training cost" period, but does not disclose this to its new hires. FA Trainees not directly fired are forced out by the Firm's high pressure sales requirements and diminishing pay scale, intentionally designed to force advisors to sell or leave, while Edward Jones retains the clients, assets, and fees the FA Trainees have developed for the Firm.[1]

2.     The Firm's limited training consists largely of high pressure sales tactics and a directive to sell to clients the financial products of "preferred product partners," who kick back a portion of their (often high) fees to the Firm. FA Trainees who resist Edward Jones's pressure to push these products on their clients in order to boost the Firm's revenues typically find themselves unable to meet their production goals and are forced out of the Firm.

3.     As a result, and by design, most FA Trainees will owe Edward Jones a significant portion of their pay as so-called "training costs," despite having received no meaningful training. Armed with the leverage and threat of substantial "training costs" debt if they leave, Edward Jones forces FA Trainees to work long hours, fails properly to record or pay them for hours and overtime worked, and misclassifies FA Trainees as exempt from overtime requirements after the initial training period.

4.     Edward Jones's practice of forcing FA Trainees to pay purported training costs and intentionally denying them minimum wages and overtime compensation violates federal and state wage and hour laws, including by failing to pay wages "free and clear." On behalf of themselves and other Edward Jones FA Trainees, Plaintiffs seek an end to Defendants' unlawful practices and fair relief for class members.

---

[1] As used herein, "FA Trainees" includes Edward Jones financial advisors from hire date through the three-year "training cost" period.

2

## JURISDICTION AND VENUE

5.      Plaintiffs' claims arise under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*., state wage and hour and wage payment laws, and state statutory and common law.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

6.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b).  Edward Jones is licensed to do business in this District, maintains a number of branch offices in this District, and services clients who are residents of this District.  Plaintiffs Durkiewicz, Bowles, and Reyes are residents of this District and worked for and were harmed by Edward Jones in this District.  The unlawful conduct challenged herein occurred in this District and across the United States.

## PARTIES

7.      The Jones Financial Companies, L.L.L.P. claims to be a leader in the financial services industry.  Edward D. Jones & Co., L.P., its wholly owned registered broker-dealer financial services subsidiary, claims to serve "nearly 7 million investors from more offices than any other investment firm in America."[2] As of the end of 2017, Edward Jones managed over $1 trillion in assets and employed more than 16,000 Financial Advisors ("FAs") to service largely individual investors in more than 12,000 locations throughout the United States.[3]  In 2017, Edward Jones reported revenues exceeding $7.5 billion, including $5.7 billion in fees related to client accounts.[4]

---

[2] https://www.edwardjones.com/about/index.html.
[3] The Jones Financial Companies, L.L.L.P., 10-K Report for fiscal year ended December 31, 2017 at 29, https://www.edwardjones.com/about/financial-reports.html; https://www.edwardjones.com/value/edward-jones-advantage.html; https://www.edwardjones.com/find-financial-advisor.html.
[4] The Jones Financial Companies, L.L.L.P., 10-K Report for fiscal year ended December 31, 2017 at 5, https://www.edwardjones.com/about/financial-reports.html.

8.     Edward D. Jones, L.P. is registered with the Securities and Exchange Commission as a broker-dealer.  The Firm is a member organization of the Financial Industry Regulatory Authority ("FINRA").

9.     Plaintiffs and the putative class and collective members are or were employed by Edward Jones as FA Trainees and participate(d) in Edward Jones's training program.

10.     Plaintiff Wayne Bland worked for Edward Jones as an FA Trainee in Charlotte, North Carolina and in Lake Wylie, South Carolina.  Bland worked for Edward Jones from approximately November 2014 until March 2016.  Edward Jones classified Bland as a non-exempt employee from his hire until March 2015 and misclassified him as an exempt employee thereafter.[5]

11.     Plaintiff Danuta Durkiewicz worked for Edward Jones as an FA Trainee in Elk Grove Village and Itasca, Illinois.  Durkiewicz worked for Edward Jones from approximately July 2015 until May 2016.  Edward Jones classified Durkiewicz as a non-exempt employee from her hire until November 2015 and misclassified her as an exempt employee thereafter.

12.     Plaintiff David Bowles worked for Edward Jones as an FA Trainee in Lake Zurich, Illinois.  Bowles worked for Edward Jones from approximately January 2014 until January 2015.  Edward Jones classified Bowles as a non-exempt employee from his hire until June 2014 and misclassified him as an exempt employee thereafter.

13.     Plaintiff Adam Reyes worked for Edward Jones as an FA Trainee in Chicago, Illinois.  Reyes worked for Edward Jones from approximately October 2015 until June 2016.

---

[5] Bland is African American.  In addition to this Complaint, Bland filed a related class action complaint (No. 18-cv-03673) challenging the same training, compensation, and "training cost" recoupment policies and practices discussed herein, among other things, by alleging they are intentionally discriminatory and have a disparate impact on African Americans.

