**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WAYNE BLAND, DANUTA DURKIEWICZ, DAVID BOWLES and ADAM REYES, individually and on behalf of all others similarly situated, | ) ) ) ) ) | Case No. 18-cv-1832 |
| | ) | Judge Robert M. Dow, Jr. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| EDWARD D. JONES & CO., L.P. and THE JONES FINANCIAL COMPANIES, L.L.L.P., | ) ) ) ) | |
| Defendants. | ) ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs Wayne Bland, Danuta Durkiewicz, David Bowles and Adam Reyes ("Plaintiffs") filed this putative collective and class action on behalf of themselves and all those similarly situated against Defendants Edward D. Jones & Co., L.P. and The Jones Financial Companies, L.L.L.P.; alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (Count I) and several Illinois and Missouri statutes. Currently before the Court is Defendants' motion to dismiss [38] Plaintiffs' Amended Class and Collective Action Complaint [35]. For the reasons stated below, Defendants' motion to dismiss [38] is granted. Plaintiff Bowles's claims in Count I are dismissed with prejudice, except as to any claims that relate to the TCR Provision, which are dismissed without prejudice. Plaintiffs' recordkeeping claim in Count I is also dismissed with prejudice. The rest of Count I and Counts II–VI are dismissed without prejudice. Plaintiffs are given until April 15, 2019 to file an amended complaint consistent with this opinion. The case is set for further status on April 23, 2019 at 9:00 a.m. Finally, Defendants' request for oral argument [63] is denied as moot.

I.      **Background**[1]

Plaintiffs are all former Financial Advisors who worked for Defendants and participated in

Defendants' Financial Advisor training program.[2]  [35, ¶¶ 9–13.]  Plaintiffs assert that the terms

of the training program, the wages they received during the training program, and the wages they

subsequently received as financial advisors violate the Fair Labor Standards Act ("FLSA"), 29

U.S.C. § 201 *et seq*., and a host of state laws.  See generally [35].  Many of their claims concern

one of the terms contained within the "Financial Advisor Employment Agreement" that Plaintiffs

and the class they wish to represent were required to execute before beginning their training.[3]  [*Id.*

¶ 15.]

The contract provision in question, which the Court will refer to as the "training cost

reimbursement provision" ("the TCR Provision"), states:

> Upon execution of this Agreement and receipt of your can sell date from Edward
> Jones, you will be a financial advisor of Edward Jones.  If, within three (3) years
> after receipt of your can sell date, your employment with Edward Jones is
> terminated by you or by Edward Jones, you maintain registration of your license
> with FINRA and accept employment with any entity as either an employee or

---

[1]  For purposes of the motion to dismiss, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor.  *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

[2]  While Plaintiffs refer to all those who have had "can sell" status for less than three years as "FA Trainees," [35, at 2 n.1], the Court will refer to those individuals who have achieved "can sell" status, such as Plaintiffs, as financial advisors and will only use "trainees" to refer to individuals who have not yet achieved "can sell" status.

[3]  Plaintiffs do not challenge Defendants' inclusion of a copy of the Financial Advisor Employment Agreement [39-2] and the related compensation agreement [39-3] that each of the Plaintiffs' agreed to with their motion to dismiss. Even if they had, as the Seventh Circuit explained in *188 LLC v. Trinity Indus., Inc.*:

> It is also well-settled in this circuit that "documents attached to a motion to dismiss are considered
> part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.
> Such documents may be considered by a district court in ruling on the motion to dismiss."  *Wright
> v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir.1994).)  * * * While narrow, this exception is
> "aimed at cases interpreting, for example, a contract."  [*Levenstein v. Salafsky*, 164 F.3d 345, 347
> (7th Cir.1998).]

300 F.3d 730, 735 (7th Cir. 2002).  Here, Plaintiff specifically referenced the documents in question.  See [35, ¶ 15; ¶20 ("Edward Jones FA Trainees are paid on a bi-weekly basis pursuant to compensation plan, and each employee receives a schedule of expected compensation shortly after their hire")].  The Court will therefore consider both documents in ruling on the instant motion.

independent contractor engaged in the sale of securities and/or insurance business, you agree to reimburse Edward Jones the reasonable cost of the training Edward Jones has provided you including, but not limited to, the cost of the selection and hiring. * * * You agree that the reimbursable amount bears a reasonable relationship to the computed damages Edward Jones would suffer from a breach by you and that Edward Jones will suffer demonstrable loss as a result of your breach. The amount you agree to reimburse Edward Jones is $75,000.00. There shall be no reduction in the amount of training costs owed by you in the event your employment is terminated during the first year of service as a financial advisor of Edward Jones. This obligation shall be reduced by $9,375.00 for each full quarter year of service beginning the thirteenth month of your employment as a financial advisor of Edward Jones. You must be employed by Edward Jones for each full quarter year in order to have your training cost obligation reduced according to the provisions of this paragraph.

[39-2, ¶ 21.] Each of the Plaintiffs also received a "Compensation Agreement," [35, ¶ 20], that provides a schedule of compensation for both their time as trainees and then as "New Financial Advisors", [39-3].

The training program comprises a 17-week "Study Calendar" period divided into two stages. [*Id.* ¶¶ 17–18.] During the first or "self-study" stage, trainees study for industry licensing exams using written online materials on computers loaned to them by Defendants." [*Id.* ¶ 18.] At the end of that stage, trainees take and must pass the FINRA Series 7 and 66 licensing exams.[4] "Series 7 and 66 licenses are essential to the successful completion of the training program, and FA Trainees must pass the exams on their first try or be fired." [*Id.*]

The second or "door knock" stage, begins with one week of on-site training in either St. Louis, Missouri or Tempe, Arizona, followed by seven weeks of knocking on doors in a designated neighborhood to obtain individuals' contact information. [*Id.* ¶ 19.] This stage ends

---

[4] While Plaintiffs allege that "Series 4 and 66 licenses are essential to the successful completion of the program, [35, ¶ 18], they fastidiously avoid alleging if or when Plaintiffs took them or when they passed. Despite that oversite, the Court infers that Plaintiffs must have taken them during the self-study period and passed given the TRC Provision of which they complain only applies if an individual leaves Defendants' employment, maintains their license, and takes a job that involves selling financial products within three years of receipt of their "can-sell" status. [39-2, ¶ 21.]

with another on-site week, designated as "Evaluation/Graduation," where Defendants determine whether trainees "can sell" to prospective clients. [*Id.*]

During this Study Calendar period, trainees are paid on a bi-weekly basis. [*Id.* ¶ 20.] The trainees also qualify as overtime eligible. [*Id.*] Although Defendants expect trainees to work 45 hours during the first stage and 60 hours during the second stage, the projected bi-weekly pay does not vary between the two periods. [39-3, at 2.] Rather, Defendants adjust the hourly rate between the two periods such that individuals like Plaintiffs are paid an almost identical amount in both periods.[5] [*Id.*] This "projected gross pay" includes the overtime trainees are expected to work. [*Id.*] However, Plaintiffs allege that Defendants neither track nor compensate trainees for the hours that they actually work. [35, ¶ 20.] Plaintiffs further allege that Defendants' policy and practice "knowingly discourages * * * [trainees] from accurately reporting all of the hours they work and fails to pay * * * [trainees] wages and overtime for the work they perform." [*Id.* ¶ 22.]

