**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| WAYNE BLAND, DANUTA DURKIEWICZ, DAVID BOWLES, and ADAM REYES, individually and on behalf of all others similarly situated, | No. 18-cv-01832 |
| Plaintiffs, | |
| v. | Judge Robert M. Dow Jr. |
| EDWARD D. JONES & CO., L.P. and THE JONES FINANCIAL COMPANIES, L.L.L.P., | Jury Trial Requested |
| Defendants. | |

## SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs Wayne Bland, Danuta Durkiewicz, David Bowles, and Adam Reyes, individually and on behalf of all others similarly situated, by and through their attorneys, Stowell & Friedman, Ltd., hereby file this Second Amended Class and Collective Action Complaint against Defendants Edward D. Jones & Co., L.P. ("Edward Jones" or "the Firm") and The Jones Financial Companies, L.L.L.P.

## JURISDICTION AND VENUE

1.      Plaintiffs' claims arise under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, state wage and hour laws, and state statutory and common law.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because Defendants are each citizens of Missouri, Plaintiffs Durkiewicz, Bowles, and Reyes are citizens of Illinois, and Plaintiff Bland is a citizen of North Carolina.  The amount in controversy for each Plaintiff exceeds $75,000.

2.      Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b).  Defendants are licensed to do business in this District, maintain branch offices in this District, and service clients who are residents of this District.  Plaintiffs Durkiewicz, Bowles, and Reyes are residents of this District and worked for and were harmed by Defendants in this District.  The unlawful conduct challenged herein occurred in this District and across the United States.

## PARTIES

3.      Defendant The Jones Financial Companies, L.L.L.P. ("JFC") is a holding company organized as a limited liability limited partnership in the state of Missouri.  JFC operates its brokerage operations and employs its financial advisor workforce through Defendant Edward D. Jones & Co., L.P. ("Edward Jones"), its wholly-owned, principal operating subsidiary, which is registered with the Securities and Exchange Commission as a broker-dealer.

4.      Plaintiffs and the putative class and collective members are or were employed by Edward Jones as financial advisor trainees ("FA Trainees").

5.      Plaintiff Wayne Bland worked for Edward Jones as an FA Trainee in Charlotte, North Carolina and in Lake Wylie, South Carolina.  Bland worked for Edward Jones from approximately November 2014 until March 2016.  Edward Jones classified Bland as a non-exempt employee from his hire until March 2015 and misclassified him as an exempt employee thereafter.

6.      Plaintiff Danuta Durkiewicz worked for Edward Jones as an FA Trainee in Elk Grove Village, Illinois.  Durkiewicz worked for Edward Jones from approximately July 2015 until May 2016.  Edward Jones classified Durkiewicz as a non-exempt employee from her hire until November 2015 and misclassified her as an exempt employee thereafter.

7.      Plaintiff David Bowles worked for Edward Jones as an FA Trainee in Lake Zurich, Illinois.  Bowles worked for Edward Jones from approximately January 2014 until January 2015.  Edward Jones classified Bowles as a non-exempt employee from his hire until June 2014.

8.      Plaintiff Adam Reyes worked for Edward Jones as an FA Trainee in Chicago, Illinois.  Reyes worked for Edward Jones from approximately October 2015 until June 2016. Edward Jones classified Reyes as a non-exempt employee from his hire until February 2016 and misclassified him as an exempt employee thereafter.

## **FACTUAL ALLEGATIONS**

9.      Edward Jones has devised a scheme whereby the Firm recruits a revolving door of FA Trainees with false promises of extensive, valuable "best in class" training and high paying careers to support its top-heavy partnership.  The Firm does not disclose to recruits that most will fail.  Although Edward Jones benefits tremendously from the services of these FA Trainees and the sales leads, clients, assets, and revenue they generate, it fails to pay them for the long hours they are forced to work, or to provide the promised training necessary to properly service clients and succeed.  Worse, if these FA Trainees do not succeed or are fired, the likely outcome for the vast majority of FA Trainees, Edward Jones then seeks either to bar these trainees from working as advisors (or in the industry at all) or to recover up to $75,000 of FA Trainees' wages as what the Firm disingenuously calls "training costs."  This $75,000 far exceeds what Edward Jones paid most FA Trainees during their entire employment and bears no relationship to any training provided.  This lawsuit challenges and seeks to end the Firm's fraudulent scheme and unlawful practices on behalf of the Plaintiffs and all other similarly situated Edward Jones FA Trainees.

A.    **The Edward Jones Business Model and Recruitment Efforts**

10.    Edward Jones is the wholly-owned, principal operating subsidiary of The Jones Financial Companies, L.L.L.P. ("JFC"), a limited liability limited partnership with 455 general partners and 24,761 limited partners. Edward Jones is a broker-dealer registered with the Securities and Exchange Commission and a member organization of the Financial Industry Regulatory Authority ("FINRA").

11.    Edward Jones claims to serve "nearly 7 million investors from more offices than any other investment firm in America."[1] As of the end of 2018, JFC managed $1.1 trillion in assets and employed 16,797 Financial Advisors ("FAs") to service largely individual investors in more than 13,540 branch offices throughout the United States.[2] Edward Jones accounts for most of JFC's earnings, and in 2018, JFC reported $8.6 billion in revenue, including $6.8 billion in fees and commissions related to client accounts.[3]

12.    For most of its history, Edward Jones has primarily offered commission-based accounts, as opposed to fee-based accounts for which the Firm charges a set management fee to clients regardless of trading volume. Edward Jones' former managing partner, Jim Weddle, maintained that fee-based accounts were poorly suited for the Firm's clients, who tend to have fewer assets under management and to trade less frequently than the clients of other financial firms.[4] But the Firm now steers clients towards fee-based accounts, on which it earns fees regardless of whether its clients make any trades, and earns far more revenue from management fees than it does from commissions on transactions. In addition, Edward Jones works with and

---

[1] *About Us*, https://www.edwardjones.com/about/index.html.
[2] The Jones Financial Companies, L.L.L.P., Annual Report (Form 10-K) 4, 9, 29, 34 (Mar. 14, 2019), https://www.sec.gov/Archives/edgar/data/815917/000156459019007788/
[3] *Id*. at 5.
[4] John Churchill, *Keeping Up With the Joneses* (Apr. 1, 2006), https://www.wealthmanagement.com/institutions/keeping-joneses.

steers its clients to the financial products of preferred vendors from which Edward Jones receives

fees annually for every year the asset is held at Edward Jones. In 2018 alone, Edward Jones

received "revenue sharing" payments of $212.9 million from these relationships, comprising

more than 21% of its overall net 2018 income.[5] Edward Jones has also abandoned its historical

aversion to proprietary products. As recently as 2013, the Firm's website proclaimed that

"Edward Jones offers no proprietary products."[6] Now, just a few years later, Edward Jones's

Bridge Builder mutual funds are among the largest family of funds in the industry.[7]

Revolving Door Hiring Practices

13.    As Edward Jones acknowledges, continuous recruitment and hiring of FAs is

critical to its business model. To maintain its top-heavy partnership structure, and the financial

and overhead commitments associated with over 13,500 U.S.-based offices, Edward Jones must

continue to bring in new FAs, clients, assets and revenue. As the Firm reported to the SEC, "the

failure to achieve an attrition rate lower than anticipated or net growth in the number of financial

advisors may result in a decline in the revenue the Partnership receives from asset-based fees,

commissions and other securities-related revenues." 10-K at 15.

14.    As a result, Edward Jones hires thousands of new FA Trainees annually. Since at

least 2014, Edward Jones has hired at least 3,000 new FAs per year. According to its website,

the Firm is currently looking to add thousands of new FAs in metropolitan centers across the

country, including 2,500 in Southern California, 1,000 in Chicago, 550 in Atlanta, and 300 in

---

[5] https://www.edwardjones.com/images/revenue-sharing-disclosure.pdf
[6] Bruce Kelly & Jason Kephart, *Edward Jones makes unexpected leap into proprietary products* (Aug. 13, 2013), https://www.investmentnews.com/article/20130813/FREE/130819974/
edward-jones-makes-unexpected-leap-into-proprietary-products.
[7] Stephen Foley, *Edward Jones shakes up US mutual funds industry*, FINANCIAL TIMES (Jan. 3, 2016), https://www.ft.com/content/e77a5ecc-a9b4-11e5-9700-2b669a5aeb83.

Dallas. The Firm lures these FA Trainees with false promises of valuable, industry-leading training that will ensure their success and high paying brokerage careers.

15.     Most FA Trainees do not survive at the Firm and are forced to leave quickly.  As Edward Jones confirms in its 10-K filings for at least the past nine years, "a significant number of Edward Jones financial advisors have been licensed as financial advisors for less than three years," and it "generally loses more than half of [those] financial advisors who have been licensed for less than three years."  Edward Jones does not disclose to FA Trainees its attrition problems and that most will be fired or forced to leave the Firm within three years.

16.     Unlike most brokerage firms, Edward Jones does not require financial advisor trainees to hold college degrees or have relevant industry or sales experience.  Rather, Edward Jones encourages the recruitment of family and friends of existing financial advisors.  The Firm's hiring process requires candidates to submit a business plan, be interviewed by Firm personnel, and in some cases, to perform unpaid sales lead prospecting for Edward Jones, including by providing names and contact information for prospects and conducting neighborhood surveys to garner information about sales prospects.

Employment Agreements and So-Called "Training Costs"

17.     As a condition of employment, Edward Jones forces all FA Trainees to execute a one-sided, unlawful written Financial Advisor Employment Agreement (the "FA Employment Agreement"), after being hired but before they begin their employment.

18.     Among other things, the FA Employment Agreement obligates each FA Trainee to pay Edward Jones what it disingenuously calls "training costs" of up to $75,000 if his or her Edward Jones employment ends for any reason and the FA Trainee "accept[s] continued employment with any entity as either an employee or independent contractor engaged in the sale

6

of securities and/or insurance business" within three years of receipt of a "can-sell" date (the date on which Edward Jones directs FA Trainees to solicit and sell to clients).  Edward Jones knows, but does not inform its recruits, that most FA Trainees it hires will fail out of the training program within the time window of the payment obligation.

19.     The FA Employment Agreement inaccurately describes the $75,000 figure as "the reasonable cost of the training Edward Jones has provided." The provision is identical for recruits who already obtained their FINRA brokerage licenses before joining Edward Jones, and thus skip the 8-week self-study portion of the 17-week training program, except that their employment agreements value the training costs at $65,000 instead of $75,000.  Thus, Edward Jones explicitly values the self-study licensing portion of the training program at no more than $10,000, which is nearly 16 times the retail price of $637.20 for the Security Training Corporation's Premier Series 7/66 study program, the training materials that Edward Jones provides to FA Trainees.[8]

20.     The payment obligation is notable in that it reaches maximum value at the conclusion of the 17 weeks leading up to "can-sell" and only begins to decrease gradually in value beginning in the thirteenth month of employment. This means that FA Trainees who are fired or forced to leave Edward Jones quickly owe the most amount of money, despite receiving the least amount of "training."

**B.      The Edward Jones FA Training Program**

21.     The Firm's training program lasts for approximately 17 weeks for unlicensed new hires, and 9 weeks for licensed new hires.  During the training program, Edward Jones designates FA Trainees as non-exempt and entitled to overtime pay.

---

[8] *Series 66 Exam Prep*, SECURITIES TRAINING CORPORATION, https://www.stcusa.com/securities/licensing/us/series-66/.

22. The 17-week period for unlicensed recruits consists of two primarily self-directed stages and is set forth in a study calendar.

Study Period

23. In the study period, weeks 1 through 8, the Firm directs FA Trainees to spend at least six days per week studying on their own to take the FINRA Series 7 and 66 licensing exams. The vast majority of the "study" is self-study for these exams, including review of online materials on a computer loaned by Edward Jones (and subject to a separate $3,000 repayment obligation if unreturned at termination), and some written materials.

24. Edward Jones provides study materials from a third-party vendor, Security Training Corporation, rather than its own materials. Although the Firm values the training it provides during this period at $10,000, the retail list price of Security Training Corporation's premier courses for the Series 7 and 66 examinations is $637.20. The list prices on Securities Training Corporation's website are for individual customers, but Edward Jones is likely to have negotiated a reduced bulk price.[9]

25. Edward Jones does not provide an office or any administrative support for the vast majority of FA Trainees, who must study at their homes.