Edward Jones classified Reyes as a non-exempt employee from his hire until February 2016 and misclassified him as an exempt employee thereafter.

## FACTUAL ALLEGATIONS

14. Edward Jones has devised a scheme whereby the Firm recruits FA Trainees and benefits from their services and the clients they develop, fails to pay FA Trainees lawfully, and then seeks to recover much of, or even more than, FA Trainees' wages as what the Firm disingenuously calls "training costs" if these FA Trainees do not succeed or are fired. Edward Jones encourages FA Trainees to work extensive overtime, but does not properly record their hours or pay them for the hours they work, including overtime hours. This lawsuit challenges these unlawful practices on behalf of the Plaintiffs and all other similarly situated Edward Jones FA Trainees subjected to these practices.

15. As a condition of employment, Edward Jones forces all FA Trainees to execute a one-sided, unlawful written agreement, the "Financial Advisor Employment Agreement" (the "FA Employment Agreement"), after they accept the job but before they begin their employment.

16. The FA Employment Agreement obligates each FA Trainee to pay Edward Jones what it disingenuously calls "training costs" of up to $75,000 if his or her Edward Jones employment ends for any reason and the FA Trainee "accept[s] continued employment with any entity as either an employee or independent contractor engaged in the sale of securities and/or insurance business" within three years of receipt of a "can sell" date (the date at which Edward Jones directs FA Trainees to solicit and sell to clients). Thus, the FA Employment Agreement constitutes a de facto, unlawful restrictive covenant. Edward Jones knows, but does not inform

its recruits, that most FA Trainees it hires will fail out of the training program within the time window of the payment obligation.

**The Study Calendar Period**

17.     The Firm's training program begins with a 17-week period, during which Edward Jones designates the FA Trainees as non-exempt and entitled to overtime pay.  The 17-week period consists of two stages and is set forth in a "Study Calendar."

18.     In the study stage, weeks 1 through 8, FA Trainees spend at least six days per week studying on their own and taking the FINRA Series 7 and 66 licensing exams.  A majority of the "study" is self-study for these exams, including review of written online materials on a computer loaned by Edward Jones.  The Series 7 and 66 licenses are essential to the successful completion of the training program, and FA Trainees must pass the exams on their first try or be fired.  The relatively low pass rates for first-time Series 7 and 66 test-takers (65% and 72%, respectively) are well known, and FA Trainees often put in long days of study, including weekends, that easily exceed 45 hours per week.

19.     The "door knock" stage, weeks 9 through 16, begins with one week of on-site training in either St. Louis, Missouri or Tempe, Arizona, followed by seven weeks of knocking on doors in a designated neighborhood to obtain contact information for 25 persons per day. Edward Jones pressures FA Trainees to meet their daily quota of 25 contacts, which requires walking door-to-door in their assigned neighborhoods and finding 25 households willing to provide their contact and other information to an uninvited solicitor.  This can entail many long hours and failed attempts to gain even a single contact.  The "door knock" stage ends with another on-site week, designated as "Evaluation/Graduation," where Edward Jones decides whether FA Trainees "can sell" to prospective clients.

20.     Edward Jones FA Trainees are paid on a bi-weekly basis pursuant to a compensation plan, and each employee receives a schedule of expected compensation shortly after their hire.  Edward Jones neither tracks nor compensates FA Trainees for the hours they actually work.  Although Edward Jones identifies the Study Calendar period of employment prior to reaching "can-sell" status as overtime-eligible, the Firm's compensation schedule is designed to avoid having to pay FA Trainees any overtime premium.

21.     Edward Jones first identifies the "projected gross pay" it wants to pay the FA Trainee.  Next, the Firm assigns an arbitrary number of hours per work week for each stage of the Study Calendar, assuming a 45-hour work week during the study stage and a 60-hour work week during the "door knock" stage.  Edward Jones then manipulates the "hourly rate" for each stage so the FA Trainee's gross pay does not vary from one stage of the Study Calendar to the next, despite the assumed increase in overtime during the "door knock" stage.  Edward Jones accomplishes this by substantially reducing the hourly rate – by approximately one-third – from the study stage to the "door knock" stage of the Study Calendar.

22.     Under its policy and practice, Edward Jones knowingly discourages non-exempt FA Trainees from accurately reporting all of the hours they work and fails to pay non-exempt FA Trainees wages and overtime for the work they perform.  As a result, during the initial training period, non-exempt FA Trainees work hours for which they are not paid overtime wages as required by applicable laws.

**Period After FA Trainees "Can Sell"**

23.     After the Firm assigns FA Trainees "can sell" status, they must solicit "door knock" contacts to become Edward Jones clients. Although Edward Jones acknowledges they are still trainees, the Firm provides minimal training during this period, consisting mainly of access

to a Regional Trainer and wholesaler presentations by "preferred partner" firms whose products

the Firm pushes FA Trainees to sell to clients. The FA Trainees' primary duty is to sell financial

products. After "can sell" status, the Firm misclassifies FA Trainees as "exempt" (as explained

below), and not entitled to overtime pay. FA Trainees receive a salary for the first few months

after reaching "can sell" status, which diminishes over time during the transition to commission

pay – all subject to clawback as "training costs."