Upon achieving "can sell" status, trainees become "new financial advisors" and Defendants classify them as overtime "exempt." [35, ¶ 23; 39-3, at 2.] Financial Advisors are salaried, though the salary begins to fluctuate based on performance after four months. [39-3, at 2–3.] However, a financial advisor's salary includes a "minimum guaranteed salary" ("MGS") that does not fluctuate and is paid regardless of performance. [*Id.*] What amount of a financial advisor's salary is composed of MGS "is determined by the applicable federal and state guidelines where [the advisor's] branch is located." [*Id.* at 3.]

As new financial advisors, individuals such as Plaintiffs solicit "door knock" contacts to become clients. [35, ¶ 23.] They receive little training during this period, which primarily constitutes "access to a Regional Trainer and wholesaler presentations by 'preferred partner' firms

---

[5] This "manipulation" involves lowering the "hourly rate" from $14.17 in the first stage, to $9.62 in the second stage. [39-3, at 2.]

4

whose products the Firm pushes [new financial advisors] to sell to clients." [*Id.*] However, their primary duty is to sell financial products. [*Id.*] In fact, Plaintiffs allege that Defendants instructed them to "sell these financial products without regard to the clients' individual needs, financial circumstances, or investment objectives." [*Id.* ¶ 85.] Nor were Plaintiffs placed in job positions "whose primary duty was to perform work directly related to the management or general business operations of Edward Jones or clients * * *." [*Id.* ¶ 86.]

Plaintiffs worked for Defendants at various offices around the country and at various periods between January 2014 and June 2016. [*Id.* ¶¶ 10–13.] They each signed the Financial Advisor Employment Agreement containing the TCR Provision.[6] [*Id.* ¶¶ 35, 43, 52, 61.] Each worked well over 40 hours per week, studying for the industry licensing exams, completing the training program requirements, travelling to St. Louis or Tempe for training, completing whatever tasks were assigned to them in the office, working to develop a network of potential clients, and selling financial products to clients, among other things. [*Id.* ¶¶ 37, 45, 54, 63.] Specifically, each alleges that he or she worked (1) more than 45 hours during the "self-study" stage, (2) more than 60 hours during the "door knock" stage, and (3) more than 40 hours a week after achieving "can sell" status. [*Id.* ¶¶ 38, 46, 55, 64.] Plaintiffs allege that they were never compensated for all the hours that they worked and did not receive the meaningful training and/or "lucrative career" that they were promised. [*Id.* ¶¶ 39–40, 47–48, 56–57, 65–66.] Instead, Plaintiffs allege that they were each constructively discharged or otherwise forced to leave, and that Defendants later demanded that they pay either all or some portion of the $75,000 required under the TCR Provision that

---

[6] Plaintiff Bowles claims to have worked for Defendants from January 2014 until June 2014. As explained below, this places him outside the statute of limitations for FLSA claims.

exceeds the amount they were paid during their entire employment with Defendants. [*Id.* ¶¶ 40–41, 49–50, 58–58, 67–68.][7]

In response to this conduct, Plaintiffs filed this purported collective and class action suit alleging multiple violations of the FLSA and various Illinois and Missouri statutes on March 13, 2018. See generally [1]. On June 12, 2018, Plaintiffs filed an amended complaint further detailing those claims. See generally [35]. On July 10, 2018, Defendants filed the instant motion to dismiss. [38.] The court now resolves the motion.

## II.    Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)) (alteration in original). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). Dismissal for failure to state a claim under Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs'

---

[7] Additional facts are discussed below where relevant to the parties' arguments.

favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Evaluating whether a "claim is sufficiently plausible to survive a motion to dismiss is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011)).

## III. Analysis

Plaintiffs allege five separate violations of the FLSA (Count I), a violation of the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* (Count II), a violation of the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* (Count III), and a violation of the Missouri Minimum Wage Law, V.A.M.S. 290.500 *et seq.* (Count VI). In addition, Plaintiffs seek the rescission of the TCR Provision (Count IV) and the disgorgement of funds under a theory of unjust enrichment (Count V).

### A. FLSA Claims

Plaintiffs allege five violations of the FLSA: (1) that the TCR Provision violated the FLSA's requirement to pay wages "free and clear;" (2) that enforcement of the TCR Provision would result in Plaintiffs' compensation falling below the minimum wage; (3) that Defendants failed to adequately pay the minimum wage or overtime while they were in non-exempt positions;[8] (4) that Defendants misclassified Plaintiffs once they achieved can sell status and therefore failed to pay them overtime; and (5) Defendants failed to keep accurate records. Defendants assert that Plaintiffs have not presented a plausible claim under any of the five theories.

---

[8] Plaintiffs response [59-1, at 20–22 (Section II(A) "Plaintiffs' Overtime Claims are Sufficiently Pled")], only addresses whether Plaintiffs' have adequately alleged that they were entitled to overtime. It does not address whether Plaintiffs also stated a claim for a minimum wage violation. Consequently, the Court understands Plaintiffs as alleging only a failure to pay overtime during the non-exempt period, and not that plaintiffs also failed to receive the minimum wage. In any event, as explained below, Plaintiffs have not sufficiently alleged a minimum wage violation.

### 1. The TCR Provision

The FLSA requires a subject employer to pay its employees a minimum hourly wage, and to compensate its employees at one and one-half time the regular rate for a workweek longer than forty hours. See 29 U.S.C. §§ 206, 207. Pursuant to the FLSA, the Department of Labor has issued regulations requiring that minimum wages be paid "free and clear," *i.e.*:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the [FLSA] will not be met where the employee "kicks-back" directly or indirectly to the employer or another person for the employer's benefit the whole or part of the wage delivered to the employee.

29 C.F.R. § 531.35. Claims under § 531.35 are only cognizable if the effect of the condition complained of would reduce the employee's wages below the statutory minimum. See, e.g., *Franks v. MKM Oil, Inc.*, 2010 WL 3613983, at *4 (N.D. Ill. Sept. 8, 2010) (concluding plaintiff failed to state a claim because she had not pled any facts that the condition she complained of resulted in her earning less than the minimum wage); see also *Brown v. Lululemon Athletica, Inc.*, 2011 WL 741254, at *4 (N.D. Ill. Feb. 24, 2011) (collecting cases holding plaintiffs must allege that their pay fell below minimum wage). Given these rulings, the Court addresses Plaintiffs claims that the TCR Provision places an illegal condition on their pay, [35, ¶¶ 77–78], and that enforcement of the provision would reduce their earnings to below the minimum wage, [*id.* ¶¶ 77–78, 81], together. Defendants move to dismiss both claims on the grounds that Plaintiffs do not have standing to challenge the TCR Provision because they were paid the minimum wage during the entirety of their employment and have not paid any amount since their termination, and that in any event the TCR Provision does not violate the FLSA because it amounts to a loan to cover the training that they received.