26. Edward Jones requires successful attainment of industry licenses in approximately half the time allotted by competing financial services firms, such as Merrill Lynch, UBS and Wells Fargo, who typically provide trainees four months to study and dedicated office space.[10]

---

[9] *Series 66 Exam Prep*, SECURITIES TRAINING CORPORATION, https://www.stcusa.com/securities/licensing/us/series-66/. The price of Kaplan's Series 7 and 66 materials is less than $600.

[10] https://www.ubs.com/global/en/about_ubs/careers/analyst-program-americas/program-overview.html https://www.wellsfargoadvisors.com/joinwfadvisors/newadvisors/associatefinancialadvisor/index.htm https://web.archive.org/web/20190212142442/https://www.ml.com/merrill-lynch-advisor/new-advisor.html

27.     Edward Jones warns trainees that the Series 7 and 66 licenses are a requirement to complete the training program, and they must pass the exams on their first try or be fired.  The relatively low pass rates nationwide for first-time Series 7 and 66 test-takers (65% and 72%, respectively) are well known.  Given these high stakes, FA Trainees put in long days and hours of study, including on weekends, that far exceed 45 hours per week.

"Know Your Customer" or Door Knocking Period

28.     The second phase of the training program, "Know Your Customer," weeks 9 through 16, introduces FA Trainees to Edward Jones's signature marketing strategy, which requires FA Trainees literally to walk door-to-door in designated neighborhoods and solicit contact information and sales leads from strangers.

29.     The "door knocking" period begins with four and one-half days of on-site training in either St. Louis, Missouri or Tempe, Arizona.  This is one of only two formal training sessions in the entire 17-week training period. FA Trainees must travel to the training location the day before the program begins, and they are not compensated for the time they spend traveling.  FA Trainees are housed in shared hotel rooms and served meals prepared in Edward Jones's on-campus cafeteria.

30.     This training session is dedicated to training attendees on how to approach prospective customers in their homes through various role-playing scenarios, from how close to stand when knocking on a door, to what to say to try to get prospects to let you enter their home. FA Trainees spend the vast majority of the session practicing knocking on doors and talking to prospective clients in "role-play suites" designed to look like homes.  The sessions are almost entirely devoid of any training regarding financial products or any other substantive knowledge necessary to provide sound financial and wealth management advice.  Moreover, because this

door-to-door sales strategy is unique to Edward Jones, the training does not provide FA Trainees with portable skills valued by other financial firms.

31.     After returning home from St. Louis or Tempe, FA Trainees are directed to spend the next 7 weeks knocking on doors in a designated neighborhood to meet a mandatory quota of obtaining contact information for 25 leads per day.  A number of factors make it difficult for FA Trainees to meet this 25-leads-per-day quota, including anti-solicitation regulations, prospective clients being away from home during working hours or unwilling to talk to an unknown solicitor, bad weather, competition from other financial advisors (including Edward Jones advisors), harassment from the police, lack of administrative support, and marketing materials that display Edward Jones's main phone number or another advisor's office number instead of the FA Trainee's contact information.  This can entail many long hours and failed attempts to gain even a single contact.

32.     FA Trainees must research their routes and strategies and prepare their own notes and summaries.  Edward Jones also requires FA Trainees to enter all of the relevant information regarding their sales prospects and leads onto the Firm's online sales lead system and to write and send thank you cards daily to each of their prospects.  FA Trainees must do this work on their own as the Firm does not provide any administrative or sales support.  Most FA Trainees work from home, as the Firm does not provide an office.[11]  FA Trainees work long hours and often seven days per week to try to meet their sales lead quotas and complete the other required administrative work.

33.     The "door knock" stage ends with another four and one-half days of on-site training in St. Louis or Tempe, designated as "Evaluation/Graduation," where Edward Jones

---

[11] As of year-end 2018 Edward Jones reported a headcount of 16,797 FAs and 13,540 offices, so there were 3,200 more FAs than offices.

decides whether FA Trainees can sell to prospective clients. As before, FA Trainees are not paid for the travel time and must put in long hours during the training session.

34. In a boiler room environment filled with cubicles and under the watch of Edward Jones trainers, FA Trainees rehearse scripted sales pitches and then put those pitches into practice to sell financial products to the contacts made over the course of the previous several weeks. Edward Jones recommends products that the FA Trainees should sell, employing an identical pitch to each person on their acquired list of contacts. The FA Trainees are directed to sell the same preferred partner products that generate upfront revenue to Edward Jones or a recommended blue-chip stock such as AT&T or Johnson & Johnson to all of their prospects using the same sales script. FA Trainees are instructed to continue that approach when they return home, because according to the Firm, for example, there "is not much difference between mutual funds" or trainees can just rely on the wholesaler of a particular preferred product for guidance. Again, the training does not include investment advice, financial planning or any individualized wealth management strategies but instead trains a one-size-fits-all approach to sell a small number of products pre-approved by Edward Jones.

Training Program Pay

35. Edward Jones FA Trainees are paid on a bi-weekly basis pursuant to a compensation plan, and each employee receives a schedule of expected compensation shortly after their hire. Although Edward Jones identifies the study calendar period of employment prior to reaching "can-sell" status as overtime-eligible, the Firm's compensation schedule is designed to avoid having to pay FA Trainees any overtime premium. Edward Jones neither tracks nor compensates FA Trainees for the hours they actually work.

36.     Edward Jones first identifies the "projected gross pay" it wants to pay the FA Trainee.  Next, the Firm assigns an arbitrary number of hours per work week for each stage of the study calendar, assuming a 45-hour work week during the study stage and a 60-hour work week during the "door knock" stage.  Edward Jones then manipulates the "hourly rate" for each stage so the FA Trainee's gross pay does not vary from one stage of the study calendar to the next, despite the assumed increase in overtime during the "door knock" stage.  Edward Jones accomplishes this by substantially reducing the hourly rate – by approximately one-third – from the study stage to the "door knock" stage of the study calendar (e.g. from $15/hour during the study period to $9/hour during door knocking).

37.     Under its policy and practice, Edward Jones knowingly discourages non-exempt FA Trainees from accurately reporting all of the hours they work and fails to pay non-exempt FA Trainees wages and overtime for the work they perform.  Further, many FA Trainees were unaware that Edward Jones had a timekeeping mechanism and therefore did not log any time. Additionally, those that did record time were encouraged by Edward Jones employees to not record all of their hours worked. Moreover, for most FA Trainees, the timekeeping mechanism was inactivated at the conclusion of the Know Your Customer stage before door knocking. As a result, during the initial training period, non-exempt FA Trainees work hours for which they are not paid overtime wages as required by applicable laws.

**C.     Misclassification of FA Trainees After "Can-sell"**

38.     After the Firm assigns FA Trainees "can-sell" status, the FA Trainees' primary duty is to continue to "door knock" and generate sales contacts for Edward Jones (and enter those leads on the Firm's intranet system), and to sell to those "door knock" leads from a limited group of pre-approved, preferred partner products.

39.     Even after "can-sell," Edward Jones does not provide most FA Trainees with their own office. As a result, they often work from their home, public places such as coffee shops, or meet clients at their homes or places of business. Edward Jones does not provide dedicated administrative support or personnel, so FA Trainees continue to perform their own administrative tasks without assistance.

40.     Once an FA Trainee reaches "can-sell" status, Edward Jones instructs FA Trainees to do whatever it takes to garner leads and sell, including putting in long hours to meet sales goals to avoid being terminated from Edward Jones. As a result, the FA Trainees continue to work substantially long hours, up to 80 hours per week, following "can-sell." Edward Jones does not record the hours worked or properly pay FA Trainees wages and overtime pay for the hours they work.

41.     The Firm misclassifies FA Trainees with "can-sell" status as "exempt," and not entitled to overtime pay.

42.     FA Trainees receive a salary for the first few months after reaching "can-sell" status, which diminishes over time during the transition to commission pay. However, FA Trainees do not meet the salary basis test, as the Firm treats FA Trainees' wages as forfeitable and subject to clawback as "training costs."

43.     FA Trainees also fail to exercise the discretion and independent judgment required to qualify as exempt employees. Edward Jones does not provide its FA Trainees with the financial advice, financial planning or wealth management training sufficient for them to independently assess their clients' financial needs and use their own discretion to advise clients on financial strategies or portfolios. Instead, Edward Jones directs FA Trainees to sell from a short list of pre-approved products from preferred partners, which generate additional fees for the

Firm. Edward Jones directs FA Trainees to rely on the Firm's online portfolio balancing application, which directs investment allocations and provides preferred partner product options. Edward Jones also directs FA Trainees to rely upon the advice and judgment of wholesalers selling the preferred products. The Firm questions FA Trainees who try to sell non-preferred products and often redirects them to preferred products.

**D.      Edward Jones Seeks to Claw-Back Wages of Up To $75,000**

44.      Edward Jones's practice of seeking to obligate FA Trainees to pay their earned wages for so-called "training costs" violates the requirement that wages be received free and clear and constitutes an unlawful clawback of earned wages, which also has the effect of denying FA Trainees minimum and overtime wages.

45.      The Firm's "training costs" are not a loan to FA Trainees, who do not receive training or other value commensurate to the $75,000 claimed by Edward Jones. Indeed, the $75,000 bears no relation to costs actually incurred by Edward Jones for training actually provided to FA Trainees.

46.      The training provided by Edward Jones is minimal and does not approach $75,000. The self-study materials provided by the Firm cost, at most, $700, and the FINRA administrative cost to take the Series 7 examination is $245, while the Series 66 examination costs $165. The Firm's training is largely self-directed, and the only portion of the training that is not home-based is essentially 9 days of door knocking training. This very limited training consists largely of high pressure sales tactics and a directive to sell clients the financial products of the Firm's "preferred product partners," who return a portion of their (often high) fees to Edward Jones for every year of the client's investment.

47.     A comparison of the Edward Jones 17-week training program to other firms with comparably-sized FA workforces illustrates the paucity of the Firm's training.  Merrill Lynch, Morgan Stanley, UBS and Wells Fargo provide offices, administrative support, higher salaries and extensive, structured training to trainees for a period of 43 months (Merrill Lynch), 36 months (Morgan Stanley), and 24 months (for UBS and Wells Fargo).  All provide immediate placement in a designated office location with access to on-site managers and experienced FAs, between two to five weeks of extensive home office training, mentors, and regular, live training, as well as extensive training regarding financial products, financial planning, and other topics important to providing sound financial advice.  Most of these programs allocate the first four months to license study alone, more than double the time allotted by Edward Jones for the same study in a period nearly equal in length to Edward Jones's entire designated "training program." In stark contrast to Edward Jones's practice, Wells Fargo does not allow its trainees to take the lead on client relationships in their first year; UBS does not allow trainees to work as financial advisors until after their 24th month of training; and Merrill Lynch and Morgan Stanley do not even allow their trainees to prospect new clients until their fifth month. None of these other firms obligate their trainees to pay for the cost of their years-long extensive training.

48.     Nor does Edward Jones provide FA Trainees with a portable training of value. The FA Employment Agreement effectively prohibits FA Trainees from using their Series 7 and Series 66 credentials after their Edward Jones employment ends. The clause requiring repayment of training costs is triggered if these licenses are registered with another employer at any time within three years of "can-sell" status (and if the terminated employee engages in the sale of securities or insurance).  The majority of trainees are terminated during this three-year period. Under FINRA regulations, these licenses expire two years after termination of employment

unless the licensee is again registered with a FINRA-regulated employer.  So a terminated FA Trainee is placed in a catch-22 situation where they can only preserve the value of their licenses by joining a competitor, thereby triggering the repayment obligation, or they must wait out the three-year period and lose their licenses.

49.     The operation of the training cost provision demonstrates the disconnect between the $75,000 obligation and Edward Jones's purported justification of recouping training costs.  According to the FA Employment Agreement, training costs owed are to be amortized, or decrease, ratably after the first of the three years following the "can-sell" date.  Thus, FA Trainees who are fired or forced to leave Edward Jones quickly owe the most amount of money, despite receiving the least amount of "training."