24.     Once an FA Trainee reaches "can-sell" status, Edward Jones managers, armed

with the leverage of the "training costs" obligation, instruct FA Trainees to do whatever it takes

to sell, including putting in long hours to meet sales and production goals to avoid "washing out"

of the Training Program (like most FA Trainees will). As a result, the FA Trainees continue to

work substantially long hours, in excess of 40 hours per week, during the "can sell" period.

**Post-Employment Claw Backs up to $75,000**

25.     Edward Jones's practice of requiring the payment of so-called "training costs"

constitutes an unlawful kickback, or claw back of earned wages, which also has the effect of

denying FA Trainees minimum or overtime wages. Wages earned are not received "free and

clear" because of Edward Jones's mandatory, unlawful "training costs" payment agreement.

26.     The "training costs" obligation is not a legitimate cost recovery measure and bears

no relation to costs actually incurred by Edward Jones for training actually provided to FA

Trainees. FA Trainees do not receive training commensurate in value to the "training costs"

claimed by Edward Jones.

27.     The operation of the training cost provision demonstrates the disconnect between

the $75,000 obligation and Edward Jones's purported justification of recouping training costs.

According to the FA Employment Agreement, training costs owed are to be amortized, or

decrease, ratably after the first of the three years following the "can sell" date. Thus, FA

Trainees who are fired or forced to leave Edward Jones quickly owe the most amount of money,

despite receiving the least amount of "training."

28.     If an FA Trainee has studied for and successfully obtained FINRA Series 7 and 66

licenses and completed the only two on-site sessions of the 17-week Study Calendar, but leaves

the Firm before receiving "can sell" status, then the FA Trainee has no obligation to pay any so-

called training costs. If that same FA Trainee were fired or forced to resign one or two days

later, after receiving "can sell" status, Edward Jones contends the FA Trainee would be obliged

for the full amount of $75,000 (more than a full year's tuition for an MBA program at Harvard,

Duke, or the University of Chicago).

29.     Edward Jones is unjustly enriched by these practices because it receives benefits

and services from FA Trainees without paying wages owed, while providing little or no

meaningful training to the FA Trainees. In addition, after terminating the employment of these

FA Trainees or forcing them out, Edward Jones retains the clients these new FA Trainees have

brought in and serviced, as well as the resulting client assets, fees, and revenue generated by

these clients, which may well extend many years beyond the FA Trainees' departure from the

Firm.

30.     In addition to requiring FA Trainees to agree to an unlawful "training costs"

provision, Edward Jones engages in a pattern of unlawful collection efforts and harassment by

enforcing these "training costs" obligations where the conditions Edward Jones imposed were

not met. Under the FA Employment Agreements, which Edward Jones drafted, a former FA

Trainee owes "training costs" if three conditions are met within three years after the "can sell"

date: the FA Trainee (1) is fired or resigns from Edward Jones, (2) maintains his or her FINRA

license, and (3) "accept[s] employment with any entity as either an employee or independent contractor engaged in the sale of securities and/or insurance business." Instead of conducting any reasonable investigation into whether the third condition is met, however, Edward Jones routinely attempts to collect money from former FA Trainees who did not, in fact, engage in the sale of securities or insurance business within three years after their "can sell" date. Edward Jones's harassing conduct compels FA Trainees either to hire counsel or to pay extortionate sums or both. Moreover, Edward Jones persists in these unlawful collection efforts even after learning that the former employee did not engage in the sale of securities and/or insurance business within the three-year period.

31. In sum, Edward Jones operates a scheme of indebting FA Trainees likely to fail for the grossly overstated costs of training the Firm never provided, and using that "debt" as leverage to avoid paying wages lawfully owed to FA Trainees. Edward Jones's practices of encouraging non-exempt FA Trainees not to report all hours worked, not paying non-exempt FA Trainees for those hours, misclassifying FA trainees as exempt after their "can sell" dates, and attempting to create contractual rights to recoup these so-called "training costs" violate state and federal wage laws.

32. Edward Jones maintained and/or enforced compensation and other policies and practices that resulted in Edward Jones's failure to compensate Plaintiffs and those similarly situated for all of their earned wages by, among other things, failing to pay lawful wages for hours worked or overtime premiums to employees for all hours worked over 40 in a given workweek as required by federal and state law; and unlawfully claiming entitlement to and attempting to collect sham "training costs" from FA Trainees, which unlawfully recapture earned

wages and, in many instances, result in FA Trainees being paid less than the minimum or overtime wage under applicable laws.