8

### a. Plaintiffs lack standing to assert claims under the TCR Provision, and in any event, fail to state a claim

Because it is a threshold issue, the Court must address Defendants' standing argument first.[9]  Article III of the Constitution confines federal courts to adjudicating actual cases or controversies.  U.S. Const. art. III, § 2.  Under Article III, a plaintiff must allege: (1) an injury in-fact; (2) fairly traceable to the defendant's action; that is (3) capable of being redressed by a favorable decision from the court.  *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 514 (7th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The asserted injury must be both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.  *Lujan*, 504 U.S. at 560.  Moreover, a plaintiff must demonstrate standing separately for each form of relief sought.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

At first glance, Plaintiffs' standing appears tenuous.  In all but one of the cases cited by the parties in which a court has reviewed a contract provision similar to the TCR Provision at issue here, the plaintiff had actually been deprived of a concrete dollar amount by the defendant.  See *Gordon v. City of Oakland*, 627 F.3d 1092, 1094 (9th Cir. 2010) ("Gordon paid the City the $5,268.03 it claimed was due" for "'training reimbursement' and 'collection costs.'"); *Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777, 778 (7th Cir. 2002) ("Two Rivers withheld all of Heder's pay from his last two pay periods."); *City of Oakland v. Hassey*, 78 Cal. Rptr. 3d 621, 629 (Cal. Ct. App. 2008), as modified on denial of reh'g (July 15, 2008), as modified (July 17, 2008) (noting the city withheld a plaintiff's final paycheck and a check to cash out his retirement balance

---

[9]  While Defendants do not describe it as such, the Court construes Defendants' standing arguments as a motion to dismiss the relevant claims under Rule 12(b)(1) and thus reviews those arguments under the Rule 12(b)(1) standard. In this case, Defendants have made a facial attack on standing because they assert Plaintiffs allegations are insufficient to establish injury-in-fact.  See *Murphy v. FT Travel Mgmt., LLC*, 2014 WL 1924045, at *1 (N.D. Ill. May 14, 2014). Consequently, the Court need only look to the complaint and "see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." *Id.* (citations and quotation marks omitted).

to cover money owed under a repayment agreement); *Park v. FDM Grp. (Holdings) PLC*, 2017 WL 946298, at *2 (S.D.N.Y. Mar. 9, 2017) ("Plaintiff resigned from her FDM Consultant position * * * and paid a Termination Fee of $20,000 * * *.").  Only one case cited by either party or located by the Court involved a plaintiff without a concrete deprivation. See *Ketner v. Branch Banking and Trust Company*, 143 F.Supp.3d 370 (M.D.N.C. 2015).

In *Ketner*, the named plaintiffs alleged that a provision of their employment contracts nearly identical to the TCR Provision violated the FLSA's minimum wage requirement and sought a declaratory judgment invalidating it.  143 F.Supp.3d at 375–76; see also *Ketner v. Branch Banking and Trust Company*, No. 14-cv-967, Docket Entry 1, ¶¶ 69–72 (M.D.N.C. Nov. 19, 2014). In response, the defendant argued that at least one of the plaintiffs lacked standing because he had not paid any portion of his "loan obligation." *Id.* at 382.  The court rejected that argument, noting that (1) the plaintiff disputed the validity of the contract, (2) the defendant's law firm had sent plaintiff letters demanding payment and threatening legal action if payment was not forthcoming, and (3) the defendant had previously enforced the provision in question and actually recovered money.  *Id.* at 383.  The court concluded that these facts undermined any concerns that the plaintiff's injury was speculative or hypothetical and that based on the facts alleged, the plaintiff had "'an objective and reasonable apprehension of future litigation' regarding his alleged payment obligations under the [Agreement]."  *Id.* at 383 (citation omitted).  The plaintiff therefore had standing.

Whether a plaintiff has "an objective and reasonable apprehension of future litigation" is one of the standards used by the Fourth Circuit to determine if a plaintiff has standing under the Declaratory Judgment Act ("DJA), 28 U.S.C. § 2201.  See *Energy Recovery, Inc. v. Hauge*, 133 F. Supp. 2d 814, 817 (E.D. Va. 2000).  Thus, it appears that North Carolina district court relied on

10

the Fourth Circuit's jurisprudence regarding declaratory judgments to determine whether the *Ketner* plaintiffs had standing. Given that the Supreme Court has held that "the 'actual controversy' requirement of the Declaratory Judgment Act is coextensive with the 'case or controversy' standard for determining whether the Court has jurisdiction under Article III," see *Deutsche Leasing USA, Inc. v. Hamps Enterprises, LLC*, 2015 WL 536010, at *3 (N.D. Ill. Feb. 6, 2015) (citing *MedImmune*, 549 U.S. at 126–27), the Court elects to do the same, especially in view of Plaintiffs' request for a declaration that "Defendants' conduct, policies, and practices are unlawful and constitute willful violations of the [FLSA] * * *." [35, at 27 ¶ d.] The question therefore is whether the allegations demonstrate that there is "'a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *Bell v. Taylor*, 827 F.3d 699, 711 (7th Cir. 2016) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)).

Here, Plaintiffs have alleged that Defendants sent some form of communication stating that they owe or demanding that they pay $75,000 as provided for by the TCR Provision, [35, ¶¶ 41, 50, 59], the validity of which Plaintiffs clearly dispute. However, unlike in *Ketner*, Plaintiffs have not alleged any facts suggesting that Defendants have (1) taken any steps to bring litigation against them, (2) ever actually collected money from individuals pursuant to the TCR Provision, or (3) even expressly threatened to file suit.[10] The absence of any such allegations places this case precariously close to the limits of this Court's jurisdiction. See *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002) ("[A] declaratory judgment plaintiff must be able to show that the feared lawsuit from the other party is immediate and real, rather than merely speculative."). As the

---

[10] Although Plaintiffs allege "Edward Jones's harassing conduct compels FA Trainees either to hire counsel or pay extortionate sums or both," [35, ¶ 30], there is not one allegation that any individual has actually paid $75,000 or any amount close to that or engaged an attorney (outside of this lawsuit). The absence of any specific instances in which any Plaintiff has retained counsel undermines the force of the general allegation set out in paragraph 30.

Seventh Circuit has explained, "the threat of suit, however immediate, is not by itself sufficient for the invocation of the federal power to issue a declaratory judgment." *Id.* Because Plaintiffs' allegations amount to little more than an avowal of their fear of litigation, the Court cannot conclude that they have alleged enough to invoke the Court's jurisdiction. There is—at least presently—no concrete harm, and the threat of that harm is too speculative on the facts as Plaintiffs have alleged. In fact, Defendants may never file suit against Plaintiffs for fear that the TCR Provision could be struck down under state law as unconscionable or on other grounds.

Plaintiffs invocation of the Supreme Court's decision in *Medimmune, Inc. v. Genetech, Inc.* 549 U.S. 118, 127–28, 137 (2007), does not alter the Court's conclusion. In *Medimmune*, the Court considered whether a licensee could sue for a declaratory judgment challenging the validity of the patent underlying its contract with the licensor, when the licensee continued to perform and benefit from that contract. 549 U.S. at 127–37. That case is readily distinguishable from this case. If Plaintiffs were still employed by Defendants and wished to leave, but did not do so on account of the TCR Provision, then *Medimmune* would support a lawsuit for a declaratory judgment.[11] Here, Plaintiffs have already left Defendants' employ and now challenge the validity of the TCR Provision, purportedly in fear of imminent litigation against them to enforce the provision. Based on the facts currently before it, this suit appears to be "a tactical device whereby a party who would be a defendant in a coercive action may choose to a be plaintiff by winning the proverbial race to the courthouse." *Hyatt*, 302 F.3d at 712.