50.     If an FA Trainee has studied for and successfully obtained FINRA Series 7 and 66 licenses and completed the only two on-site sessions of the 17-week study calendar, but leaves the Firm before receiving "can-sell" status, then the FA Trainee has no obligation to pay any so-called training costs.  If that same FA Trainee were fired or forced to resign one or two days later, after receiving "can-sell" status, Edward Jones contends the FA Trainee would be obliged for the full amount of $75,000 (more than the cost of earning an MBA at the University of Illinois or a full year's tuition for an MBA program at Harvard or the University of Chicago).

51.     Edward Jones' claim that the training cost provision is necessary because the Firm is harmed by FA Trainees' departure is false.  As explained above, the training does not cost the Firm $65,000 or $75,000.  In addition, the FA Employment Agreement already precludes FA Trainees from soliciting Edward Jones clients for a period of one year after termination and prohibits the disclosure of any trade secrets learned.  The Firm's delay of several years in seeking to enforce its training policy demonstrates that it has no genuine protectable interest.

52.     Far from being harmed by FA departures, Edward Jones benefits greatly from the services provided by the FA Trainees, even when they leave the Firm.  Edward Jones requires FA Trainees to garner and enter onto the Firm's system hundreds of sales leads, which it retains, expressly claims ownership of in the FA Employment Agreement, and assigns to other Edward Jones FAs when FA Trainees are fired or forced to resign.  Similarly, the Firm retains the client assets and revenue generated by the new FA Trainees and reassigns the clients, and trailing commissions, to other Edward Jones FAs.  This is a key part of the Firm's recruitment and training program scheme, to garner assets and revenue for the Firm and partner FAs on the backs of FA Trainees.  Edward Jones is unjustly enriched by these practices because it receives benefits and services from FA Trainees without fully paying wages owed, while providing little or no meaningful training to the FA Trainees.  After terminating the employment of these FA Trainees or forcing them out, Edward Jones retains the clients these new FA Trainees have brought in and serviced, as well as the resulting client assets, fees, and revenue generated by these clients, which may well extend many years beyond the FA Trainees' departure from the Firm.  Edward Jones does not decrease the amount of the so-called "training cost" it seeks to recover or otherwise account for the ongoing financial benefits it has received from FA Trainees in any way. Instead, Edward Jones seeks to collect sham "training costs" from former trainees in amounts that equal or exceed the total wages paid them during their employment.

53.     To avoid the financial cost, attorneys' fees, and potential catastrophic losses of being sued by Edward Jones for training costs not actually incurred by the Firm, many former employees gave up lucrative broker job opportunities and even left the financial services industry altogether, losing substantial income as a result.

54.     In addition to requiring FA Trainees to agree to an unlawful "training costs" provision, Edward Jones engages in a pattern of unlawful collection efforts and harassment by enforcing these "training costs" obligations even where the conditions Edward Jones imposed were not met.  Under the FA Employment Agreements, which Edward Jones drafted, a former FA Trainee owes "training costs" if three conditions are met within three years after the "can-sell" date:  the FA Trainee (1) is fired or resigns from Edward Jones, (2) maintains his or her FINRA licenses, and (3) "accept[s] employment with any entity as either an employee or independent contractor engaged in the sale of securities and/or insurance business."

55.     Instead of conducting any reasonable investigation into whether the third condition is met, however, Edward Jones routinely hires counsel to send form letters threatening legal action and seeking to collect money and obtain general releases from former FA Trainees who did not, in fact, engage in the sale of securities or insurance business within three years after their "can-sell" date.  Edward Jones's harassing conduct compels FA Trainees either to hire counsel or to pay the Firm extortionate sums or both.  Moreover, Edward Jones persists in these unlawful collection efforts even after learning that the former employee did not engage in the sale of securities and/or insurance business within the three-year period.

56.     Public records indicate that Edward Jones's collection efforts are not idle threats. Edward Jones has regularly sued its former advisors to recover the so-called "training costs" in arbitrations before FINRA and its predecessor, the National Association of Securities Dealers, and has prevailed in obtaining arbitration awards for monetary payments.  *See, e.g.*, *Edward D. Jones & Co. v Mosbaugh* No. 09-03049 (FINRA 2009) (Fendelman, Arb.), https://www.finra.org/sites/default/files/aao_documents/09-03049-Award-FINRA-20091102.pdf; *Edward D. Jones & Co. v Difiore*, No. 07-02532 (FINRA 2007) (Larson, Arb.),

https://www.finra.org/sites/default/files/aao_documents/07-02532-Award-FINRA-20080222.pdf;

*Edward D. Jones & Co. v. Schwab*, No. 06-00911 (N.A.S.D. 2006) (Henn, Arb.)

https://www.finra.org/sites/default/files/aao_documents/06-00911-Award-NASD-20061003.pdf ;

*Edward D. Jones & Co. v Ferguson*, No. 05-01253 (NASD 2006) (Grey, Arb.)

https://www.finra.org/sites/default/files/aao_documents/05-01253-Award-NASD-20060504.pdf.

57.     In sum, Edward Jones operates a scheme of indebting FA Trainees likely to fail for the grossly overstated costs of training the Firm never provided, and using that "debt" as leverage to prevent them from working as financial advisors, confiscating the clients and sales leads they generated, and avoid paying wages they earned and Edward Jones owed.  Edward Jones's practices of encouraging non-exempt FA Trainees not to report all hours worked, not paying non-exempt FA Trainees for those hours, misclassifying FA Trainees as exempt after their "can-sell" dates, and attempting to create contractual rights to recoup these so-called "training costs" violate federal and state wage laws and state common law.

58.     Edward Jones maintained and/or enforced compensation and other policies and practices that resulted in Edward Jones's failure to compensate Plaintiffs and those similarly situated for all of their earned wages by, among other things, failing to pay lawful wages for hours worked or overtime premiums to employees for all hours worked over 40 in a given workweek as required by federal and state law; and unlawfully claiming entitlement to and attempting to collect sham "training costs" from FA Trainees, which unlawfully recapture earned wages and, in many instances, result in FA Trainees being paid less than the minimum or overtime wage under applicable laws.

59.     Plaintiffs' experiences demonstrate the harm suffered by FA Trainees due to Edward Jones's unlawful practices.

19

**Plaintiff Wayne Bland**

60.     In fall 2014, an Edward Jones recruiter based in St. Louis contacted Plaintiff Wayne Bland about joining the Firm as an FA after Bland responded to a targeted internet ad. Bland was initially reluctant, but the recruiter told Bland that the Firm's training program was the "best in the industry," complete with a "state of the art" training facility in St. Louis.  He promised Bland a lucrative career with the Firm, telling him the average compensation was over $100,000 and promising that he would quickly receive an office with "world class" marketing and sales support.  The promise of exceptional training and other promises convinced Bland to continue with the application process and eventually accept employment with Edward Jones.  At no time did the recruiter inform Bland of the high attrition rate of FA Trainees at the Firm.

61.     After the initial contact with the Edward Jones recruiter, Bland continued the application process, which included at least two interviews with an Edward Jones FA, submission of a "business plan," and a virtual "day in the life" exercise.  The hiring process took about one month.  The recruiter and the FAs Bland interviewed with told him that he would be terminated if he did not pass the Series 7 and 66 exams on the first try.

62.     After Bland verbally accepted an employment offer from Edward Jones, the Firm required him to sign an FA Employment Agreement as a condition of his employment.  The FA Employment Agreement required, among other things, that Bland agree to pay up to $75,000 in "training costs" if his employment ended for any reason within three years of reaching "can-sell" status and certain other conditions were met.  This was the first Bland had heard of the training cost obligation, but he relied on the Firm's representations that its "best in the industry" training would set him on the path for a lucrative career.  Bland therefore executed the FA Employment Agreement on October 23, 2014.

63.     Edward Jones sent Bland a study calendar detailing the material Bland should review and master in order the pass the Series 7 and 66 licensing exams.  The calendar instructed him to study a minimum of six days per week, Monday through Saturday.  Each day of the study period had specific topics, chapters, and subjects to cover.

64.     Bland received a box of study materials, which included a binder of printed materials, flash cards, and a laptop computer (which was subject to a separate $3,000 repayment obligation if unreturned at termination).  The training materials, both printed and online study modules, were produced by Securities Training Corporation.

65.     During the study period of his training, from approximately November 10, 2014 through January 9, 2016, Bland worked an average of 72–80 hours per week.  For the first few weeks of the eight week study period, Bland did not know that he could record his time, as no one from Edward Jones had told him how to do so.  Then an Edward Jones employee told Bland and other FA Trainees on a conference call that they should not record more than 50 hours per week.  Bland then, on his own, located the timekeeping mechanism on Edward Jones's JonesLink intranet system, and began to report some of his hours, consistent with what the Edward Jones employee had instructed him to do.  Accordingly, Bland regularly worked 12–18 hours per week more than he was paid for during his study period.

66.     The study period was almost entirely self-study.  Edward Jones did not provide Bland with an office or other place to study; therefore, he studied in his home.  The online study modules required a high speed internet connection that Edward Jones did not provide.  Occasionally, Edward Jones scheduled conference calls led by an Edward Jones FA with several FA Trainees; however, the calls were largely void of any substantive information such as study advice or lectures.  Rather, the calls were "motivational," encouraging the FA Trainees on the

call to work harder and reinforcing the fact that they must pass their exams to continue in the training program.

67.    After passing his Series 7 and 66 exams, Bland traveled to St. Louis from Sunday, January 11, 2015 to January 16, 2016, to attend the on-site Know Your Customer stage of the training program.  As directed by Edward Jones, Bland arrived in St. Louis on Sunday and participated in the sales training from Monday morning through Friday afternoon.  Bland spent about four hours traveling.

68.    Edward Jones generally requires FA Trainees to share a hotel room during the Know Your Customer training; however, Bland was granted an exception only after providing documentation of medical necessity from his physician.  The meals Edward Jones provided during Know Your Customer were largely prepared at Edward Jones on-campus cafeteria. During the four and one-half days in St. Louis, Bland worked an average of 12–13 hours per day, and he was not compensated for the four hours he spent traveling to Know Your Customer, or the approximately four and one-half hours he spent traveling home. Including the time he spent travelling, Bland worked approximately 64 hours during Know Your Customer.  Edward Jones failed to pay Bland approximately 12 hours of overtime during the Know Your Customer period.

69.    At Edward Jones's facility in St. Louis, Bland and his fellow FA Trainees spent long days role playing sales scenarios.  For example, FA Trainees would roleplay on either side of a mock-up of a residential entry door. One would act as a trainee soliciting a new client while the other trainee would act as the unsuspecting prospective client.  The trainees would alternate roles and rehearse their attempts to elicit personal and contact information from prospective clients. There was little to no product or financial literacy training.  The training focused

exclusively on sales tactics and "overcoming obstacles," such as potential clients being reluctant to speak to a stranger at the door.

70.     During the Know Your Customer period, Bland heard several fellow FA Trainees remark that they were unaware they could record their time during the study period. Bland understood this to mean that those FA Trainees had not recorded any of their time during the study period.

71.     When Bland returned home on January 16, 2015, he logged into JonesLink to record the time he had spent travelling to and working in St. Louis, but he discovered that the timekeeping mechanism was no longer active.  From the Know Your Customer stage until Bland achieved his "can-sell" status and thereafter, Bland was not able to record his time because he lacked a means to do so.

72.     During the door knocking period, Bland typically worked 7 days per week and averaged 78–83 hours per week.  Bland returned home from St. Louis late Friday evening and began the door knocking stage of the training program on the following Monday morning, January 19, 2015, through February 28, 2015.  Edward Jones required Bland to obtain 25 leads per day or risk failing out of the program.  Bland was tasked with canvassing the area to which he was assigned, to knock on every door, and attempt to garner potential leads by getting contact information, or any other personal or financial information he was able to elicit.

73.     Because Edward Jones did not give him an office, Bland worked out of his home and vehicle during the door knocking period.

74.     Edward Jones required that at the end of each day Bland record his leads in the computer system controlled and maintained by Edward Jones; draft, print, and mail thank you notes to each lead; and make follow-up calls to prospective clients. Bland then planned the area

he would canvass for leads the following day. Bland worked tirelessly to meet Edward Jones's high demands and avoid failing out of the program.