33.     Plaintiffs' experiences demonstrate the harm suffered by FA Trainees due to Edward Jones's unlawful practices.

**Plaintiff Wayne Bland**

34.     Plaintiff Bland was recruited to Edward Jones with more than a decade of financial advisory and sales experience.  Although Bland had previously held insurance and Series 6 licenses, they had lapsed by late 2014.

35.     As a condition of employment, Edward Jones forced Bland to sign an FA Employment Agreement, which required him to pay up to $75,000 in "training costs" if his employment ended for any reason within three years of reaching "can sell" status and certain other conditions were met.

36.     During Bland's employment, Edward Jones advised Bland that he should work very hard to succeed and build his knowledge base and book of business.  Indeed, Edward Jones loaned Bland a laptop computer so that he could work before and after office hours and on weekends, building his book of business for Edward Jones.

37.     Throughout his tenure at Edward Jones, Bland worked well over 40 hours per week, studying for his industry licenses, completing the Firm's training program requirements, travelling to St. Louis for FA training, completing whatever tasks were assigned to him in the office, working to develop a network of potential clients, and selling financial products to clients, among other things.

38.     During the study stage of his training period, Bland worked well in excess of 45 hours per week, and in the door-knocking stage, in excess of 60 hours per week.  After achieving

"can-sell" status, Plaintiff continued to work long hours, well in excess of 40 hours per week, in order to meet production goals and earn commissions.

39.     Edward Jones did not pay Bland for all of the hours and overtime he worked.

40.     Edward Jones failed to provide any meaningful training to Bland.  On the contrary, Edward Jones constructively discharged him in March 2016.

41.     After Bland's employment ended, Edward Jones demanded that Bland pay $75,000 in "training costs," an amount that exceeded Bland's $45,000 initial annual salary and exceeded Bland's total earnings during his employment at Edward Jones.

42.     As a result of Edward Jones's unlawful conduct, Bland was denied wages owed and suffered other damages.

**Plaintiff Danuta Durkiewicz**

43.     Danuta Durkiewicz was hired in July 2015, with over a decade of professional work experience.  As a condition of employment, Edward Jones forced Durkiewicz to sign an FA Employment Agreement, which required her to pay up to $75,000 in "training costs" if her employment ended for any reason within three years of reaching "can sell" status and certain other conditions were met.

44.     Consistent with Bland's experience, Edward Jones advised Durkiewicz that she should work very hard to succeed and build her knowledge base and book of business.  Indeed, Edward Jones also loaned Durkiewicz a laptop computer so that she could work before and after office hours and on weekends, developing her skillset and building her book of business for Edward Jones.

45.     Throughout her tenure at Edward Jones, Durkiewicz worked well over 40 hours per week, studying for her industry licenses, completing the Firm's training program

requirements, travelling to St. Louis and Tempe for FA training, completing whatever tasks were assigned to her in the office, working to develop a network of potential clients, and selling financial products to clients, among other things.

46.     During the study stage of her training period, Durkiewicz worked well in excess of 45 hours per week, and in the "door knock" stage, in excess of 60 hours per week.  After achieving "can-sell" status, Plaintiff continued to work long hours, well in excess of 40 hours per week, in order to meet production goals and earn commissions.

47.     Edward Jones did not pay Durkiewicz for all of the hours and overtime she worked.

48.     Durkiewicz did not receive the meaningful training or lucrative career Edward Jones promised.

49.     Like many FA Trainees lured to Edward Jones with false promises, Durkiewicz was forced to leave Edward Jones, but did not attempt to take any of the clients she had developed for Edward Jones with her when she left.  Instead, Edward Jones continued to reap the benefits and income generated from the clients Durkiewicz brought to the Firm.

50.     On January 30, 2018, long after Durkiewicz's employment ended, Edward Jones sent her a notice stating that she owed Edward Jones $75,000 in "training costs," well in excess of the amount she had earned during her entire employment at Edward Jones.

51.     As a result of Edward Jones's unlawful conduct, Durkiewicz was denied wages owed and suffered other damages.

**Plaintiff David Bowles**

52.     Plaintiff Bowles, then a recent college graduate, was hired by Edward Jones in January 2014.  Like other FA Trainee hires, Bowles was required to sign an FA Employment

Agreement indicating he initially would be an hourly employee and would be required to pay up to $75,000 in "training costs" if his employment ended for any reason within three years of reaching "can sell" status and certain other conditions were met.

53.     Consistent with Bland's experience, Edward Jones advised Bowles that he should work very hard to succeed and build his knowledge base and book of business.  Indeed, Edward Jones also loaned Bowles a laptop computer so that he could work before and after office hours and on weekends, developing his knowledge base and building his book of business for Edward Jones.

54.     Throughout his tenure at Edward Jones, Bowles worked well over 40 hours per week, studying for his industry licenses, completing the Firm's training program requirements, travelling to St. Louis for FA training, completing whatever tasks were assigned to him in the office, working to develop a network of potential clients, and selling financial products to clients, among other things.