---

[11]  However, Plaintiffs' assertion that they have alleged an injury because Defendants used the threat of the TCR Provision to force them to work long hours, [35, ¶ 3], does not give them standing to challenge the TCR Provision. If Plaintiff's worked overtime hours for which they did not receive compensation, then they have a claim for insufficient wages which the Court examines in Sections III(A)(2–3), not a suit to invalidate a provision that no longer applies to them given that they are no longer in Defendants' employ.

Turning to the substance of Plaintiffs' claims, Defendants maintain that *Heder* and *Gordon* should control the outcome in this case and require concluding in their favor. [62, at 2–6.] Plaintiffs argue that *Heder* actually supports their position, and that in any event this Court should follow the analysis laid out in *Ketner*, which questioned the applicability of *Heder* and viability of *Gordon.*

In *Heder*, the Eastern District of Wisconsin and then the Seventh Circuit evaluated the validity of an agreement between the City of Two Rivers and the city's firefighters under Wisconsin law. *Heder v. City of Two Rivers*, 149 F. Supp. 2d 677 (E.D. Wis. 2001); *Heder*, 295 F.3d at 778, 780–83. As part of the agreement in *Heder*, Two Rivers agreed to pay for the city's firefighters' paramedic training but required any individual who left the department before three years of service to repay the city for (1) the training, (2) any overtime wages received due to that training, and (3) any premium wages the firefighter earned as a result of that training. 149 F. Supp. 2d at 688. The district court, describing the contract term as a "liquidated damages" provision, held that the provision was unenforceable as to the wage repayment because it violated the FLSA, but noted that the portion "'equal to the cost of tuition, books, and other training costs for the paramedic training' [was] not problematic * * *." *Id.* at 693–94. Nonetheless, the district court invalidated the entire provision under Wisconsin law because the agreement did not reduce the amount due over time. *Id.* at 693.

At the Seventh Circuit, the city conceded that Heder was entitled to keep "any compensation that the FLSA specified as a statutory floor below which no contract may go." *Heder*, 295 F.3d at 779. Thus, he was entitled to "at least the statutory minimum wage for his final two pay periods," the paychecks for which the city had previously withheld as payment for the training costs, and other liquidated damages. *Id.* at 778–79. However, the court also noted that

13

the City was entitled to collect any residual amount as an ordinary creditor, *i.e.* the City could collect from any difference between the statutory minimum and the total of the paychecks. *Id.* After addressing the proper way to determine the amount to which the plaintiff was entitled, the court of appeals turned to the district court's conclusion regarding the viability of the training costs provision under Wisconsin law. The Seventh Circuit reversed the district court's conclusion that the training cost reimbursement provision amounted to a non-compete agreement, reasoning that the "cost of training equates to the loan, repayment of which is forgiven after three years." *Id.* at 782. The court therefore concluded that Heder could be required to pay for the "full costs of his books and tuition" under state law. *Id.* However, the court reiterated that to the extent to which the collection of those training costs reduced plaintiff's overtime pay in his final two paychecks to less than time and a half for all his overtime hours, the collection was invalid. *Id.*

Relying on *Heder*, the Ninth Circuit in *Gordon* concluded that the money that a police officer paid to the defendant city pursuant to a training reimbursement agreement did not constitute an illegal kickback under the FLSA. 627 F.3d at 1093, 1095–96. The court focused on *Heder's* comment that "[a]s long as the city paid departing firefighters at least the minimum wage, it could collect the training costs as an ordinary creditor." *Id.* at 1096 (citing 295 F.3d at 779). The Ninth Circuit relied on this principle to conclude that because the City of Oakland had paid Gordon at least the minimum wage for her final week of work, it was free to seek repayment of her "training debt" as an ordinary creditor. *Id.*

The few district courts that have examined both *Heder* and *Gordon* have split in regard to whether a tuition reimbursement provision such as the one at issue here is actionable as a matter of law. In *Ketner*, the court concluded that *Heder* was inapposite as it had not actually held such an agreement was acceptable under the FLSA and that *Gordon*'s reliance on *Heder* was therefore

14

misplaced.  143 F. Supp. 3d at 383.  It further distinguished the two cases noting that the training at issue in *Ketner* was employer specific, while *Heder* and *Gordon* both involved training that provided portable skills.  *Id.* at 383–84.  The court also noted that the damage amount at issue (~$36,000) was significantly more than that at issue in *Gordon* ($8,000) and *Heder* ($1,500) before denying the defendant's motion to dismiss.  *Id.*  The court noted that "factual development" would "determine whether the costs of training for the LDP is a bona fide loan as asserted by [Defendant] or a kick-back of salary."  *Id.* at 384.

By contrast, *Park v. FDM Grp. (Holdings) PLC* held that a "termination fee" which required a payment if an individual left within a certain amount of time after the completion of her training did not violate the FLSA.  2017 WL 946298, at *4 (S.D.N.Y. Mar. 9, 2017). Like the TCR Provision at issue here, the contract in *Park* characterized the termination fee as liquidated damages approximating the damages the defendant would suffer if the employee breached the agreement prior to the end of the contracted period.  *Id.*  Additionally, the maximum fee of $30,000 corresponded to the maximum value of the training provided and the agreement included the plaintiff's specific "acknowledgement that the Company incurred significant costs in training the employees and that the two-year term was contracted in consideration of such costs."  *Id.*  Nor was the fee "a deduction for tools used or costs incurred in the course of [p]lainitff's performance of her job as a consultant."  *Id.*  Finally, the court noted that "[s]uch liquidated damages provisions in employment agreements are not unusual, and even those that are explicitly tied to repayment of the costs of a training program have been upheld as akin to loan repayment provisions."  *Id.* (citing *Gordon*, 627 F.3d at 1096, *Heder*, 295 F.3d at 783).  Thus, the court dismissed plaintiff's claim. *Id.*  On Plaintiff's motion for reconsideration, the *Park* court specifically rejected Plaintiff's arguments that the court should view *Ketner* as more persuasive than *Gordon* and denied her

request for leave to file an amended complaint. *Park v. FDM Grp., Inc.*, 2018 WL 4100524, at *4 (S.D.N.Y. Aug. 28, 2018).

This Court elects to follow *Park*, *Gordon*, and especially *Heder*, which constitutes controlling authority in this Circuit. As in *Park*, Plaintiffs explicitly agreed that the reimbursable amount "bears a reasonable relationship to the computed damages Edward Jones would suffer from a breach by you and that Edward Jones will suffer demonstrable loss as result of your breach." [39-2, ¶ 21.] Although the Court is somewhat skeptical that the actual costs of training totaled $75,000—especially considering that the contract explicitly notes that the $75,000 includes "the cost of selection and hiring"—the Court cannot infer from the contract that Defendants seek reimbursement for the tools of the trade or costs incurred in the performance of Plaintiffs' jobs. [*Id.*] Nor is this case like *Heder*, in which the city withheld paychecks from the plaintiff and where the liquidated damages provision expressly attempted to claw back the compensation paid to the plaintiff.

Rather, like the tuition reimbursement provision of *Heder*, instead of requiring employees to pay for all the necessary training out of their own pocket, Defendants made an investment in their employees, but required the employees to repay at least part of that investment if they left before the company felt it had recouped fair value for its investment—which the company determined to take place over time at the rate of a 1/8 reduction in Plaintiffs' obligation every quarter they remained employed after the first year. [39-2, ¶ 21.] Moreover, unlike the purported training in *Ketner*, the training here did result in Plaintiffs' receiving portable credentials—namely, Series 7 and 66 licenses. [35, ¶¶ 18, 38, 46, 55.]