75.    It was not unusual for Bland to begin his day by 8:00 A.M. and not finish until 11:00 P.M., Monday through Saturday, and spend an additional four to five hours on administrative tasks on Sunday. During the door knocking stage, Bland did not record his time because Edward Jones did not provide a mechanism to do so. Bland worked approximately 12 – 16 hours of overtime per week during the door knocking stage for which he was not compensated.

76.    Once Bland began prospecting for leads during the door knocking period, Bland discovered that the territory Edward Jones assigned him had already been prospected by Edward Jones FAs. For example, while knocking on doors in his territory, Bland encountered another Edward Jones FA who was similarly prospecting in the same geographic area. The FA expressed her surprise that Edward Jones had assigned Bland to her territory because she had already approached most of the households in the area in her own struggle to collect contact information, meaning Bland was prospecting in a territory that had already been picked over.

77.    After the door knocking period, Bland once again traveled to St. Louis for the "Evaluation/Graduation" period, at the conclusion of which FA Trainees achieve "can-sell" status—when Edward Jones deems a FA Trainee can sell financial products to clients. During Evaluation/Graduation period from March 1, 2015 through March 6, 2015, Bland and the other FA Trainees called the leads they collected during the door knocking period and attempted to sell them financial products. During the four and one-half days in St. Louis, Bland worked an average of 12 – 13 hours per day, and he was not compensated for time spent traveling to and from St. Louis. Including the time he spent travelling, Bland worked approximately 64 hours

during Evaluation/Graduation. Edward Jones failed to pay Bland approximately 12 hours of overtime during that period.

78.     Bland received little to no training on the products he was asked to sell and was told only that they had been pre-vetted by Edward Jones and deemed appropriate for all clients. The Edward Jones employee leading Evaluation/Graduation gave Bland and the other trainees a list of Edward Jones's preferred products—financial products that Edward Jones receives the maximum profit from—and told them to sell "something" from this list. The list had little information about the financial products. The Firm's official told Bland and the others that the purpose of the Evaluation/Graduation period was to hone their sales skills, not to learn how to tailor financial advice to their clients' individual needs.

79.     Bland and the other trainees were given a number of script templates drafted by Edward Jones to recite to prospective clients.

80.     After achieving his "can-sell" status, Bland returned home on March 6, 2015, and continued prospecting for clients by knocking on doors to gather and record sales leads, which occupied a majority of his time, while also attempting to sell Edward Jones's preferred financial products. From approximately March 7, 2015 through March 23, 2016, Bland typically worked 7 days a week and an average of 70–80 hours per week throughout the remainder of his tenure with the Firm. At this point, Edward Jones incorrectly classified Bland an exempt employee not eligible for overtime. Therefore, Bland worked approximately 30–40 hours of overtime per week for which he was not compensated after he reached "can-sell" status.

81.     Edward Jones provided FAs with a short list of preferred products from which to sell. Bland sold exclusively from this list because Edward Jones directed and incentivized FAs to sell its preferred partner products and provided little to no product training during the 17-week

training period.  Bland relied on the list of products that Edward Jones had vetted and pre-approved.  A senior FA, Rob Winkler, narrowed the preapproved list down further to three products that he said Bland could sell to anyone, as a sort of one-size-fits-all solution, with a low, medium, and high risk level.

82.     At some point after achieving his "can-sell" status, Bland learned about the Firm's incentive packages for FAs, which included all-expenses paid vacations for FAs and their families.  In order to qualify for these rewards, FAs were required to sell a certain number of products from Edward Jones's preferred partners list.

83.     After Bland achieved his "can-sell" status, Edward Jones required him to attend regular meetings in the Gastonia Conference Center hosted by the Firm's regional leader.  At these meetings, Edward Jones instructed Bland and other FAs to sell a specific financial product to all of their clients.  On one occasion, Bland expressed concern about whether the particular product was appropriate for *all* of his clients, the regional leader said that the product had been "fully vetted" by Edward Jones and that "it won't hurt anyone."  After receiving their instructions, Bland and the other FAs made the sales calls under the supervision of the regional leader or another senior FA.  These group sales sessions were usually sponsored by a preferred product partner.

84.     After achieving his "can-sell" status, Edward Jones provided Bland access to a proprietary application that allowed Bland and other FA Trainees to complete a short client risk tolerance questionnaire, at the conclusion of which the application would produce a "model portfolio."  The model portfolio was always filled with products from Edward Jones's preferred products list, and the only variable was the risk level based on the client's responses to basic

questions prompted by the Edward Jones application.  Bland relied heavily on this application to determine the recommended preferred partner products to sell to prospective and active clients.

85.     Contrary to what Edward Jones's recruiter had told him, Bland did not initially get his own office; therefore, for several months as a fully licensed FA, Bland worked exclusively out of his home and vehicle.  This significantly hurt his ability to secure clients because prospective clients often asked to meet him at his office to sign paper work or simply to vet him.  Bland did not receive access to an office until another FA in the area was terminated and then he was only given access to her shared space in another FA's office. Edward Jones did not, however, provide Bland with a Branch Office Assistant ("BOA"), so administrative work consumed a large portion of his time each day.

86.     Bland continued to work at Edward Jones until he was constructively discharged in March 2016.

87.     In late April or early May 2016, Edward Jones, through its attorney, sent Bland a letter dated April 28, 2016, on the letterhead of a New York law firm, The Law Offices of Joseph D'Elia, stating that "[y]ou…owe EDJ the sum of $75,000" and demanding that Bland "remit a check…in the amount of $75,000 within fourteen days from the date of this letter."  The $75,000 amount that Edward Jones demanded was more than the total amount the Firm had paid Bland during his seventeen months of employment.  The letter claimed that "[a] preliminary investigation indicates that you may have accessed certain confidential documents before your departure" and threatened to "commence litigation and seek not only the return of the materials but monetary damages (compensatory and punitive), as well as sanctions, costs, [and] expenses for this willful material breach."

88.     After receiving this letter, Bland feared imminent litigation and hired the law firm

Stowell & Friedman to defend him against the Firm's collection efforts and protect his rights.

89.     As a result of Edward Jones's unlawful conduct, Bland was denied wages owed

and suffered other damages, including the cost of litigation.

**Plaintiff Danuta Durkiewicz**

90.     In the summer of 2015, Plaintiff Danuta Durkiewicz responded to an online

advertisement soliciting Edward Jones FAs.  Shortly thereafter, an Edward Jones recruiter

contacted Durkiewicz by telephone and invited her to complete the application process, which

included at least two interviews with current Edward Jones FAs, submitting a "business plan,"

and a "day in the life" exercise, all over the phone or internet.  Durkiewicz was told throughout

the process that she would be terminated from the training program if she did not pass the Series

7 and 66 exams on the first try.

91.     Throughout the application process, Edward Jones employees promised

Durkiewicz that the Firm's "best in the industry" training would prepare her for a successful

career as a FA.  They also commented on how much money Edward Jones FAs make while only

working four days per week. The promise of exceptional training convinced Durkiewicz to

continue with the application process and eventually accept employment with Edward Jones.  At

no time did Edward Jones disclose to Durkiewicz the high attrition rate of FA Trainees at the

Firm.

92.     After Durkiewicz accepted an employment offer from Edward Jones, the Firm

required her to sign a FA Employment Agreement as a condition of her employment.  The FA

Employment Agreement required, among other things, that Durkiewicz agree to pay up to

$75,000 in "training costs" if her employment ended for any reason within three years of

reaching "can-sell" status and certain other conditions were met. An Edward Jones employee had mentioned the training costs provision to Durkiewicz during the application process, but assured Durkiewicz that the Firm only enforced the training costs provision against FAs who leave the Firm and attempt to take their clients with them. Durkiewicz relied on the Firm's representations, including that its "best in the industry" training would prepare her for a lucrative career, and so she executed the FA Employment Agreement on June 26, 2015.

93.      Edward Jones sent Durkiewicz a study calendar detailing the material Durkiewicz should review and master in order to pass the Series 7 and 66 licensing exams. The calendar instructed her to study a minimum of six days per week (Monday through Saturday). Each day of the study period had specific topics, chapters, and subjects to cover.

94.      Edward Jones also sent Durkiewicz a box of study materials, which included a binder of printed materials, flash cards, and a laptop computer (which was subject to a separate $3,000 repayment obligation if unreturned at termination). The training materials, both printed and online study modules, were produced by Securities Training Corporation.

95.      During the study period of her training, from approximately July 13, 2015 through September 4, 2015, Durkiewicz worked an average of 80–85 hours per week. Edward Jones told her that she had only one chance to pass her exams or she would be removed from the training program. Durkiewicz began studying very early in the morning, approximately 6:00 or 7:00 A.M., and continued to study throughout the day until late at night. It was not unusual for Durkiewicz to study until midnight. Durkiewicz even took her printed study materials with her to the gym so she could read chapters and review flash cards while she was on the treadmill.

96.      Durkiewicz recorded some of her time throughout the training period; however, she did not record most of her overtime because Edward Jones warned Durkiewicz and other FA

29

Trainees to be careful and "reasonable" in reporting their time. Durkiewicz understood this to mean that she should not record all or most of her overtime. Durkiewicz regularly worked approximately 25–30 hours per week more than she recorded or was paid for during the study period.

97. The study period was entirely self-study. Edward Jones did not provide Durkiewicz with an office or other place to study, so she studied in her home. Occasionally, Edward Jones scheduled conference calls with several FA Trainees, but the calls were largely devoid of substantive information. Rather, the calls were "motivational," encouraging the FA Trainees on the call to work harder.

98. On Sunday, September 20, 2015, after Durkiewicz passed her Series 7 and 66 exams, she traveled to St. Louis to attend the on-site Know Your Customer stage of the training program. Durkiewicz arrived in St. Louis on a Sunday afternoon and participated in sales training Monday through Friday afternoon. The meals provided by Edward Jones were largely buffet-style hotel food. During the four and one-half days in St. Louis, Durkiewicz worked an average of 12–13 hours per day, and she was not compensated for time spent traveling to and from St. Louis. Durkiewicz worked approximately 62 hours during Know Your Customer. Edward Jones failed to pay Durkiewicz approximately 10-12 hours of overtime for her time in the Know Your Customer stage.

99. At Edward Jones's facility in St. Louis, Durkiewicz and her fellow FA Trainees spent long days role-playing sales scenarios. For example, the FA Trainees would stand on either side of a replica residential entry door on wheels, with one role-playing the unsuspecting prospective client and the other as the financial advisor trying to elicit personal information.

There was little to no product or financial literacy training. The training focused almost exclusively on sales tactics such as "overcoming obstacles" and "getting past no."

100.     When Durkiewicz returned home on approximately September 25, 2015, she logged into JonesLink to record the time she had spent travelling to and working in St. Louis, but she discovered that the timekeeping mechanism was no longer active. From the Know Your Customer stage until Durkiewicz reached her "can-sell" status, Durkiewicz did not record time because Edward Jones provided no means to do so.

101.     During the door knocking period, which began on September 26, 2015 and continued through October 30, 2015, Durkiewicz typically worked 7 days per week and averaged 72–76 hours per week. Durkiewicz returned home from St. Louis on Friday evening, September 25, 2015, and began the door knocking stage of the training program that Saturday morning, September 26, 2015. Edward Jones required Durkiewicz to obtain at least 25 leads per day or risk failing out of the program. Edward Jones also required Durkiewicz to canvass her assigned territory, Elk Grove Village in Illinois, knock on every door and attempt to garner potential leads by getting contact information, and any other valuable personal or financial information she was able to elicit from strangers.

102.     At the end of each day, Durkiewicz returned home, made follow-up calls, entered the names, contact and personal information of each lead into Edward Jones's system, and drafted, printed, and mailed personal thank you cards to each lead she made contact with that day. Then she would plan her route for the following day. It was not unusual for Durkiewicz to begin her day by 8:00 A.M. and not finish until 8:00 P.M. During the door knocking stage, Durkiewicz did not record her time because Edward Jones did not provide a mechanism to do so.

Durkiewicz worked approximately 12–16 hours of overtime per week during the door knocking stage for which she was not compensated.

103.    Durkiewicz worked tirelessly to meet Edward Jones's high demand of at least 25 leads per day to avoid failing out of the program.