55.     During the study stage of his training period, Bowles worked well in excess of 45 hours per week, and in the "door knock" stage, in excess of 60 hours per week.  After achieving "can-sell" status, Plaintiff continued to work long hours, well in excess of 40 hours per week, in order to meet production goals and earn commissions.

56.     Edward Jones did not pay Bowles for all of the hours and overtime he worked.

57.     Bowles did not receive the meaningful training or lucrative career Edward Jones promised.

58.     Like many FA Trainees lured to Edward Jones with false promises, Bowles was forced to leave Edward Jones, but did not attempt to take any of the clients he had developed for

Edward Jones with him when he left. Instead, Edward Jones continued to reap the benefits and income generated from the clients Bowles brought to the Firm.

59.     On February 5, 2018, long after Bowles's employment ended, Edward Jones sent Bowles a notice that he owed Edward Jones $75,000 in "training costs," well in excess of the amount he had earned during his entire employment at Edward Jones.

60.     As a result of Edward Jones's unlawful conduct, Bowles was denied wages owed and suffered other damages.

**Plaintiff Adam Reyes**

61.     Plaintiff Reyes, then a recent college graduate, was hired by Edward Jones in October 2015. Like other FA Trainee hires, Reyes was required to sign an FA Employment Agreement indicating he initially would be an hourly employee and would be required to pay up to $75,000 in "training costs" if his employment ended for any reason within three years of reaching "can sell" status, and certain other conditions were met.

62.     Consistent with Bland's experience, Edward Jones advised Reyes that he should work very hard to succeed and build his knowledge base and book of business. Indeed, Edward Jones provided Reyes a laptop computer so that he could work before and after office hours and on weekends, developing his knowledge base and building his book of business for Edward Jones.

63.     Throughout his tenure at Edward Jones, Bland worked well over 40 hours per week, studying for his industry licenses, completing the Firm's training program requirements, travelling to St. Louis for FA training, completing whatever tasks were assigned to him in the office, working to develop a network of potential clients, and selling financial products to clients, among other things.

64.    During the study stage of his training period, Reyes worked well in excess of 45 hours per week, and in the "door knock" stage, in excess of 60 hours per week.  After achieving "can-sell" status, Plaintiff continued to work long hours, well in excess of 40 hours per week, in order to meet production goals and earn commissions.

65.    Edward Jones did not pay Reyes for all of the hours and overtime he worked.

66.    Reyes did not receive the meaningful training or lucrative career Edward Jones promised.

67.    Like many FA Trainees lured to Edward Jones with false promises, Reyes was forced to leave Edward Jones, but did not attempt to take any of the clients he had developed for Edward Jones with him when he left.  Instead, Edward Jones continued to reap the benefits and income generated from the clients Reyes brought to the Firm.

68.    On January 30, 2018, well after Reyes' employment ended, Edward Jones sent Reyes a notice that he owed Edward Jones $75,000 in "training costs," well in excess of the amount he had earned during his entire employment at Edward Jones.

69.    As a result of Edward Jones's unlawful conduct, Reyes was denied wages owed and suffered other damages.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

70.    Pursuant to 29 U.S.C. § 216(b), Plaintiffs Bland, Durkiewicz, and Reyes seek collective action treatment of their claims under the Fair Labor Standards Act on behalf of all FAs and FA Trainees who worked in non-exempt positions.

71.    Plaintiffs Bland, Durkiewicz, and Reyes are similarly situated to FA Trainees who worked in non-exempt positions, were subject to the same compensation schedule, were required to execute the same FA Employment Agreement, and were subject to Edward Jones's unlawful

practice of being forced to work without being properly paid for hours worked, upon threat of being forced to pay "training costs."

72.     Plaintiffs Durkiewicz, Bowles, and Reyes seek class certification of Illinois statutory claims under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of FA Trainees hired by Edward Jones to work in Illinois who were not paid for hours worked over 45 hours per week in the initial phase of their training and 60 hours in the next phase and/or who were required to execute agreements requiring their payment of so-called "training costs" in the event their employment ended for any reason within three years after their "can sell" date and certain other conditions were met.

73.     Plaintiffs seek class certification of common law and Missouri statutory claims under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of FA Trainees hired by Edward Jones who were not paid for hours worked over 45 hours per week in the initial phase of their training and 60 hours in the next phase and/or who were required to execute agreements requiring their payment of so-called "training costs" in the event their employment ended for any reason within three years after their "can sell" date and certain other conditions were met.

74.     The proposed state law classes of FA Trainees meet all requirements of Rule 23(a) as they are so numerous that joinder is impracticable, the classes present common questions of law and fact, and the Plaintiffs identified will fairly and adequately protect the interests of the proposed classes.  Common questions of law and fact for the state law classes include whether the alleged unlawful practices violated applicable state laws.  Answers to those common questions depend on common evidence, including Edward Jones's mandatory FA Training program, compensation schedule, and FA Agreement.