At bottom, the contract and the parties' performance pursuant to it resulted in Plaintiffs' accrual of a debt that Defendants are entitled to collect. See *Heder*, 295 F.3d at 782. Plaintiffs

have not cited, nor has this Court located, any case that suggests employers may not act to collect a debt incurred for an employee's benefit at the termination of their employment on the basis that such a collection is a kickback that would reduce Plaintiffs' wages below the statutory minimum. In fact, courts have held just to the contrary. See, e.g., *Vazquez v. Tri-State Mgmt. Co.*, 2002 WL 58718, at *5 (N.D. Ill. Jan. 14, 2002) (counterclaim against employee to recover on loan used to purchase a vehicle for the employee's use, at the employee's request, was not an impermissible set-off under § 531.35). Moreover, Defendants never reduced Plaintiffs wages below the minimum wage while they were employed, so all the case law stating an employer may not do so is inapposite. See, e.g., *Calderon v. Witvoet*, 999 F.2d 1101, 1107 (7th Cir. 1993) (noting employers "may not reduce the wage below the statutory minimum to collect a debt to the employer").

All the arguments that Plaintiffs raise against the TCR Provision—that $75,000 does not bear a rational resemblance to the costs Defendants actually incurred in their training, that Defendants used the threat of the TCR Provision to force Plaintiffs to work extra allegedly uncompensated time, *etc.*, see, e.g. [35, ¶¶ 24, 26]—are either potential defenses to the enforcement of the contract that Plaintiffs could raise if and when Defendants attempt to enforce the provision or possible reasons to invalidate the contract as a matter of state law. They are not reasons to find that the TRC Provision violates the FLSA. The TCR Provision does not violate the FLSA because it is not a kickback, but rather constitutes to a loan that Plaintiffs' accrued when they achieved "can sell" status. Consequently, any payment under the TCR Provision is not a kickback that would reduce the Plaintiffs' wages to below the statutory minimum wage.

Because Plaintiffs do not have standing to challenge the TCR Provision, and in any event fail to state a claim, the Court grants Defendants' motion as to Plaintiffs' claims in Count I

regarding the TCR Provision. However, because the Court concludes that Plaintiffs lack standing based on the complaint as pled, the dismissal is without prejudice and with leave to replead.

### 2. Failure to Pay Minimum Wage & Overtime Prior to Achieving "Can sell" status

Plaintiffs also assert that they and all those similarly situated worked well in excess of 45–60 hours per week in the non-exempt positions and were not paid the minimum wage or overtime for those hours.[12] [35, ¶¶ 79–80.] Defendants respond that Plaintiffs allegations are too impermissibly vague and conclusory to state a claim.

### a. Plaintiffs fail to state a minimum wage claim

"Courts generally construe FLSA * * * wage claims to apply to the work-week unit." *Hughes v. Scarlett's G.P., Inc.*, 2016 WL 4179153, at *2 (N.D. Ill. Aug. 8, 2016). Therefore, to determine whether an employer has violated the minimum wage provision of the FLSA:

> [C]ourts uniformly calculate the hourly wage over the course of a workweek—*i.e.*, dividing the total compensation an employee received in a workweek by the compensable hours worked. Although the Seventh Circuit has not expressly addressed this issue, every circuit court that has considered the issue has utilized the workweek averaging approach to determine whether a FLSA violation occurred.

*Hirst v. Skywest, Inc.*, 2016 WL 2986978, at *5 (N.D. Ill. May 24, 2016) (collecting cases and regulations). "To state a FLSA claim under the workweek averaging approach, then, the plaintiffs must plausibly allege at least one workweek for which the compensation they received, divided by their total compensable time, failed to meet the FLSA minimum [hourly] wage." *Hughes*, 2016 WL 4179153, at *2 (quoting *Hirst*, 2016 WL 2986978 at *6). In both *Hirst* and *Hughes*, the plaintiffs failed to meet this standard because they did not include in their complaint any

---

[12] In view of Plaintiffs' allegations that they worked more than the amount of hours set out by the training schedule set by Defendants and thus were not paid sufficient wages or overtime [see, e.g., 35, ¶¶ 22], the Court infers that Plaintiffs contend that the number of hours they worked, divided by their wages for that week, resulted in a per-hour pay of less than the minimum wage. Consequently, the Court has evaluated Plaintiffs' claim under the "workweek averaging approach."

allegations concerning their "hourly wages or any examples of the total compensation they received for any workweek" or concerning "the number of hours worked in any given week." *Hughes*, 2016 WL 4179153, at *2–3 (citing *Hirst*, 2016 WL 2986978, at *6).

As in *Hirst* and *Hughes*, Plaintiffs have not provided a single allegation regarding what the Plaintiffs' effective hourly wages were during the relevant period, nor have they introduced any examples of the total compensation they received during any given workweek. Instead, they simply allege that they worked more than the hours that the training schedule called for, and that Defendants failed "to pay non-exempt FA Trainees wages and overtime for work they perforem[ed]." [35, ¶ 22.] The mere allegation that an individual did not receive compensation for all the hours that they worked is insufficient to state a FLSA violation. See *Hirst*, 2016 WL2986978 at *6. If Plaintiffs truly contend that Defendants failed to pay them the minimum wage, they need to allege facts to support a plausible claim that their effective hourly wages fell below the statutory minimum wage for at least one period. See, e.g., *Labriola v. Clinton Entm't Mgmt., LLC*, 2016 WL 1106862, at *4 (N.D. Ill. Mar. 22, 2016) ("The complaint must allege, at a minimum, the hours worked for which plaintiff seeks unpaid minimum wages, and what wages, if any, were paid. The complaint passes this threshold for both Plaintiffs by including specific factual details, such as the approximate dates Plaintiffs worked at Pink Monkey and the number of hours they worked each week for which they received no wages.").

### b. Plaintiffs fail to state an overtime claim

Similarly, to state a claim under the FLSA for failure to pay overtime, courts in this district generally require a plaintiff to plead some details beyond a bare allegation that he or she worked more than 40 hours without premium pay. See *Trujillo v. Mediterranean Kitchens, Inc.*, 2017 WL 2958240, at *1 (N.D. Ill. July 11, 2017); *Hughes*, 2016 WL 4179153, at *2 (collecting cases). The

19

question is just how many more details are needed to make a claim plausible. While a plaintiff need not "plead infinitesimal details to render [FLSA] claims plausible or provide defendants fair notice of the claims against them," *Brown v. Club Assist Rd. Serv. U.S., Inc.*, 2013 WL 5304100, at *6 (N.D. Ill. Sept. 19, 2013), he or she must still "provid[e] some specific facts to ground those legal claims." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Thus, this Court, other courts in this district, and several courts of appeals have instructed that to state a claim for failure to pay overtime, "'a plaintiff must sufficiently allege forty hours of work in a given workweek as well as some uncompensated time in excess of forty hours.'" *Parks v. Speedy Title & Appraisal Review Servs.*, 318 F. Supp. 3d 1053, 1069 (N.D. Ill. 2018) (quoting *Silver v. Townstone Fin., Inc.*, 2015 WL 1259507, at *2 (N.D. Ill. Mar. 17, 2015); see also *Trujillo*, 2017 WL 2958240, at *1; *Hughes*, 2016 WL 4179153, at *3; *DeJesus v. HF Management Services*, 726 F.3d 85, 89 (2d Cir. 2013) (allegations that plaintiff worked over forty hours in "some or all weeks" insufficient because at least one given week must be alleged); *Pruell v. Caritas Christi,* 678 F.3d 10, 12 (1st Cir. 2012) (allegation that plaintiffs "regularly worked" more than 40 hours a week insufficient).