104.    Only after Durkiewicz began prospecting in her assigned area did she discover that the two Edward Jones FAs already assigned to the same territory had contacted many of the houses and businesses in her territory.  Therefore, most of the potential leads in her territory were either already Edward Jones customers or had turned the previous FA away.

105.    For the first several weeks of the door knocking stage, Durkiewicz worked out of her home and car because Edward Jones did not give her access to an office.  Later, an Edward Jones FA permitted Durkiewicz to use space in the FA's office; however, Durkiewicz was not allowed to use the BOA and therefore had to perform all of her own administrative work.

106.    After completing the door knocking period, Durkiewicz once again traveled to St. Louis from Sunday afternoon, November 1, 2015 through Friday afternoon, November 6, 2015, for the "Evaluation/Graduation" period, at the conclusion of which FA Trainees reach "can-sell" status — the period Edward Jones deems a FA Trainee can sell financial products to clients. During the four and one-half days in St. Louis, Durkiewicz worked on average of 12–13 hours per day, and she was not compensated for time spent traveling to and from St. Louis.  Including the time she spent traveling, Durkiewicz worked approximately 62 hours during Evaluation/Graduation.  Edward Jones failed to pay Durkiewicz approximately 10-12 hours of overtime during her time at Evaluation/Graduation.

107.    During the Evaluation/Graduation period, Edward Jones required Durkiewicz and the other FA Trainees to call the leads they collected during the door knocking period and

attempt to sell them financial products. Durkiewicz received little to no training on the products she was asked to sell. The Edward Jones employee leading Evaluation/Graduation gave Durkiewicz and the other trainees a list of Edward Jones's preferred products and told them to sell "something" from this list. The list had little information about the financial products. The Firm's employee told Durkiewicz and the others that the purpose was to hone their sales skills, not to learn how to tailor investment advice to their clients' individual needs.

108.    The Evaluation/Graduation stage took place in a large classroom, with tables in the middle of the room and cubicles along the outside walls with a phone and computer. Durkiewicz and the other FA Trainees gathered in the middle of the room to receive phone sales training from an Edward Jones official, such as how to keep a lead on the phone, how to leave voicemails that sound urgent to ensure the lead would return the call, and how to close a deal. At the end of these short sessions, Durkiewicz and the other FA Trainees would go to a cubicle and start making calls from their lead list under the supervision of an Edward Jones employee.

109.    Edward Jones's sales trainer gave Durkiewicz and the other trainees a number of script templates to recite to prospective clients. The trainer told the FA Trainees to pick a product and a corresponding script and call their leads. The products were not independently tailored to the prospective client's need. For instance, the trainer instructed Durkiewicz to convince clients who already had mutual fund investments to switch to one of Edward Jones's preferred partners, such as American Funds, despite potential negative implications of the transfer.

110.    Upon obtaining her "can-sell" status, Durkiewicz continued to spend a majority of her time prospecting for clients by knocking on doors to gather and record sales leads, while also attempting to sell Edward Jones's preferred financial products. From approximately

November 7, 2015 through May 20, 2016, Durkiewicz typically worked six days per week and an average of 65–72 hours per week after achieving her "can-sell" status. At this point, Edward Jones incorrectly classified Durkiewicz as an exempt employee not eligible for overtime. Therefore, Durkiewicz worked approximately 25–32 hours overtime per week for which she was not compensated after she reached "can-sell" status.

111. At the Firm's direction, Durkiewicz sold exclusively from the Firm's preferred products list because Edward Jones provided little to no product training during the 17-week training period and she felt it "safe" to sell from the list of products that Edward Jones had vetted and pre-approved. Durkiewicz also felt she lacked the ability to independently vet financial products not on the preferred products list.

112. After she achieved "can-sell" status, Durkiewicz learned about the Firm's incentive packages for FAs, which included all-expenses paid vacations for FAs and their families—paid for by the Firm's wholesalers. In order to qualify for these rewards, FAs were required to sell a certain number of products from Edward Jones's preferred partners list.

113. Like most of her counterparts, Durkiewicz, was told to rely on fund wholesalers, individuals employed by investment funds to market their products to investment firms and advisors, for product training and advice. These wholesalers were direct employees of the funds they represented and had a self-interest in promoting their product. Given the preferred partner relationships Edward Jones forged with these funds and the fees the partners paid to Edward Jones, the Firm had an added incentive to feature these products to its customers. Consequently, Durkiewicz and her fellow trainees were given a very unbalanced perspective on how best to serve their clients' interests. Edward Jones' reliance on biased outside training only serves to

underscore the Firm's limited commitment to actual industry-leading training and raises significant doubt as to the value of this training in any competitive environment.

114.    Edward Jones provided Durkiewicz access to a proprietary Firm application that allowed her to complete a short client risk tolerance questionnaire, at the conclusion of which the application would produce a "model portfolio."  The model portfolio was always filled with products from Edward Jones's preferred products list—the only variable was the risk level based on the client's responses to basic questions prompted by the Edward Jones application. Durkiewicz relied on this application to determine what to sell to prospective and active clients.

115.    During the period following her "can-sell" date, Durkiewicz felt extremely unprepared to provide financial advice to customers.  She had been taught very little about investment strategies, and the little direction she did receive was to focus on selling products from the preferred partner list that generated upfront revenues to Edward Jones.

116.    Durkiewicz initially performed well, but after she exhausted her personal network, she found it extremely difficult to reach the unrealistic sales goals established by Edward Jones and her pay began to decline.

117.    Durkiewicz continued to work at Edward Jones until she was constructively discharged in May 2016.  After her termination from Edward Jones, Durkiewicz found employment with PNC Bank as a Financial Specialist. In that capacity, Durkiewicz did not sell securities or insurance products to customers; she only addressed their banking needs.  If a customer sought financial advisory services, Durkiewicz was required to send them to one of the bank's financial advisors.

118.    Edward Jones made no attempt to communicate with Durkiewicz until late January 2018, more than eighteen months after she left the Firm's employ.  On or about January

30, 2018, Edward Jones directed one if its attorneys in the Chicago office of Quintairos, Prieto, Wood & Boyer, P.A. to send a demand letter to Durkiewicz at her employer's address. The letter stated that "the amount you owe Edward Jones for your training costs under the Agreement is $75,000" and demanded that Durkiewicz "remit a check in the amount of $75,000 within fourteen (14) days from the date of this letter," in order to resolve the matter "without resort to adversarial legal proceedings." The letter sloppily included a different FA's electronic signature page as one of its attachments.

119.    Upon receiving this letter, Durkiewicz feared imminent litigation and hired the law firm Stowell & Friedman to defend her against the Firm's collection efforts and protect her rights.

120.    As a result of Edward Jones's unlawful conduct, Durkiewicz was denied wages owed and suffered other damages, including the cost of litigation.

**Plaintiff David Bowles**

121.    On January 2, 2014 Plaintiff David Bowles accepted employment with Edward Jones as a FA Trainee. Edward Jones required him to sign a FA Employment Agreement as a condition of his employment. The FA Employment Agreement required, among other things, that Bowles agree to pay up to $75,000 in "training costs" if his employment ended for any reason within three years of reaching "can-sell" status and certain other conditions were met.

122.    After executing the Agreement, Edward Jones sent Bowles a study calendar detailing daily the material Bowles should review and master in order to pass the Series 7 and 66 licensing exams. Edward Jones instructed him to study a minimum of six days a week (Monday through Saturday). Each day of the study period had specific topics, chapters, and subjects to cover.

123.    Edward Jones sent Bowles a box of study materials, which included a binder of printed materials, flash cards, and a laptop computer (which was subject to a separate $3,000 repayment obligation if unreturned at termination).  The training materials, both printed and online study modules, were produced by Securities Training Corporation.

124.    Bowles began his study period in January 2014, which continued through his successful attainment of the required licenses on April 4, 2014.  During the study period, with genuine concern about possible termination from the training program if he did not pass on his first attempt, Bowles worked an average of 65–70 hours per week.  Bowles began studying by 8:00 A.M., and continued to study throughout the day until at least 7:00 P.M., Monday through Saturday.  Bowles also studied at least three hours every Sunday, and when the exam dates approached, he devoted even more time to studying.

125.    Bowles regularly worked approximately 20–25 hours of overtime per week more than he was compensated for during the study period.

126.    The study period was self-directed. Edward Jones did not provide Bowles with an office or other place to study, so he studied in his home.

127.    Bowles obtained his "can-sell" status on June 23, 2014 and left the Firm on January 22, 2015.

128.    Subsequently, Bowles accepted a position as an unlicensed personal banker at Fifth Third Bank. In this capacity, Bowles was not permitted to sell securities products (and his employer did not sell insurance products) to customers; his job duties were limited to addressing clients' banking needs.  Then, Bowles accepted a position as a financial representative with Fidelity Investments, a non-producing position in which he was unable to sell financial or insurance products.  In September 2016, Bowles accepted employment with Scottrade as a

nonproducing investment consultant.  Bowles consciously sought employment that did not involve the sale of securities and/or insurance within the three year period following his June 23, 2014 "can-sell" date, so that Edward Jones would not sue him for $75,000.  As a result, Bowles lost earnings by accepting positions with far less earning potential than a financial advisor position and diverted his career trajectory for three years.

129.     Not until September 2017, more than three years after he obtained his "can-sell" status with Edward Jones, did Bowles transition to a position selling securities products with Scottrade.

130.     Edward Jones made no attempt to communicate with Bowles until late February 2018, more than three years after he left the Firm's employ, and nearly four years after he obtained "can-sell" status.  On or about February 5, 2018 Edward Jones directed one if its attorneys in the St. Louis office of Husch Blackwell to send a demand letter to Bowles at his employer's address.  The letter stated that "the amount you owe Edward Jones for your training costs under the Agreement is $75,000" and demanded that Bowles "remit a check in the amount of $75,000 within fourteen (14) days from the date of this letter," in order to resolve the matter "without resort to adversarial legal proceedings."

131.     Disheartened by his receipt of this letter despite his focused effort to avoid employment that could have triggered a repayment obligation, Bowles searched the internet to determine whether Edward Jones had taken similar steps to pursue others for training costs.  Bowles was distressed to discover that Edward Jones had in fact filed legal actions in FINRA arbitration to collect training costs.  Bowles feared imminent litigation and the consequences of jeopardizing his FINRA licenses and hired the law firm Stowell & Friedman to defend him against the Firm's collection efforts and protect his rights.

132.    Bowles' attorneys reached out to Edward Jones's counsel, Husch Blackwell, and explained that Bowles was not subject to the training cost provision because he had not, within three years of receiving his call sell date, engaged in the sale of securities and/or insurance. Edward Jones's counsel refused to discuss the matter and persisted in its demand, stating "[a]ll investigation done by my client is work product and as such I cannot reveal the extent or nature of it," and continued, "I am interested to know why your client has hired you, and apparently is paying you to represent him, rather than making us a reasonable offer to satisfy his obligation under his employment agreement."  Edward Jones plainly conducted no due diligence of its own to determine if Bowles was in breach of the FA Employment Agreement.  Instead, Bowles was forced to undergo the time and expense of hiring an attorney and filing this action.

133.    As a result of Edward Jones's unlawful conduct, Bowles was denied wages owed and suffered other damages, including the cost of litigation.

**Plaintiff Adam Reyes**

134.    In summer 2015, Plaintiff Adam Reyes attended an Edward Jones recruitment seminar where a panel of Edward Jones FAs told Reyes and approximately 75 other attendees of the benefits of being an Edward Jones FA: a short work day, all-expenses paid vacations, your own office with an assistant, and an average salary of $100,000.  There was no mention of the $75,000 training costs provision. Reyes was impressed by presentation and submitted an application.  Shortly thereafter, an Edward Jones recruiter contacted Reyes by telephone and invited him to complete the application process, which included at least two interviews with a current Edward Jones FA, submitting a business plan, and a "day in the life" exercise, all over the phone or internet.  Edward Jones promised Reyes "best in the industry" training and that he would be well prepared for a successful career as a FA.  The promise of exceptional training

convinced Reyes to continue with the application process and ultimately to accept employment with Edward Jones.  At no time during the application process did Edward Jones disclose to Reyes the high attrition rate of FA Trainees at the Firm.