75.     Plaintiffs seek certification of liability and injunctive and declaratory relief classes under Rule 23(b)(2) and 23(c)(4), and/or certification of broader classes under Rule 23(b)(3). All requirements of class certification are met by the proposed classes.

## COUNT I

### VIOLATIONS OF THE FAIR LABOR STANDARDS ACT
### 29 U.S.C. § 201 *et seq.*

76.     Plaintiffs Bland, Durkiewicz, and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate all allegations above as though fully stated herein.

**Failure to Pay Wages "Free and Clear"**

77.     Consistent with the requirements of the Fair Labor Standards Act ("FLSA"), 29 C.F.R. § 531.35, Edward Jones was required to pay to Plaintiffs and those similarly situated all wages they had earned fully, unconditionally, and "free and clear" of any claim by Edward Jones to a set off, kickback or other recoupment.  To the extent that Edward Jones paid Plaintiffs and those similarly situated a wage on the condition that Plaintiffs pay back "training costs" up to $75,000, those wages were paid conditionally and not "free and clear" as required by the FLSA.

**Failure to Pay Minimum Wage / Overtime**

78.     The FLSA generally requires that employees receive wages of not less than $7.25 per hour.  29 U.S.C. § 206.

79.     The FLSA further requires that applicable employees receive at least one and a half times their normal rate of wages for any hours worked in excess of 40 hours in a week.  29 U.S.C. § 207.  Plaintiffs and all those similarly situated are not exempt from the overtime requirements of the Fair Labor Standards Act during the time they worked in non-exempt positions.  *See* 29 U.S.C. § 213.

80.     Plaintiffs and all those similarly situated worked well in excess of 45-60 hours per week in the non-exempt positions.  However, Edward Jones failed to compensate Plaintiffs and others similarly situated beyond their normal rate of pay on weeks they worked over 45-60 hours.

81.     Additionally, Edward Jones forced Plaintiffs and all those similarly situated to sign an agreement to pay "training costs" if they were fired or resigned from Edward Jones within the first three years after receipt of their "can sell" status under certain circumstances. Such payment of "training costs" reduces the wages of Plaintiffs to below the minimum wage required by 29 U.S.C. § 206 and/or below the overtime wage required by 29 U.S.C. § 207.

**Misclassification**

82.     Edward Jones treated Plaintiffs and those similarly situated as exempt from FLSA's wage and hour protections and failed to pay them overtime compensation after they attained "can sell" status.

83.     Plaintiffs and those similarly situated routinely worked in excess of 40 hours per week after their "can sell" date, without receiving proper overtime pay.

84.     After Plaintiffs and those similarly situated received "can sell" status, Edward Jones did not pay them a guaranteed, predetermined salary within the meaning of 29 C.F.R. §§ 541.200(a)(1), 541.600(a), 541.602(a).  Among other things, Edward Jones paid Plaintiffs and those similarly situated wages on the condition that Plaintiffs and those similarly situated pay "training costs" up to $75,000 under certain circumstances.  In addition, their wages were subject to reduction because of alleged variations in the quality or quantity of work performed.

85.     In addition, after their "can sell" dates, Edward Jones assigned Plaintiffs and those similarly situated the primary duty of selling financial products, including the Firm's proprietary

products and the products of the Firm's "preferred product partners." The primary duty of Plaintiffs and those similarly situated did not include the exercise of discretion and independent judgment with respect to matters of significance. On the contrary, Edward Jones instructed Plaintiffs and those similarly situated to sell these financial products without regard to the clients' individual needs, financial circumstances, or investment objectives.

86. Moreover, Edward Jones did not place Plaintiffs and those similarly situated, after their "can sell" dates, in job positions whose primary duty was to perform work directly related to the management or general business operations of Edward Jones or its clients – the vast majority of whom were individual investors.

87. As a result, Plaintiffs and those similarly situated were non-exempt employees and eligible for overtime compensation after receipt of their "can sell" date.

88. Edward Jones misrepresented to Plaintiffs and those similarly situated that they were not eligible to receive overtime pay.

**Recordkeeping**

89. The FLSA requires employers accurately to record, report, and preserve records of hours worked.

90. Edward Jones failed to fulfill its obligations accurately to record, report, and preserve records of hours worked by Plaintiffs and all those similarly situated.

91. As a direct and proximate result of Defendants' conduct, Plaintiffs and all others similarly situated have been underpaid for the work they performed for Edward Jones.

92. Defendants' acts and omissions described above constitute willful violations of the FLSA within the meaning of 29 U.S.C. § 255(a).

## COUNT II

**VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT**
**820 ILCS 115/1 *et seq.***

93.     Plaintiffs Durkiewicz, Bowles, and Reyes, individually and on behalf of all others similarly situated, incorporate all allegations above as though fully stated herein.