Plaintiffs allegations do put Defendants on notice of the time periods during which Defendants failed to properly compensate them. Although Plaintiffs do not state the exact time periods at issue, it would be easy to determine the exact eight weeks that each of the Plaintiffs spent in the "study stage" and the nine weeks each participated in the "door-knocking" stage of their training with Defendants. However, Plaintiffs specifically allege that "Edward Jones neither tracks nor compensates FA Trainees[13] for the hours they actually work." [35, ¶ 20.] Rather,

---

[13] As mentioned earlier, see *supra* n.2, it is difficult to know who exactly Plaintiffs are referring to in this allegation, given they define FA Trainee as anyone within three years of their "can sell" date to whom the TCR Provision applies, including those who have achieved "can sell" status and are therefore classified as exempt.

Defendants apparently provide a study schedule which assumes that trainees will work 45 hours a week during the "self-study period" and 60 hours a week during the "door knock" stage. [35, ¶ 21.] Defendants then allegedly "manipulate[ ] the 'hourly rate' for each stage [—by substantially reducing the hourly rate from one stage to the next—] so the FA Trainee's gross pay does not vary from one stage of the Study Calendar to the next, despite the assumed increase in overtime during the "door knock" stage." [*Id.* ¶ 21.] Notably, Plaintiffs do not explain or assert why this "manipulation" violates the FLSA. Instead, they allege that "[under] its policy and practice, Edward Jones knowingly discourages non-exempt FA Trainees from accurately reporting all of the hours they work and fails to pay non-exempt FA Trainees wages and overtime for the work they perform." [*Id.* ¶ 22.] They further allege that "FA trainees often put in long days of study, including weekends, that easily exceed 45 hours per week." [*Id.* ¶ 18.] Plaintiffs thus allege that they worked more than the 45 and 60 hours, respectively, that the study schedule called for and as a result were not adequately compensated. See [*id.* ¶¶ 38, 46, 55, 64.]

While this approaches the detail required to place Defendants on notice of a plausible claim, it is not quite sufficient to state a claim. Compare *Brown*, 2013 WL 5304100, at *6 (plaintiffs adequately pled an overtime claim where they asserted that "since July 2009, they have worked an average of 85 hours per week but have not been properly compensated for that time."), and *Hancox v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 2018 WL 3496086, at *3 (N.D. Ill. July 20, 2018) (finding that plaintiff adequately stated a claim for overtime pay where she alleged that for a two-year period "she worked more than 40 hours in a workweek during 30 to 35 pay periods" and "was never paid proper overtime wages"), with *Parks*, 318 F.Supp.3d 1053, at 1069 ("Here, Plaintiff generally alleges that she worked overtime without sufficient pay. * * * She also states her dates of employment and her approximate salary during that timeframe. * * * However,

Plaintiff does not allege how many hours she worked in a week (and whether or not this was over forty hours) or how many overtime hours she worked without being paid the proper salary. Without such allegations, Defendants are not on notice of the factual basis for her FLSA claim.") (internal citations omitted), and *Hughes*, 2016 WL 454348, at *5 (holding insufficient plaintiffs' claim that "'[a]t such times as Plaintiffs worked more than forty hours in a week, they were not paid time and a half.'"), and *Pruell*, 678 F.3d at 13 (allegation that "[t]hroughout their employment with defendants, Plaintiffs regularly worked hours over 40 in a week and were not compensated for such time, including the applicable premium pay" was insufficient to state a claim), and *Dejesus*, 726 F.3d at 89 (allegation that "in 'some or all weeks' [plaintiff] worked more than "forty hours" a week without being paid '1.5' times her rate of compensation" insufficient to state a claim). Plaintiffs allegations are hard to distinguish from those dismissed in *Parks*, *Hughes*, *Pruell*, or *Dejesus*.

*Brown* or *Hancox* do not support a different conclusion. In *Brown*, the contracts at issue called for individuals to be on call for "17.5 hour shifts, seven days a week," and each of the individuals asserted that they "typically work or worked at least 85 hours a week" and that they were never paid any overtime. 2013 WL 5304100, at 3. Likewise, in *Hancox*, Judge Tharp noted that the plaintiff's allegations were nearly insufficient given her generalized allegations. 2018 WL 3496086, at *3. To support her claim plaintiff had just alleged that "she worked more than 40 hours in a workweek during 30 to 35 pay periods;" nonetheless, her claim survived because she also alleged: (1) she was paid time and half her minimum guaranteed rate, rather than time and a half her regular rate as required by the FLSA; (2) the defendant withheld her commission wages when she worked more that 40 hours; and (3) she alleged the specific practices that caused her to work during unpaid meal breaks. *Id.*

22

By contrast, Plaintiffs simply allege that "[u]nder its policy and practice, Edward Jones knowingly discourages non-exempt FA Trainees from accurately reporting all of the hours they work" [35, ¶ 22], and that Plaintiffs accordingly did so [*id.* ¶¶ 38, 46, 55, 64]. However, Plaintiffs do not allege any facts detailing what, if any, specific pressure or policies led Plaintiffs to underreport their time,[14] nor do they provide even one example of a week in which they worked more than 45 hours and/or were not paid sufficient overtime. Defendants' compensation scheme may be condemnable, or manipulative, but based on the facts before it, the Court cannot conclude that Plaintiffs have plausibly alleged a violation of the FLSA's overtime requirements. Plaintiffs need to provide more details about what they were or were not paid, and at least one example of a pay period in which their pay was insufficient given the number of hours they worked.

### 3. Misclassification of "Can sell" Status

Plaintiffs also allege that they are entitled to overtime after they achieved "can sell" status and began working as financial advisors because Defendants' misclassified them as non-exempt. Defendants argue that Plaintiffs were not misclassified, and that in any event, Plaintiffs have not adequately alleged that they worked overtime during the relevant period.

As explained above, the FLSA generally requires employers to pay employees overtime for any hours worked over forty hours in a given week. 29 U.S.C. § 207(a). That requirement does not apply, however to employees working in "a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Here, the parties dispute whether Plaintiffs and those similarly situated qualify for the "administrative exemption." The administrative exemption exempts employees

---

[14] The generalized allegation that Plaintiffs worked excessive hours out of fear that they would be fired and therefore subject to the TCR Provision, can only support Plaintiff's claims after they achieved "can sell" status and therefore exempt from overtime requirements, given the requirements of the TCR Provision do not attach until one achieves "can sell" status.

(1) [who are] [c]ompensated on a salary or fee basis at a rate not less than $455 per week * * * exclusive of board, lodging or other facilities;

(2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1)–(3). Plaintiffs allege that Defendants misclassified them as exempt because the position they received once they achieved "can sell" status failed to meet either the "salary basis test" or "the job duties test" and that they are therefore owed overtime wages.