135.    After Reyes accepted an employment offer from Edward Jones, the Firm required him to sign a FA Employment Agreement as a condition of his employment.  The FA Employment Agreement required, among other things, that Reyes agree to pay up to $75,000 in "training costs" if his employment ended for any reason within three years of reaching "can-sell" status and certain other conditions were met.  At no point prior to receiving the FA Employment Agreement did Edward Jones tell Reyes about the training costs provision.  Reyes relied on the Firm's representations of valuable, "best in the industry" training, a lucrative career, and success, and executed the FA Employment Agreement on September 24, 2015.

136.    After executing the Agreement, Edward Jones sent Reyes a study calendar detailing the material Reyes should review and master in order to pass the Series 7 and 66 licensing exams.  Edward Jones instructed him to study a minimum of six days per week (Monday through Saturday).  Each day of the study period had specific topics, chapters, and subjects to cover.

137.    Edward Jones also sent Reyes a box of study materials, which included a binder of printed materials, flash cards, and a laptop computer (which was subject to a separate $3,000 repayment obligation if unreturned at termination).  The training materials, both printed and online study modules, were produced by Securities Training Corporation.

138.    During the study period of his training, from approximately October 26, 2015 through approximately December 23, 2015, Reyes worked an average of 55–60 hours per week.  Edward Jones told him that he had only one chance to pass his exams or else be removed from

the training program.  Reyes began studying by 9:00 A.M., and continued to study throughout the day until approximately 7:00 P.M., Monday through Friday.  Reyes also studied at least five hours every Saturday, and when the exam dates approached, on Sundays as well.

139.    Reyes regularly worked approximately 10–15 hours of overtime per week more than he was compensated for during the study period.

140.    The study period was entirely self-study.  Edward Jones did not provide Reyes with an office or other place to study, so he studied in his home.

141.    Occasionally, Edward Jones scheduled conference calls led by an Edward Jones FA with several FA Trainees.  These calls were largely devoid of substantive information such as study advice or lectures.  Rather, the calls were "motivational," encouraging Reyes and the other FA Trainees on the call to work harder and reinforcing the fact that they must pass their exams to continue in the training program.

142.    After passing his Series 7 and 66 exams, Reyes traveled from Chicago to St. Louis from January 10, 2016 to January 15, 2016 to attend the on-site Know Your Customer stage of the training program. Reyes arrived in St. Louis on a Sunday afternoon and participated in sales training Monday through Friday afternoon.  During the four and a half days in St. Louis, Reyes worked on average of 12–13 hours per day and was not compensated for time spent traveling to and from St. Louis.  Including the time he spent travelling, Reyes worked approximately 62 hours during Know Your Customer.  Edward Jones failed to pay Reyes approximately 12-13 hours of overtime for his time at Know Your Customer.

143.    At Edward Jones's facility in St. Louis, Reyes and his fellow FA Trainees spent long days role playing sales scenarios.  For example, the FA Trainees would stand on either side of a fake door on wheels, with one role-playing the prospective client and the other as the

financial advisor trying to elicit personal and contact information. There was little to no product or financial literacy training. The training focused almost exclusively on sales tactics such as "overcoming obstacles" and "getting past no." Reyes and the other FA Trainees were in the Firm's training center from 8:00 A.M. until 8:30 or 9:00 P.M. during each of the four full days in St. Louis.

144.    Reyes returned home on Friday evening and began the door knocking stage the next day, Saturday, January 16, 2016. During the door knocking period, from approximately January 16, 2015 through February 20, 2016, Reyes typically worked 7 days per week and an average of 68–70 hours per week. Edward Jones required Reyes to obtain at least 25 leads per day or risk failing out of the program. Edward Jones required Reyes to canvass his assigned territory in Mt. Greenwood, Illinois, knock on every door and attempt to garner potential leads by getting contact information from strangers.

145.    At the end of each day, Reyes returned home, made follow-up calls, entered the names and personal information of each lead into Edward Jones's system, and drafted, printed, and mailed personal thank you cards to each lead he made contact with that day, and then he would plan his route for the following day. It was not unusual for Reyes to begin his day by 8:00 A.M. and not finish until 8:00 P.M., Monday through Friday. Reyes also worked an average of five hours every Saturday and three hours every Sunday. Reyes worked approximately 12–16 hours of overtime per week during the door knocking stage for which she was not compensated. During the door knocking stage, Reyes did not record his time because Edward Jones did not provide a mechanism to do so.

146.     Because Edward Jones did not provide an office, Reyes worked exclusively out of his home and vehicle during the door knocking period.  Edward Jones never gave Reyes his own office, or even access to a more senior FA's office for his entire tenure with the Firm.

147.     Before Reyes was assigned to his territory in Mt. Greenwood, Illinois, he asked Edward Jones whether any Edward Jones FA worked in the area—he was told no.  When Reyes began to knock on doors and canvass for leads in his assigned territory, he quickly learned that two FAs with the Firm already operated within the area.  Reyes found that many of the prospects in his territory had recently been contacted by another Edward Jones FA or were existing Firm clients.

148.     Reyes worked tirelessly to meet Edward Jones's high demand of at least 25 leads per day to avoid failing out of the program.

149.     After completing the door knocking period, Reyes once again traveled to St. Louis from Sunday afternoon, February 21, 2016, through Friday afternoon, February 26, 2016, for the "Evaluation/Graduation" period, at the conclusion of which FA Trainees reach "can-sell" status, when Edward Jones deems a FA Trainee can sell financial products to clients.  During the four and one-half days in St. Louis, Reyes worked on average of 12–13 hours per day, and he was not compensated for time spent traveling to and from St. Louis. Including the time he spent traveling, Reyes worked approximately 62 hours during Evaluation/Graduation.  Edward Jones failed to pay Reyes approximately 10-11 hours of overtime for his time at Evaluation/Graduation.

150.     During Evaluation/Graduation period, Reyes and the other FA Trainees called the leads they collected during the door knocking period and attempted to sell them financial products.  Reyes received little to no training on the products he was asked to sell.  The Edward

Jones employee leading Evaluation/Graduation gave Reyes and the other trainees a list of Edward Jones's preferred products and told them to sell "something" from this list to all of their contacts. The list had little information about the financial products.

151. In other sales sessions during Evaluation/Graduation, the Edward Jones employee told Reyes and the other FA Trainees that they should try to sell a "staple" stock, such as Johnson & Johnson or Proctor & Gamble, a long term stock that does not fluctuate in stock price and has dividends. Accordingly, Reyes attempted to sell his leads either Johnson & Johnson or Proctor & Gamble. Reyes was given scripts written by Edward Jones to recite when making these sales calls.

152. Upon obtaining his "can-sell" status, Reyes continued prospecting for clients by knocking on doors to gather and record sales leads, which accounted for a majority of his time, while also attempting to sell Edward Jones's preferred products. Reyes typically worked 6 days a week and an average of 65–70 hours a week after reaching "can-sell" status from approximately February 27, 2016, through June 8, 2016. At this point, Edward Jones incorrectly classified Reyes as an exempt employee not eligible for overtime. Therefore, Reyes worked approximately 25–30 hours of unpaid overtime per week for which he was not compensated after he reached "can-sell" status.

153. At the Firm's direction, Reyes sold exclusively from the Firm's preferred products list. Edward Jones provided little to no product or investment strategy training during the 17-week training period, and he felt it "safe" to sell from the list of products that Edward Jones had vetted and pre-approved. When Reyes asked an Edward Jones employee how he should determine which product from the preferred products list to sell, the employee responded

that "they're all the same" and that he should sell the product from "whichever wholesaler answered their phone first."

154.    After he achieved "can-sell" status, Reyes learned about the Firm's incentive packages for FAs, which included all-expenses paid vacations for FAs and their families—paid for by the Firm's wholesalers.  In order to qualify for these rewards, FAs were required to sell a certain number of products from Edward Jones's preferred partners list.

155.    Reyes, like most of his counterparts, was forced to rely on fund wholesalers, individuals employed by investment funds to market their products to investment firms and advisors, for product training.

156.    Edward Jones provided Reyes access to a proprietary Firm application that allowed him to complete a short client risk tolerance questionnaire, at the conclusion of which the application would produce a "model portfolio."  The model portfolio was always filled with products from Edward Jones's preferred products list—the only variable was the risk level based on the client's responses to basic questions prompted by the Edward Jones application.  Reyes relied heavily on this application to determine what to sell to prospective and active clients.

157.    Reyes continued to work at Edward Jones until he was constructively discharged on June 8, 2016.  After his termination from Edward Jones, Reyes found employment with JP Morgan Chase Bank as a Relationship Banker.  In this capacity, Reyes does not sell securities or insurance products to customers; he only addresses their banking needs.  If customers seek financial advisory services, Reyes refers them to one of the bank's financial advisors.

158.    Edward Jones made no attempt to communicate with Reyes until late January 2018, more than eighteen months after he left the Firm's employ.  On or about January 30, 2018 Edward Jones, through its attorneys in the Chicago office of Quintairos, Prieto, Wood & Boyer,

P.A., sent a demand letter to Reyes at his employer's address. The letter stated that "the amount you owe Edward Jones for your training costs under the Agreement is $75,000" and demanded that Reyes "remit a check in the amount of $75,000 within fourteen (14) days from the date of this letter," in order to resolve the matter "without resort to adversarial legal proceedings."

159.    Upon receiving this letter, Reyes researched whether Edward Jones had taken legal action against former FAs. Reyes discovered after conducting an internet search that Edward Jones had in fact filed legal actions in FINRA arbitration to collect training costs. Reyes feared imminent litigation and hired the law firm Stowell & Friedman to defend him against the Firm's collection efforts and protect his rights.

160.    As a result of Edward Jones's unlawful conduct, Reyes was denied wages owed and suffered other damages, including the cost of litigation.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

161.    Plaintiffs' claims are appropriate for class and collective action treatment because Plaintiffs and similarly situated Edward Jones FA Trainees signed nearly identical FA Employment Agreements, and they were subject to the same uniform policies and practices, including those challenged in this lawsuit.

162.    Pursuant to 29 U.S.C. § 216(b), Plaintiffs Bland, Durkiewicz, and Reyes seek collective action treatment of their claims under the Fair Labor Standards Act on behalf of all similarly situated FA Trainees. Among other things, Defendants did not pay Plaintiffs and those similarly situated all of the overtime they were owed during the period that the Firm classified them as non-exempt employees, and Defendants misclassified them as exempt once they received "can-sell" status, both because Defendants do not pay FA Trainees "free and clear" of

any clawback, and because the work FA Trainees perform does not meet the regulatory requirements to be exempt.

163.    Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs Bland, Durkiewicz, and Reyes seek nationwide class certification of a Missouri breach of contract claim based on Defendants' failure to provide the valuable training they promised Plaintiffs and other FA Trainees in the FA Employment Agreements. Plaintiffs seek a declaratory judgment and an order enjoining enforcement of the Training Cost Repayment Provision as an unlawful restrictive covenant under Missouri law. Finally, Plaintiffs seek nationwide certification of a Missouri Minimum Wage Law claim based on Defendants' failure to pay required minimum wage and overtime.

164.    Plaintiffs Durkiewicz and Reyes, on behalf of other similarly situated Illinois FA Trainees also seek certification of and Illinois class of FA Trainees with claims under the Illinois Wage Payment and Collection Act, the Illinois Minimum Wage Law, Illinois Consumer Fraud Act, and Illinois common law.

165.    The proposed state law classes of FA Trainees meet all requirements of Rule 23(a) as they are so numerous that joinder is impracticable, the classes present common questions of law and fact, and Plaintiffs have claims typical of class members, and will fairly and adequately protect the interests of the proposed classes. Common questions of law and fact for the state law classes include whether the alleged unlawful practices violated applicable state laws. Answers to those common questions depend on common evidence, including Edward Jones's mandatory training program, pay practices, and FA Employment Agreement.

166.     Plaintiffs seek certification of liability and injunctive and declaratory relief classes under Rule 23(b)(2) and 23(c)(4), and/or certification of broader classes under Rule 23(b)(3). All requirements of class certification are met by the proposed classes.

## COUNT I

### VIOLATIONS OF THE FAIR LABOR STANDARDS ACT
### 29 U.S.C. § 201 *et seq.*

167.     Plaintiffs Bland, Durkiewicz, and Reyes, individually and on behalf of all others similarly situated incorporates the above paragraphs as though fully stated herein.