94.     Plaintiffs and all similarly situated Illinois FA Trainees entered into compensation agreements with Edward Jones that they would be paid as non-exempt employees for all hours worked and would receive overtime compensation during the initial training period of their employment.

95.     Edward Jones violated the Illinois Wage Payment and Collection Act by regularly and repeatedly failing properly to compensate Plaintiffs and all similarly situated Illinois FA Trainees for the actual time they worked each week.

96.     The Illinois Wage Payment and Collection Act prohibits an employer from taking back wages that have been paid to employees.

97.     In seeking reimbursement for "training costs," Edward Jones unlawfully attempts to take back wages in which Plaintiffs and all similarly situated Illinois FA Trainees have a vested right, causing them harm.

98.     Plaintiffs and similarly situated Illinois FA Trainees worked well in excess of 40 hours per week during the time they held non-exempt positions but were not paid for all hours worked.

99.     Edward Jones permitted and encouraged Plaintiffs and all similarly situated Illinois FA Trainees to work but not report or be paid for hours over 45-60 hours per week.

100.     As a direct and proximate result of Defendants' conduct, Plaintiffs and all similarly situated Illinois FA Trainees have been underpaid for the work they performed as FA Trainees for Edward Jones, in violation of the Illinois Wage Payment and Collection Act.

## COUNT III

### VIOLATION OF THE ILLINOIS MINIMUM WAGE LAW
### 820 ILCS 105/1 *et seq.*

101.     Plaintiffs Durkiewicz and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate all allegations above as though fully stated herein.

102.     The Illinois Minimum Wage Law generally requires that employees receive wages of not less than $8.25 per hour.  820 ILCS 105/4(a)(1).

103.     The Illinois Minimum Wage Law further requires that applicable employees receive at least one and a half times their normal rate of wages for any hours worked in excess of 40 hours per week.  820 ILCS 105/4a(1).

104.     Plaintiffs and all similarly situated Illinois FA Trainees were recruited by Edward Jones as FA Trainees and earned and were paid wages. Plaintiffs and all similarly situated Illinois FA Trainees were or are not exempt from the overtime requirements of the Illinois Minimum Wage Law during the time they held non-exempt positions.  *See* 820 ILCS 105/4a(2).

105.     Plaintiffs and all similarly situated Illinois FA Trainees worked well in excess of 45-60 hours per week in non-exempt positions.  However, Edward Jones failed to compensate Plaintiffs beyond their normal rate of pay on weeks they worked over 45-60 hours.

106.     Edward Jones forced Plaintiffs and all similarly situated Illinois FA Trainees to sign agreements to pay the firm "training costs" if they left Edward Jones within three years of reaching "can sell" status and certain other circumstances were met.

107.     Payment of training costs has the effect of reducing the net income earned by Plaintiffs and similarly situated Illinois FA Trainees to fall below the minimum and overtime wages required by 820 ILCS 105/4(a)(1).

108.     As a direct and proximate result of Defendants' conduct, Plaintiffs and all similarly situated Illinois FA Trainees have been underpaid for the work they performed for Edward Jones.

<u>**COUNT IV**</u>

**RESCISSION**

109.     Plaintiffs Bland, Durkiewicz, Bowles, and Reyes, individually and on behalf of all others similarly situated, incorporate all allegations above as though fully stated herein.

110.     As a condition of employment, Edward Jones demanded that Plaintiffs and similarly situated Illinois FA Trainees enter into virtually identical FA Employment Agreements.

111.     The FA Employment Agreements stated that Plaintiffs were at-will employees whom Edward Jones could fire "at any time for any reason."  The FA Employment Agreements also provided that the FA Trainees would have to pay up to $75,000 in "training costs" if their employment with Edward Jones was terminated for any reason and they engaged in the sale of securities and/or insurance business within three years after receipt of "can sell" status (the "Training Cost Provision").

112.     The Training Cost Provision constitutes an unlawful clawback of wages.

113.     The Training Cost Provision amount bears no reasonable relation to the actual cost or value of the training Defendants provided.  Indeed, because the alleged training cost payment obligation is reduced over time, it bears an inverse relation to the costs of training

provided by Defendants. Accordingly, the Training Cost Provision constitutes an unenforceable penalty.

114. In addition, the Training Cost Provision lacks adequate consideration, any geographical limit, or any reasonable duration or connection to Defendants' protectable business interests. The Training Cost Provision is not a reasonable incentive for employees to remain in Defendants' employ because, among other reasons, it applies to employees whom Edward Jones has fired or forced to resign. Accordingly, the Training Cost Provision constitutes an unenforceable restrictive covenant.

115. Edward Jones has engaged in a pattern of unlawful collection efforts, seeking to enforce the Training Cost Provision against former employees regardless of whether the conditions Edward Jones imposed were met.

116. As a direct and proximate result of Defendants' conduct, Plaintiffs and similarly situated Illinois FA Trainees have suffered damages.

## COUNT V

### UNJUST ENRICHMENT

117. Plaintiffs Bland, Durkiewicz, and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate all allegations above as though fully stated herein.