Generally, affirmative defenses—such as an employee's classification as exempt in the FLSA context—do not justify dismissal under Rule 12(b)(b). See *Doe v. GTE Corp.,* 347 F.3d 655, 657 (7th Cir. 2003). However, this rule does not apply when a party has included in its complaint "facts that establish an impenetrable defense to its claims." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1086 (7th Cir. 2008). "If the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief." *Id.*; see also *Hecker v. Deere & Co.,* 556 F.3d 575, 588 (7th Cir. 2009) (affirming dismissal of claims because complaint "so thoroughly anticipated" an affirmative defense that dismissal was appropriate). In this case, Plaintiffs have put Defendants' exemption defense "in play" by necessity. *Hecker,* 556 F.3d at 588. In addition to their claims for overtime during their non-exempt employment addressed above, Plaintiffs assert Defendants should have continued to pay them overtime once they achieved "can sell" status because they were misclassified as "exempt" under both the "salary basis" and "job duties" tests.

### a.     Plaintiffs' fail to allege that they worked overtime

Before examining either of those claims, however, the Court must determine whether Plaintiffs' have adequately alleged that they worked overtime once they were classified as exempt

24

given that for the affirmative defense to apply there must have been an underlying offense.  See, e.g., *Ottaviano v. Home Depot, Inc.*, *USA*, 701 F.Supp.2d 1005, 1007–08 (N.D. Ill. 2010) (proceeding to determine whether the plaintiffs were properly classified as exempt after noting the plaintiffs' allegation that defendant "terminates ASMs who regularly work less than the fifty-five hours for which they are scheduled").

Under the standard elaborated above in Section III(A)(2), Plaintiffs have not alleged an overtime claim for the time that they worked after attaining "can sell" status.  Plaintiffs simply allege (1) that they "routinely worked in excess of 40 hours per week after their 'can-sell' date, without receiving proper overtime pay" and (2) that each Plaintiff "[a]fter achieving 'can-sell' status, * * * continued to work long hours, well in excess of 40 hours per week * * *."  [35, ¶¶ 24, 38, 46, 55, 64.]  As the Court previously explained, without more, such formulaic and conclusory allegations are simply not enough to state a claim for overtime.  Moreover, even if Plaintiffs had properly alleged an overtime violation after Plaintiffs achieved "can sell" status, they have not yet alleged facts to show that they were misclassified as exempt.

> **b.    Plaintiffs' allegations do not show they fail the salary basis test**

Plaintiffs allege that they were not paid a guaranteed, predetermined salary within the meaning of the regulations above because (1) Defendants "paid Plaintiffs and those similarly situated wages on the condition that Plaintiffs and those similarly situated pay 'training costs' up to $75,000 under certain circumstances" and (2) Plaintiffs' "wages were subject to reduction because of alleged variations in the quality or quantity of work performed."  [35, ¶¶ 84–85.]

First, as explained above, the TCR Provision has no effect vis-à-vis the FLSA's wage and hours requirements.  It is not a kickback of Plaintiffs' salaries, but a contractual debt owed by

Plaintiffs. Thus, Plaintiffs cannot show that they fail the salary basis test by claiming their employment was subject to the TCR Provision.

Plaintiffs' citation to *Ketner* and the Department of Labor Opinion Letters that it addressed are unavailing. First, the Court has already explained why it disagrees with *Ketner*'s conclusion that the TCR Provision constitutes a kickback with implications under the FLSA. See Section III(A)(1) *supra*. Additionally, the Department of Labor Opinion Letters on which *Ketner* relied and that the additional letters cited by Plaintiffs also are unpersuasive. Each of the letters involved either a purposed deduction from an employee's paycheck to recover a previous payment that the DOL concluded did not constitute a loan or other inapposite situation. See U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Nov. 27, 2006), 2006 WL 3832994, at *7 n.5 ("What matters is that the employee receives no less than the weekly-required amount as a guaranteed salary constituting all or part of total compensation, which amount is not subject to reduction due to the quality or quantity of the work performed, and that the employee is never required to repay any portion of that salary even if the employee fails to earn sufficient commissions or fees"); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Mar. 10, 2006), 2006 WL 940663, at *1–2 ("deductions from the salaries of otherwise exempt employees for the loss, damage, or destruction of the employer's funds or property due to the employees' failure to properly carry out their managerial duties * * * would defeat the exemption * * *"); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Feb. 20, 2001), 2001 WL 1558760, at *1–2 (concluding that the two programs at issue were both incentive programs, and not bona fide loans or cash advances, which precluded the company from deducting amounts related to those programs from the pharmacists' last paychecks).

As explained above, nothing in *Ketner* or the DOL letters examined above convinces the Court that it should treat the TCR Provision as a kickback of the Plaintiffs' salaries designed to punish them if they failed to perform to a certain level. Rather, it is an education loan which only requires repayment if an individual attempts to use that education for the benefit of a competitor. As explained above, an employer may enforce such a provision without falling afoul of the FLSA. Plaintiffs therefore cannot ground their salary basis challenge on the TCR Provision.

Plaintiffs' second allegation likewise fails to plausibly allege that their compensation did not meet the salary basis test. While Plaintiffs reference a compensation plan in their complaint and allege that their compensation was contingent on performance and decreased within a few months of achieving "can sell" status during the transition to commission pay [35, ¶¶ 20, 23], that compensation plan—which Defendants attached to their motion—provides that Plaintiffs' compensation shall never fall below $455 a week. [39-3, at 3 (explaining that Plaintiffs are guaranteed at least $23,660 annually, or $455 a week).] The Court may properly consider such an exhibit attached to a motion to dismiss, *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014), and where those exhibits contradict the complaint allegations, "the exhibits trump the allegations." *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010). Consequently, the Court cannot conclude that the compensation plan set in place for Plaintiffs failed to meet the salary basis test.[15]

### c. Plaintiffs' allegations do not show they fail the job duties test

Plaintiffs allege that they do not meet the job duties test because their primary duties "did not include the exercise of discretion and independent judgment with respect to matters of

---

[15] In fact, the DOL held an almost identical compensation system for similarly situated individuals valid under the FLSA in one of the DOL opinion letters cited by Plaintiff. See U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Nov. 27, 2006), 2006 WL 940663.

significance." [35, ¶ 85.] Rather, they were encouraged "to sell [ ] financial products without regard to the clients' individual needs, financial circumstances, or investment objectives." [*Id.*] Specifically, they were instructed to sell financial products, mostly Defendants' proprietary products and those pre-picked and designated as "preferred product partners," which generated additional fees for Defendants. See [*id.* ¶¶ 2–3]. Nor did Defendants place "Plaintiffs * * * in job positions whose primary duty was to perform work directly related to the management or general business operations of Edward Jones or its clients * * *." [*Id.* ¶ 86.] Plaintiffs assert that these allegations are enough to show that they did not perform such duties that would qualify them to be classified as exempt.