**Failure to Pay Wages "Free and Clear"**

168.     As a condition of employment, Edward Jones forced Plaintiffs and all those similarly situated to enter into a uniform employment agreement to pay up to $75,000 in "training costs" if they were fired or resigned from Edward Jones within three years after receipt of their "can-sell" status, under certain circumstances.  Although Edward Jones represents that this repayment obligation will reimburse Edward Jones for the "reasonable cost" of the training Plaintiffs received, the amount of the obligation far exceeds the actual cost of what minimal training Edward Jones provided.  As such, the repayment obligation is an attempt to recoup the salary that Edward Jones is required to pay its financial advisors, including during their training.

169.     Under 29 C.F.R. § 785.27, "attendance at … training programs … need not be counted as working time if the following four criteria are met: (a) Attendance is outside of the employee's regular working hours; (b) Attendance is in fact voluntary; (c) The [training program] is not directly related to the employee's job; and (d) The employee does not perform any productive work during such attendance."  Here, Edward Jones's training program took place during regular working hours, attendance was mandatory, the training was directly related to Plaintiffs' jobs, and Plaintiffs performed productive work during the training program.

As such, Edward Jones was required to pay Plaintiffs a salary during the training program, and it may not shift the "cost" of that salary to Plaintiffs.

170.    Under 29 C.F.R. § 531.35, Edward Jones was also required to pay to Plaintiffs and those similarly situated all wages they had earned fully, unconditionally, and "free and clear" of any claim by Edward Jones to a set off, clawback or other recoupment.  To the extent that Edward Jones paid Plaintiffs and those similarly situated a wage on the condition that Plaintiffs pay back "training costs" up to $75,000, those wages were paid conditionally and not "free and clear" as required by the FLSA.

**Failure to Pay Minimum Wage / Overtime**

171.    The FLSA generally requires that employees receive wages of not less than $7.25 per hour.  29 U.S.C. § 206.

172.    The FLSA further requires that applicable employees receive at least one and a half times their normal rate of wages for any hours worked in excess of 40 hours in a week. 29 U.S.C. § 207.  Plaintiffs and all those similarly situated are not exempt from the overtime requirements of the Fair Labor Standards Act during the time they worked in non-exempt positions.  *See* 29 U.S.C. § 213.

173.    Plaintiffs and all those similarly situated worked well in excess of 45-60 hours per week in the non-exempt positions.  However, Edward Jones failed to compensate Plaintiffs and others similarly situated for all hours worked on weeks they worked over 45-60 hours, including by failing to pay overtime.

174.    Additionally, Plaintiffs' obligation to repay "training costs" reduces the wages of Plaintiffs to below the minimum wage required by 29 U.S.C. § 206 and/or below the overtime wage required by 29 U.S.C. § 207.

**Misclassification**

175.    Edward Jones treated Plaintiffs and those similarly situated as exempt from FLSA's wage and hour protections and failed to pay them overtime compensation after they attained "can-sell" status.

176.    Plaintiffs and those similarly situated routinely worked in excess of 40 hours per week after their "can-sell" date, without receiving proper overtime pay.

177.    After Plaintiffs and those similarly situated received "can-sell" status, Edward Jones did not pay them a guaranteed, predetermined salary within the meaning of 29 C.F.R. §§ 541.200(a)(1), 541.600(a), 541.602(a).  Among other things, Edward Jones paid Plaintiffs and those similarly situated wages subject to forfeiture for so-called "training costs" up to $75,000, under certain circumstances.  In addition, their wages were subject to reduction because of alleged variations in the quality or quantity of work performed.

178.    In addition, after their "can-sell" dates, Edward Jones assigned Plaintiffs and those similarly situated the primary duty of gathering sales leads and selling financial products, including the Firm's proprietary products and the products of the Firm's "preferred product partners."  The primary duty of Plaintiffs and those similarly situated did not include the exercise of discretion and independent judgment with respect to matters of significance.  On the contrary, Edward Jones instructed Plaintiffs and those similarly situated to sell these financial products often without regard to the clients' individual needs, financial circumstances, or investment objectives.

179.    Moreover, Edward Jones did not place Plaintiffs and those similarly situated, after their "can-sell" dates, in job positions whose primary duty was to perform work directly related

to the management or general business operations of Edward Jones or its clients – the vast majority of whom were individual investors.

180.    As a result, Plaintiffs and those similarly situated were non-exempt employees and eligible for overtime compensation after receipt of their "can-sell" date.

181.    Edward Jones misrepresented to Plaintiffs and those similarly situated that they were not eligible to receive overtime pay.

**COUNT II**

**VIOLATION OF THE ILLINOIS WAGE PAYMENT AND COLLECTION ACT**
**820 ILCS 115/1 *et seq.***

182.    Plaintiffs Durkiewicz, Bowles, and Reyes, individually and on behalf of all others similarly situated, incorporate the above paragraphs as though fully stated herein.

183.    Plaintiffs and all similarly situated Illinois FA Trainees entered into compensation agreements with Edward Jones that they would be paid as non-exempt employees for all hours worked and would receive overtime compensation during the initial training period of their employment.

184.    Edward Jones violated the Illinois Wage Payment and Collection Act by regularly and repeatedly failing properly to compensate Plaintiffs and all similarly situated Illinois FA Trainees for the actual time they worked each week.

185.    The Illinois Wage Payment and Collection Act prohibits an employer from taking back wages that have been paid to employees.

186.    In seeking reimbursement for "training costs," Edward Jones unlawfully attempts to take back wages in which Plaintiffs and all similarly situated Illinois FA Trainees have a vested right, causing them harm.

187.     Plaintiffs and similarly situated Illinois FA Trainees worked well in excess of 45 and 60 hours per week during the time they held non-exempt positions but were not paid for all hours worked, including not being paid at the proper rate.

188.     Edward Jones permitted and encouraged Plaintiffs and all similarly situated Illinois FA Trainees to work but not report or be paid for hours over 45-60 hours per week.

189.     As a direct and proximate result of Defendants' conduct, Plaintiffs and all similarly situated Illinois FA Trainees have been underpaid for the work they performed as FA Trainees for Edward Jones, in violation of the Illinois Wage Payment and Collection Act.

## COUNT III

### VIOLATION OF THE ILLINOIS MINIMUM WAGE LAW
### 820 ILCS 105/1 *et seq.*

190.     Plaintiffs Durkiewicz and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate the above paragraphs as though fully stated herein.

191.     The Illinois Minimum Wage Law generally requires that employees receive wages of not less than $8.25 per hour.  820 ILCS 105/4(a)(1).

192.     The Illinois Minimum Wage Law further requires that applicable employees receive at least one and a half times their normal rate of wages for any hours worked in excess of 40 hours per week.  820 ILCS 105/4a(1).

193.     Plaintiffs and all similarly situated Illinois FA Trainees were recruited by Edward Jones as FA Trainees and earned and were paid wages.  Plaintiffs and all similarly situated Illinois FA Trainees were or are not exempt from the overtime requirements of the Illinois Minimum Wage Law during the time they held non-exempt positions.  *See* 820 ILCS 105/4a(2).

194.    Plaintiffs and all similarly situated Illinois FA Trainees worked well in excess of 45-60 hours per week in non-exempt positions.  However, Edward Jones failed to compensate Plaintiffs beyond their normal rate of pay on weeks they worked over 45-60 hours.

195.    Edward Jones forced Plaintiffs and all similarly situated Illinois FA Trainees to sign agreements to pay the firm "training costs" if they left Edward Jones within three years of reaching "can-sell" status and certain other circumstances were met.

196.    Payment of training costs has the effect of reducing the net income earned by Plaintiffs and similarly situated Illinois FA Trainees to fall below the minimum and overtime wages required by 820 ILCS 105/4(a)(1).

197.    As a direct and proximate result of Defendants' conduct, Plaintiffs and all similarly situated Illinois FA Trainees have been underpaid for the work they performed for Edward Jones.

### COUNT IV

### MISSOURI MINIMUM WAGE LAW
### MISSOURI ANNOTATED STATUTES § 290.500 *et seq.*

198.    Plaintiffs Bland, Durkiewicz, and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate the above paragraphs as though fully stated herein.

199.    Edward Jones forced Plaintiffs and all similarly situated FA Trainees to sign FA Employment Agreements agreeing to pay the Firm "training costs" if they left Edward Jones within three years of reaching "can-sell" status under certain circumstances.

200.    The FA Employment Agreements state they shall govern the employment relationships and "the rights of the parties."  The FA Employment Agreements state they are to be "deemed to be a Missouri contract" and governed by the laws of Missouri.

201.    The Missouri Minimum Wage Law generally requires that employees receive wages of not less than $7.85 per hour.  Mo. Ann. Stat. §290.502.

202.    The Missouri Minimum Wage Law further requires that applicable employees receive at least one and a half times their normal rate of wages for any hours worked in excess of 40 hours in a week.  Mo. Ann. Stat. §290.503.

203.    Payment of training costs has the effect of reducing the income earned by Plaintiffs and similarly situated FA Trainees to fall below the minimum wage and overtime rate required by the Missouri Minimum Wage Law.

204.    Plaintiffs and all similarly situated FA Trainees were recruited by Edward Jones as Financial Advisor Trainees and earned and were paid wages.  Plaintiffs and all similarly situated FA Trainees are not exempt from the overtime requirements of the Missouri Minimum Wage Law during the time they held non-exempt positions.

205.    Plaintiffs and all similarly situated FA Trainees worked well in excess of 45-60 hours per week in non-exempt positions.  However, Edward Jones failed to compensate Plaintiffs and all similarly situated FA Trainees beyond their normal rate of pay on weeks they worked over 45-60 hours.

206.    As a direct and proximate result of Defendants' conduct, Plaintiffs and all similarly situated FA Trainees have been underpaid for the work they performed for Edward Jones.

## COUNT V

### FRAUDULENT INDUCEMENT

207.     Plaintiffs Bland, Durkiewicz, and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate the above paragraphs as though fully stated herein.

208.     In order to induce Plaintiffs and other class members to enter into employment contracts, Defendants falsely represented material facts.  Among other things, Defendants falsely represented that Edward Jones' training program was the best in the industry, or words to that effect, and that Edward Jones would provide Plaintiffs and other FA Trainees with extensive, "best in class" training that would ensure their success as financial advisors and lucrative earnings and careers with limited work schedules.  Defendants also omitted material facts in order to convince Plaintiffs to enter into employment contracts, including its knowledge that well over half of the FA Trainees would fail as FAs and would be fired or forced to resign within three years.

209.     Defendants knowingly made false representations of a material fact when they represented to Plaintiffs in their employment agreements that Edward Jones would provide Plaintiffs with valuable training, the "reasonable cost" of which would be either $65,000 or $75,000, depending on whether Plaintiffs had obtained their FINRA licenses prior to joining Edward Jones.

210.     Defendants knew when they made these false representations that the Firm's training was *de minimis*, was not among the best in the industry, and that $65,000 or $75,000 was not a reasonable estimate of the cost or value of what minimal training Edward Jones provides.

211.    Defendants intended their false representations to induce Plaintiffs to join the Firm.

212.    Plaintiffs could not have known the actual cost or value of the training program when they agreed to join Edward Jones, and they justifiably relied on Defendants' false representations about the training program to their detriment.  Among other things, Plaintiffs, forewent other employment offers and provided Defendants with their time and services to acquire accounts, commissions, and revenues for Defendants.

213.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

**COUNT VI**

**BREACH OF WRITTEN CONTRACT**

214.    Plaintiffs Bland, Durkiewicz, and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate paragraphs 1 through 160 above as though fully stated herein.

215.    As a condition of employment as Edward Jones FA Trainees, Defendants required Plaintiffs and FA Trainees to enter into contract of adhesion employment agreements.

216.    Defendants agreed in these employment agreements that Edward Jones would provide Plaintiffs with valuable training, the "reasonable cost" of which was $65,000 or $75,000, depending on whether Plaintiffs had obtained their FINRA licenses prior to joining Edward Jones.

217.    In consideration of their employment agreements, Plaintiffs provided Defendants with their time and services to acquire sales leads, clients and client accounts, to generate revenues for Defendants, and Defendants provided Plaintiffs with a salary.