118. Plaintiffs and other similarly situated Illinois FA Trainees developed and serviced client accounts and assets for Edward Jones during their employment, which generated revenues for Edward Jones.

119. After the employment of Plaintiffs and other similarly situated Illinois FA Trainees was terminated, Edward Jones retained the client accounts procured by FA Trainees,

which continued to generate fees and revenues for Edward Jones. Edward Jones did not compensate the FA Trainees for the benefits the Firm retained as a result of the FA Trainees' work and efforts, but instead sought to recover their wages as "training costs."

120.    Edward Jones has thereby been unjustly enriched and Plaintiffs have been harmed.

121.    Under these circumstances, Edward Jones's acceptance and retention of these benefits was inequitable.

## COUNT VI

### MISSOURI MINIMUM WAGE LAW
### MISSOURI ANNOTATED STATUTES § 290.500 *et seq.*

122.    Plaintiffs Bland, Durkiewicz, and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate all allegations above as though fully stated herein.

123.    Edward Jones forced Plaintiffs and all similarly situated FA Trainees to sign FA Employment Agreements agreeing to pay the Firm "training costs" if they left Edward Jones within three years of reaching "can sell" status under certain circumstances.

124.    The FA Employment Agreements state they shall govern the employment relationships and "the rights of the parties." The FA Employment Agreements state they are to be "deemed to be a Missouri contract" and governed by the laws of Missouri.

125.    The Missouri Minimum Wage Law generally requires that employees receive wages of not less than $7.85 per hour. Mo. Ann. Stat. §290.502.

126.    The Missouri Minimum Wage Law further requires that applicable employees receive at least one and a half times their normal rate of wages for any hours worked in excess of 40 hours in a week. Mo. Ann. Stat. §290.503.

25

127.    Payment of training costs has the effect of reducing the income earned by Plaintiffs and similarly situated FA Trainees to fall below the minimum wage and overtime rate required by the Missouri Minimum Wage Law.

128.    Plaintiffs and all similarly situated FA Trainees were recruited by Edward Jones as Financial Advisor Trainees and earned and were paid wages. Plaintiffs and all similarly situated FA Trainees are not exempt from the overtime requirements of the Missouri Minimum Wage Law during the time they held non-exempt positions.

129.    Plaintiffs and all similarly situated FA Trainees worked well in excess of 45-60 hours per week in non-exempt positions.  However, Edward Jones failed to compensate Plaintiffs and all similarly situated FA Trainees beyond their normal rate of pay on weeks they worked over 45-60 hours.

130.    As a direct and proximate result of Defendants' conduct, Plaintiffs and all similarly situated FA Trainees have been underpaid for the work they performed for Edward Jones.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and all others similarly situated respectfully request that this Court find against Edward Jones and order the following relief:

a.    Certify this case for collective and class action treatment, authorize notice, and equitably toll FLSA limitations periods;

b.    Designate Plaintiffs as Class Representatives for the proposed collective and class action and the proposed classes and designate Plaintiffs' counsel as Class Counsel;

c.     Rescind the Training Cost Provision, permanently enjoin Edward Jones from seeking to enforce it, rescind any releases executed in Defendants' favor in connection with their efforts to collect "training costs," and grant restitution and compensation to Plaintiffs and all others similarly situated for damages, including reasonable attorneys' fees and costs, caused by Defendants' unlawful collection efforts;

d.     Declare that Defendants' conduct, policies, and practices are unlawful and constitute willful violations of the Fair Labor Standards Act and the Illinois and Missouri wage laws set forth above;

e.     Award Plaintiffs and all others similarly situated the amount of their losses suffered, including any unpaid wages owed;

f.     Award Plaintiffs and all others similarly situated liquidated damages;

g.     Award Plaintiffs and all others similarly situated statutory interest and/or penalties;

h.     Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Edward Jones's unlawful conduct;

i.     Award Plaintiffs and all others similarly situated prejudgment and post-judgment interest and attorneys' fees and costs as provided by law;

j.     Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive, and legal relief as this Court deems just and proper; and

k.     Award Plaintiffs and all others similarly situated such other relief as is available under applicable law and this Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure.

Respectfully submitted on behalf of Plaintiffs and those
similarly situated,

s/ *George S. Robot*
STOWELL & FRIEDMAN, LTD.

George S. Robot
Linda D. Friedman
Suzanne E. Bish
STOWELL & FRIEDMAN, LTD.
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Grobot@sfltd.com
Lfriedman@sfltd.com
Sbish@sftld.com

<u>CERTIFICATE OF SERVICE</u>

I, George S. Robot, an attorney, hereby certify that on June 12, 2018, I filed the foregoing

*AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT* via the Court's CM/ECF

system, which caused a copy of the same to be served upon all counsel of record via ECF.


Respectfully submitted,

By: *<u>/s/ George S. Robot</u>*