First, as the cases cited by Defendants show, determining whether an individual's actual job duties meet the requirements of the administrative exemption is a factually intense process. See, e.g., *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, 2017 WL 772904, at *7–8 (D.N.J. Feb. 28, 2017) (examining the exact details of the plaintiffs' responsibilities on a motion for summary judgment); *Tsyn v. Wells Fargo Advisors, LLC*, 2016 WL 612926, at *4–17 (N.D. Cal. Feb. 16, 2016) (same); *Hein v. PNC Fin. Services. Grp., Inc.*, 511 F. Supp. 2d 563, 566, 570–75 (E.D. Pa. 2007) (same). Likewise, the exemption status of an employee is an affirmative defense that employers bear the burden of proving. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945); *Jackson v. Go-Tane Servs., Inc.*, 56 F. App'x 267, 270 (7th Cir. 2003). However, as explained above, Plaintiffs themselves have placed their classification at issue and alleged facts to support their claim that they were misclassified.

Both cases cited by Plaintiffs for the proposition that their allegations are sufficient to plausibly state a misclassification claim contained more factual allegations than are present here. In *Lloyd v. J.P. Morgan Chase*, the plaintiffs put forward a declaration that detailed their typical

day to day duties. 2013 WL 4828588, at *1–2. The *Lloyd* plaintiffs even included allegations about the physical spaces in which worked, *i.e.* the defendant bank's physical branches. *Id.* at *1. Likewise, in *Blum*, the plaintiffs alleged that they were engaged primarily in "lead generation activities: identifying protentional clients, calling protentional clients, and conducting appointments with potential clients to encourage them to do business * * *." *Blum v. Merrill Lynch & Co.*, No. 15-cv-1636, ECF. No. 1, ¶ 67 (S.D.N.Y. March 5, 2015). They also alleged that they "regularly" attended "client prospecting functions" and "client prospecting events." *Id.* at ¶¶ 26, 29, 39, 75. Although the Court did not provide a written disposition of the motion to dismiss, at oral argument the Court explained that "the allegations that [Plaintiffs] * * * make are sufficient allegations to, at most, [sic] for the defense to raise a factual dispute that cannot be resolved on the motion" and denied the motion in a separate order. See *Blum*, ECF No. 86, 85:19–23; *Blum*, ECF No. 84.

Here, Plaintiffs have not provided details about the type of environment in which they worked, what they did on a day to day basis, or any other details that would allow the Court to plausibly infer that they were not exempt. To the extent that Plaintiffs argue that their allegations explaining that their role was simply to sell financial products, the Court finds persuasive both the DOL opinion letters and opinions holding sales activities by licensed financial advisors are exempt because such sales inherently involve their professional judgment given FINRA's requirements. See, e.g., *Hein*, 511 F. Supp. 2d at 570 (noting the DOL "has sought to exempt from the FLSA investment advisors in the financial services industry—including those engaged in 'sales'— provided their sales activities are a function of their professional judgment respecting their clients' best interests"). Plaintiffs' allegations that they sold "financial products without regard to the clients' individual needs, financial circumstances, or investment objectives" do not change the

29

Court's conclusion.  The Court cannot infer that Plaintiffs are not exempt because they allegedly regularly violated their professional duties under FINRA,[16] without Plaintiffs' explicit allegation acknowledging that selling products in the manner that they allegedly did, or were required to,[17] violated FINRA regulations.  Plaintiffs need to provide additional information to show that that they did not or could not exercise independent judgment or that their work was not directly related to the general business operations of the employer.  But see, *Hein*, 511 F. Supp. 2d at 571 ("The [DOL] explicitly lists finance as an example of work directly related to management or general business operations").

Because the Court concludes Plaintiffs have not adequately pled that they worked overtime once being deemed "exempt" or enough facts to plausibly establish that they were exempt, the Court grants Defendants motion as to Plaintiffs' misclassification claim in Count I, again without prejudice.

### 4. Recordkeeping

Finally, although Plaintiffs appear to concede in their briefing that there is no private right of action under the FLSA for violations of the that statute's recordkeeping requirements [59-1, at 27], it is well established that Plaintiffs cannot maintain a suit for recordkeeping violations under the FLSA.  See *Farmer v. DirectSat USA, LLC*, 2010 WL 3927640, at *12 (N.D. Ill. Oct. 4, 2010)

---

[16] See, e.g., FINRA Rule 2111(a) (requiring members or associated persons to "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile.").

[17] And if Defendants truly did require Plaintiffs to sell products in such a manner, the Court hopes that Plaintiffs would report such blatant violations of FINRA's regulations to FINRA.

(collecting cases). The Court therefore grants Defendants' motion as to the recordkeeping claims within Count I with prejudice.[18]

### 5. Plaintiff Bowles

While the Court will allow Plaintiffs to file an amended complaint, it must dismiss Plaintiff Bowles with prejudice as to his overtime and misclassification claims in Count I. While the Court generally refrains from dismissing claims on the basis of an affirmative defense, such as the statute of limitations, *Doe*, 347 F.3d at 657, the allegations laid out above establish that Bowles employment terminated more than three years before the Plaintiffs filed their complaint in this case. See *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135, (1988) (explaining that the absolute maximum for the statute of limitations for willful violations of the FLSA is three years). Bowles's argument that he did not know of his harm until he received the notice seeking payment under the TRC Provision, and that the statute of limitations should therefore be tolled is inapposite given that argument only applies to Plaintiffs' claims under the TCR Provision. Thus, the Court grants Defendants' motion to dismiss Bowles from Count I with prejudice as to any claims that do not pertain to the TCR Provision.

### B. The State Claims – Counts II–VI

Having granted Defendants' motion to dismiss the one federal claim over which it has original jurisdiction, the Court addresses whether to retain jurisdiction over the remaining state law claims, Counts II–VI. 28 U.S.C. § 1367(c)(3). The Seventh Circuit has consistently stated that "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *Alonzi v. Budget Constr. Co.*, 55 F.3d

---

[18] To the extent that the factual allegations undergirding the recordkeeping claim is relevant to other claims, the Court considered them in the resolution of the motion.

331, 334 (7th Cir. 1995); *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1182 (7th Cir. 1993). Finding no justification for departing from that "usual practice"[19] in this case, Plaintiff's state law claims are dismissed without prejudice. See *In re Repository Techs., Inc.*, 601 F.3d 710, 724–25 (7th Cir. 2010); *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008) ("When the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts.").[20] However, Plaintiffs may continue to include their state law claims in any amended complaint that they may file.

## IV. Conclusion

For the reasons explained above, the Court grants Defendants' motion to dismiss [38]. Plaintiff Bowles's claims in Count I are dismissed with prejudice, except as to any claims that relate to the TCR Provision, which are dismissed without prejudice. Plaintiffs' recordkeeping claim in Count I is also dismissed with prejudice. The remainder of Count I and Counts II–VI are dismissed without prejudice. Plaintiffs are given until April 15, 2019 to file an amended complaint consistent with this opinion. The case is set for further status on April 23, 2019, at 9:00 a.m.

Dated: March 19, 2019

Robert M. Dow, Jr.
United States District Judge

---

[19] In *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251–53 (7th Cir. 1994), the Seventh Circuit noted that occasionally there are "unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point to a federal decision of the state-law claims on the merits." The first example that the Court discussed occurs "when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court." *Id.* at 1251. Because the Court is granting Plaintiffs leave to file an amended complaint, the Court defers any decision to exercise its pendent jurisdiction until the risk of foreclosing an action due to an elapsed statute of limitations has manifested.

[20] Notwithstanding the dismissal without prejudice, Plaintiffs should seriously consider the possible effects of this Court's decision in Section III(A)(1) regarding the TCR Provision on certain of their state claims.