218.    Defendant breached its employment agreements with Plaintiffs by failing to provide any meaningful training at all, much less training that could have a cost or value as high as $65,000 or $75,000.

219.    Despite its failure to train Plaintiffs as promised, Edward Jones demanded repayment of so-called "training costs" from those Plaintiffs who leave the firm, including from those Plaintiffs who were fired or constructively discharged.  In addition, Defendants retained counsel to threaten and collect so-called "training costs" from Plaintiffs and FA Trainees who were not in violation of the employment agreements, as they were not "engaged in the sale of securities and/or insurance business."

220.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages.

## COUNT VII

### RESCISSION

221.    Plaintiffs Bland, Durkiewicz, Bowles, and Reyes, individually and on behalf of all others similarly situated, incorporate paragraphs 1 through 160 above as though fully stated herein.

222.    As a condition of employment, Edward Jones demanded that Plaintiffs and FA Trainees enter into virtually identical FA Employment Agreements.

223.    The FA Employment Agreements stated that Plaintiffs were at-will employees whom Edward Jones could fire "at any time for any reason."  The FA Employment Agreements also provided that the FA Trainees would have to pay up to $75,000 in "training costs" if their employment with Edward Jones was terminated for any reason and they engaged in the sale of

securities and/or insurance business within three years after receipt of "can-sell" status (the "Training Cost Provision").

224. The Training Cost Provision constitutes an unlawful clawback of wages.

225. The Training Cost Provision amount bears no reasonable relation to the actual cost or value of the training Defendants provided. Indeed, because the alleged training cost payment obligation is reduced over time, it bears an inverse relation to the costs of training provided by Defendants. Accordingly, the Training Cost Provision constitutes an unenforceable penalty.

226. In addition, the Training Cost Provision lacks adequate consideration, any geographical limit, or any reasonable duration or connection to Defendants' protectable business interests. The Training Cost Provision is not a reasonable incentive for employees to remain in Defendants' employ because, among other reasons, it applies to employees whom Edward Jones has fired or forced to resign. Accordingly, the Training Cost Provision constitutes an unenforceable restrictive covenant.

227. Edward Jones has engaged in a pattern of unlawful collection efforts, seeking to enforce the Training Cost Provision against former employees regardless of whether the conditions Edward Jones imposed were met.

228. Rescission is warranted due to Defendants' materials breach of contract and because the contract was obtained through fraud.

229. As a direct and proximate result of Defendants' conduct, Plaintiffs and similarly situated Illinois FA Trainees have suffered damages.

## COUNT VIII

## UNJUST ENRICHMENT

230.     Plaintiffs Bland, Durkiewicz, and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate paragraphs 1 through 160 above as though fully stated herein.

231.     Plaintiffs and other FA Trainees developed and serviced client accounts and assets for Edward Jones during their employment, which generated revenues for Edward Jones.

232.     After the employment of Plaintiffs and other FA Trainees was terminated, Edward Jones retained the client accounts procured by FA Trainees, which continued to generate fees and revenues for Edward Jones.  Edward Jones did not compensate the FA Trainees for the benefits the Firm retained as a result of the FA Trainees' work and efforts, but instead sought to recover their wages as "training costs."

233.     Edward Jones has thereby been unjustly enriched and Plaintiffs have been harmed.

234.     Under these circumstances, Edward Jones's acceptance and retention of these benefits was inequitable.

## COUNT IX

## ILLINOIS CONSUMER FRAUD ACT, 815 ILCS 505/1, *et seq.*

235.     Plaintiffs Durkiewicz and Reyes, individually and on behalf of all others similarly situated, and Plaintiff Bowles individually, incorporate paragraphs 1 through 160 above as though fully stated herein.

236.     Defendants forced Plaintiffs to sign FA Employment Agreements that the Firm carefully designed to give it an unfair advantage in the marketplace.  The FA Employment

Agreements promised that Edward Jones would provide Plaintiffs with valuable training, the "reasonable cost" of which would be $65,000 or $75,000, depending on whether Plaintiffs had obtained their FINRA licenses prior to joining Edward Jones. However, Defendants did not disclose to Plaintiffs that the true cost of the minimal training Edward Jones provides would not prepare them to be financial advisors and does not begin to approach its exorbitant price tag, or that most Financial Advisors Edward Jones hires are fired or forced to resign within three years. Despite Defendants' misrepresentations and omissions, the FA Employment Agreements required Plaintiffs to agree to pay these exorbitant "training costs" if they left the Firm to work for a competitor, under certain circumstances. The FA Employment Agreements also prohibited Plaintiffs from soliciting their former Edward Jones clients for a one-year period after their termination.

237.    The FA Employment Agreements put Plaintiffs in an impossible position if they were unable to meet the Firm's unrealistic sales goals in light of the poor training. Assuming they were not fired, they could (1) continue to work long hours without adequate pay; (2) move to a different financial firm and leave their clients behind but pay Edward Jones up to $75,000 for training they did not receive, or (3) leave the financial industry entirely. On the other hand, the FA Employment Agreements allowed Defendants to profit at Plaintiffs' expense no matter which option Plaintiffs chose. If Plaintiffs stayed at Edward Jones or left the industry then Defendants would continue to reap the fruits of Plaintiffs' labor, the sales leads, clients and commissions generated by their work, despite having failed to provide the training for which Plaintiffs bargained; and if Plaintiffs moved to a different Firm then Edward Jones could potentially recoup *more than all* of the compensation that Plaintiffs earned during their time at the Firm, while keeping most or all of the prospects, clients and revenue that Plaintiffs brought to

Edward Jones.

238.    This unfair practice — which is built on a foundation of misrepresentations about the value of Edward Jones's training program — is anticompetitive and offensive to public policy. *See* 815 ILCS 505/2.

239.    Plaintiffs Durkiewicz, Reyes, and Bowles are all Illinois residents, and this scheme caused substantial injury to them and others similarly situated. Plaintiffs would not have agreed to work for Edward Jones or to repay Edward Jones's training costs if Plaintiffs had known the training's true value (or lack thereof). Among other things, Plaintiffs incurred substantial opportunity cost in working for Edward Jones instead of another employer.

240.    Defendants continued their unfair practices even after they constructively discharged Plaintiffs. Specifically, Edward Jones directed its outside attorneys to mail Durkiewicz, Reyes, and Bowles form letters falsely accusing them of breaching their FA Employment Agreements. The letters threatened "adversarial legal proceedings" if Plaintiffs did not pay Edward Jones $75,000 within 14 days. In the case of each Plaintiff, this demand was for more than the Plaintiffs earned during their entire tenure with the Firm. Moreover, Defendants sent the letters to Plaintiffs at their new place of employment, but without prior notice to Plaintiffs, in violation of 815 ILCS 505/2I.

241.    Durkiewicz, Reyes, and Bowles have also suffered substantial injury as a result of Defendants' unlawful collection activity. In addition to the emotional distress and embarrassment Plaintiffs experienced as a result of receiving the letters at their new place of employment, Plaintiffs have had to devote considerable time and energy to defending against Defendants' false allegations. Plaintiffs knew, for example, that any FINRA judgment Defendants obtained against them would appear on their permanent U-5 records, threatening

their career, and that their inability to pay would result in the suspension of their licenses and inability to work as a broker. Thus, Plaintiffs each retained Stowell & Friedman to vigorously defend them against Defendants' false allegations, and they have already incurred litigation costs in doing so.

## COUNT X

## DECLARATORY JUDGMENT, 28 U.S.C. § 2201

242.    Plaintiffs Bland, Durkiewicz, Bowles, and Reyes, individually and on behalf of all others similarly situated, incorporate paragraphs 1 through 160 above as though fully stated herein.

243.    As a condition of employment, Edward Jones demanded that Plaintiffs and similarly situated FA Trainees enter into virtually identical FA Employment Agreements. The FA Employment Agreements stated that Plaintiffs were at-will employees whom Edward Jones could fire "at any time for any reason." The FA Employment Agreements, which Edward Jones drafted, specified they would be governed by Missouri law.

244.    The FA Employment Agreements also provided that the FA Trainees would have to pay up to $75,000 in "training costs" if their employment with Edward Jones was terminated for any reason and they engaged in the sale of securities and/or insurance business within three years after receipt of "can-sell" status (the "Training Cost Provision").

245.    The Training Cost Provision constitutes an unenforceable penalty because it bears no reasonable relation to the actual cost or value of the training Defendants provided. Rather, it seeks to punish departing FAs by either driving them out of the financial services industry or requiring them to pay Edward Jones for the privilege of having worked for the Firm.

246.    In addition, the Training Cost Provision constitutes an unenforceable restrictive covenant because it lacks adequate consideration, any geographical limit, or any reasonable duration or connection to Defendants' legitimate business interests.  The Training Cost Provision is not a reasonable incentive for employees to remain in Defendants' employ because, among other reasons, it applies to employees whom Edward Jones has fired or forced to resign.  And the Training Cost Provision is unnecessary to protect Edward Jones's existing customer relationships because another provision of the FA Employment Agreements requires former Edward Jones employees to refrain from communicating with their Edward Jones clients for one year after the employees' termination.

247.    Moreover, Edward Jones has clearly stated its intention to enforce the Training Cost Provision against Plaintiffs Bland, Durkiewicz, Bowles, and Reyes.  Edward Jones sent each Plaintiff a letter demanding that they pay the Firm $75,000 within 14 days or face "adversarial legal proceedings."  Edward Jones even persisted in its collection efforts after Plaintiffs and Plaintiffs' counsel explained that Plaintiffs had not engaged in the sale of securities and/or insurance business within three years after receipt of "can-sell" status.  Given Edward Jones's intransigence, Plaintiffs require a declaratory judgment and an order enjoining Edward Jones from seeking to enforce the Training Cost Provision.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and all others similarly situated respectfully request that this Court find against Edward Jones and order the following relief:

a.      Certify this case for collective and class action treatment, authorize notice, and equitably toll FLSA limitations periods;

b.    Designate Plaintiffs as Class Representatives for the proposed collective and class action and the proposed classes and designate Plaintiffs' counsel as Class Counsel;

c.    Rescind the Training Cost Provision, permanently enjoin Edward Jones from seeking to enforce it, rescind any releases executed in Defendants' favor in connection with their efforts to collect "training costs," and grant restitution and compensation to Plaintiffs and all others similarly situated for damages, including reasonable attorneys' fees and costs, caused by Defendants' unlawful collection efforts;

d.    Declare that Defendants' conduct, policies, and practices are unlawful and constitute willful violations of the Fair Labor Standards Act, the Illinois Consumer Fraud Act, and the Illinois and Missouri wage laws set forth above;

e.    Award Plaintiffs and all others similarly situated the amount of their losses suffered, including any unpaid wages owed;

f.    Award Plaintiffs and all others similarly situated liquidated damages;

g.    Award Plaintiffs and all others similarly situated statutory interest and/or penalties;

h.    Award Plaintiffs and all others similarly situated the value of all compensation and benefits lost and that they will lose in the future as a result of Edward Jones's unlawful conduct;

i.    Award Plaintiffs and all others similarly situated prejudgment and post-judgment interest and attorneys' fees and costs as provided by law;

j.      Award Plaintiffs and all others similarly situated such other make whole

equitable, injunctive, and legal relief as this Court deems just and proper; and

k.      Award Plaintiffs and all others similarly situated such other relief as is available

under applicable law and this Court deems just and proper.

## **DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of

Civil Procedure.

Respectfully submitted on behalf of Plaintiffs and those
similarly situated,

s/ *Linda D. Friedman*
STOWELL & FRIEDMAN, LTD.

Linda D. Friedman
Suzanne E. Bish
George S. Robot
STOWELL & FRIEDMAN, LTD.
303 W. Madison St.
Suite 2600
Chicago, Illinois  60606
(312) 431-0888
Grobot@sfltd.com
Lfriedman@sfltd.com
Sbish@sftld.com

<u>CERTIFICATE OF SERVICE</u>

I, Linda D. Friedman, an attorney, hereby certify that on May 3, 2019, I filed the

foregoing Second Amended Class and Collective Action Complaint via the Court's CM/ECF

system, which caused a copy of the same to be served upon all counsel of record via ECF.


Respectfully submitted,

By: *<u>/s/ Suzanne E. Bish</u>*