**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WAYNE BLAND, DANUTA DURKIEWICZ, DAVID BOWLES and ADAM REYES, individually and on behalf of all others similarly situated, | ) ) ) ) ) | Case No. 18-cv-1832 |
| | ) | Judge Robert M. Dow, Jr. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| EDWARD D. JONES & CO., L.P. and THE JONES FINANCIAL COMPANIES, L.L.L.P., | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Wayne Bland, Danuta Durkiewicz, David Bowles, and Adam Reyes ("Plaintiffs") filed this putative collective and class action against Defendants Edward D. Jones & Co., L.P. and The Jones Financial Companies, L.L.L.P.; alleging violations of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (Count I) and several Illinois and Missouri state laws. Currently before the Court is Defendants' motion to dismiss [83] Plaintiffs' Second Amended Class and Collective Action Complaint [79]. For the reasons stated below, Defendants' motion to dismiss [83] is granted in part and denied in part. The case is set for further status on May 13, 2020 at 9:00 a.m. Counsel are directed to file a joint status report, including a discovery plan and a statement of whether any settlement talks have occurred and whether the parties request an early settlement conference, no later than May 8, 2020.

# I.    Background[1]

The Court presumes familiarity with its prior opinion [38] granting Defendant's motion to dismiss Plaintiffs' First Amended Complaint. See generally *Bland v. Edward D. Jones & Co., L.P.*, 375 F. Supp. 3d 962 (N.D. Ill. 2019) ("*Bland I*"); [68].

Plaintiffs are all former Financial Advisors who worked for Defendants and participated in Defendants' Financial Advisor training program.[2] [79, ¶ 4.] Many of their claims concern one of the terms contained within the "Financial Advisor Employment Agreement" that Plaintiffs and members of the putative class were required to execute before beginning their training.[3] [*Id.*, ¶ 17.] The contract provision in question, which the Court will refer to as the "training cost reimbursement provision" ("the TCRP"), states:

> Upon execution of this Agreement and receipt of your can sell date from Edward Jones, you will be a financial advisor of Edward Jones. If, within three (3) years after receipt of your can sell date, your employment with Edward Jones is terminated by you or by Edward Jones, you maintain registration of your license with FINRA and accept employment with any entity as either an employee or independent contractor engaged in the sale of securities and/or insurance business, you agree to reimburse Edward Jones the reasonable cost of the training Edward Jones has provided you including, but not limited to, the cost of the selection and hiring. * * * You agree that the reimbursable amount bears a reasonable relationship to the computed damages Edward Jones would suffer from a breach by you and that Edward Jones will suffer demonstrable loss as a result of your breach. The amount you agree to reimburse Edward Jones is $ 75,000.00. There shall be no reduction in the amount of training costs owed by you in the event your employment is terminated during the first year of service as a financial advisor of Edward Jones.

---

[1] For purposes of the motion to dismiss, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

[2] As before, Plaintiffs use the catchall term "FA Trainees" to refer to both people in the formal training program and those who have graduated from the program but have yet to complete the three years of on-the-job training expected of junior Financial Advisors. For simplicity's sake, the Court refers to those in the formal training program as "Trainees" and those who have completed the program (*i.e.*, have achieved "can-sell" status) as "New Financial Advisors".

[3] Plaintiffs do not object to the consideration of the Employment Agreement. [92 at 22.] In any event, consideration of the document is proper, as this contract is referenced in the complaint and is central to most of Plaintiffs' claims. See *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

This obligation shall be reduced by $ 9,375.00 for each full quarter year of service beginning the thirteenth month of your employment as a financial advisor of Edward Jones. You must be employed by Edward Jones for each full quarter year in order to have your training cost obligation reduced according to the provisions of this paragraph.

[84-1, ¶ 21.] Each of the Plaintiffs also received a "Compensation Agreement," [79, ¶ 35], that provides a schedule of compensation for both their time as trainees and then as New Financial Advisors. See [84-2].

The training program in which Plaintiffs participated lasted 17 weeks. [79, ¶ 21.] During the training period, all Trainees were classified as non-exempt, and therefore entitled to overtime pay. [*Id.*] For the first eight weeks of the training program, Trainees "self-studied" for two financial advising licensing exams, the Series 7 and Series 66. [*Id.*, ¶ 23.] Defendants instructed trainees to study on their own for six days a week to cram for these tests. [*Id.*] Trainees studied for the tests using online videos on computers provided by Defendants. Although the actual costs of providing these videos to Trainees were negligible, the Employment Agreement implicitly valued them at $10,000. [*Id.*, ¶¶ 23–24.] Defendants did not provide in-person study space or meaningful instruction during this study period—in contrast to other financial advising training programs, which have more immersive programs. [*Id.*, ¶¶ 25–26, 47.] Trainees were paid wages during self-study; the compensation agreement contemplated that Trainees would bill about 45 hours per week. [*Id.*, ¶ 27.] Trainees were (at least theoretically) allowed to bill more (or less) time than that as needed. See [*id.*, ¶ 37]. Plaintiffs allege, however, that they were simultaneously told to study ever harder, [*Id.*, ¶ 27], but to tamp down on the number of hours they billed Defendants. [*Id.*, ¶¶ 37, 65 (instructing a Plaintiff not to bill more than 50 hours per week), 96–97.]

The second stage of the training began with a four-and-a-half day long intensive seminar in either Tempe, AZ or St. Louis, MO. [*Id.*, ¶ 29.] The seminar focused on sales techniques—how to knock on potential customers' doors, gain entry, close a sale, *etc.* [*Id.*, ¶ 30.]

After the seminar, Trainees returned home to conduct several weeks of "door knocking," where they put the sales skills they learned at the seminar to use. [*Id.*, ¶ 31.] Basically, Trainees were instructed to spend their days door-to-door soliciting in select neighborhoods. [*Id.*] Trainees were expected to generate 25 new leads a day, but had trouble meeting this quota because Defendants would double-book neighborhoods and customers were generally unresponsive to in-person solicitation of financial products [*Id.*] Despite these barriers, Trainees were provided no clerical support (or even office space), and had to spend additional time researching routes and neighborhoods, logging data, and following up with the few leads they registered. [*Id.*, ¶ 32.] As before, Plaintiffs were paid an hourly rate and were overtime-eligible, though their compensation was calibrated for a 60-hour work week. [*Id.*, ¶ 36.] Plaintiffs allege having worked longer hours in order to meet Defendants' demands. [*Id.*, ¶¶ 72.] Moreover, Plaintiffs allege that Defendants made it difficult to record their hours during the door knocking period, causing them to further underreport. [*Id.*, ¶¶ 37, 71.]

Following the "door knocking" period, Trainees attended another in-person seminar in Tempe or St. Louis. [*Id.*, ¶ 33.] Trainees called all of the contacts they had accrued and were evaluated by Defendants on their ability to pitch various financial products using canned scripts. [*Id.*, ¶ 34.] Those who passed this evaluation achieved "can-sell" status (in that Defendants allowed them to sell financial products) and became New Financial Advisors. [*Id.*, ¶ 38.] Plaintiffs allege that throughout this supposed training, Defendants provided little to no actual training regarding financial advising or financial products. [*Id.*, ¶ 30, 34.]

New Financial Advisors, in contrast to Trainees, were salaried and classified as exempt, and therefore were not overtime eligible.[4] [*Id.*, ¶¶ 41–42.] Plaintiffs allege having worked 80-hour weeks as New Financial Advisors. [*Id.*, ¶ 40.] Even after achieving can-sell status, New Financial Advisors still spent their days soliciting door-to-door and fulfilling clerical duties, such as inputting client contact information. [*Id.*, ¶¶ 38–39, 152.] New Financial Advisors did not have their own offices, and therefore worked out of their homes and public places. [*Id.*, ¶ 39.]

Plaintiffs allege that they were extremely circumscribed in the financial advice they could provide to clients. They claim not to have received sufficient training regarding financial advising and Defendants' products to independently render advice. [*Id.*, ¶ 43.] Instead, they used Defendants' wealth-balancing computer software, which spits out recommendations and investment options based on a client's preferences. [*Id.*, ¶¶ 43, 84, 156] From there, New Financial Advisors are instructed to sell one of a few "preferred products," which generate large revenues for Defendants. [*Id.*, ¶ 43] When Plaintiffs had questions about financial products, they were instructed to refer to the wholesalers' recommendations and descriptions. [*Id.*] For example, Bland was told to stick to recommending one of three products—one each for low, medium, and high-risk investors. [*Id.*, ¶ 81.] Later, he was told to push a single financial product on all of his prospective clients. [*Id.*, ¶ 83.] Reyes was instructed that certain classes of products are interchangeable, and he could more-or-less sell them willy-nilly. [*Id.*, ¶ 153.] Defendants oversaw Plaintiffs' sales, and chided them when they sold "non-preferred products." [*Id.*, ¶ 43]

The Plaintiffs all allege to have been forced out. After Plaintiffs left, each received a letter demanding repayment of the entire $75,000 training fee. Basically, Plaintiffs allege that these five-

---

[4] After a short probationary period, New Financial Advisors' salaries fluctuate based on commission, but it never falls below a minimum salary. [*id.*, ¶ 42 (arguing that the minimum falls below regulatory guidelines because it is subject to the $75,000 TCRP).]

figure penalties are bogus, given that they received meagre training and acquired limited wealth management skills. [*Id.*, ¶¶ 44–59.] Plaintiffs allege that Defendants fired off threatening letters before investigating whether they in fact are violating the TCRP by selling securities for another firm. [*Id.*, ¶ 55]. Moreover, Plaintiffs have identified four instances in the past fifteen years in which Defendants arbitrated the TCRP with former brokers. [*Id.*, ¶ 56.]

All of the Plaintiffs worked for Defendants at some point between 2014–16. [*Id.*, ¶¶ 62, 92, 121, 135.] All of them signed the Employment Agreement with the TCRP. [*Id.*, ¶¶ 62, 92, 121, 135.] All allege that they consistently worked overtime hours for which they were not compensated during the self-study and (with the exception of Bowles) door knocking periods of their training. [*Id.*, ¶¶ 65, 72, 75, 95–96, 101, 124–25, 135–139, 144–45] With the exception of Bowles, Plaintiffs also allege that they consistently worked more than forty hours a week as New Financial Advisors. [*Id.*, ¶¶ 80, 110, 152]. Finally, all Plaintiffs allegedly received a letter that sought recoupment of the training costs pursuant to the TCRP.[5] [*Id.*, ¶¶ 87, 118, 130, 158.]

In response to this conduct, Plaintiffs filed this purported collective and class action suit alleging multiple violations of the FLSA and various Illinois and Missouri state laws on March 13, 2018. See generally [1]. Plaintiffs have since filed their First Amended Complaint ("FAC") [35], which the Court dismissed [68]. Before the Court is Defendants' motion to dismiss [83] Plaintiffs' Second Amended Complaint ("SAC") [79].

## II.  Legal Standard

"In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" See, *e.g.*, *Lodholtz v. York Risk Serv. Grp., Inc.*, 778

---

[5] Bland's letter, received in spring 2016, also threatened him with litigation for violating a confidentiality policy before he left the firm. [*Id.*, ¶ 87.] Bland alleges to have "feared imminent litigation" as a result of receiving this letter, but he did not file the instant action until almost two years later. Compare [*id.*, ¶ 88], with [1].

F.3d 635, 639 (7th Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's complaint needs not include "detailed factual allegations," but it must contain more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, the complaint must include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, the Court "accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016)).

## III. Analysis

### A. FLSA (Count I)

The FLSA requires a subject employer to pay its employees a minimum hourly wage, and to compensate its employees at one and one-half time the regular rate for a work week longer than forty hours. See 29 U.S.C. §§ 206, 207. Plaintiffs advance three FLSA theories. First, Plaintiffs attempt to resurrect the claim that the TCRP illegally claws back wages, reducing their pay below the FLSA minimum. Second, they argue that they were not paid overtime for some of the hours they worked as non-exempt Trainees. Third, they argue that they were misclassified as exempt upon reaching New Financial Advisor/"can-sell" status, and are therefore entitled to overtime wages. The Court addresses these arguments in turn.

#### 1. TCRP

Pursuant to the FLSA, the Department of Labor has issued regulations requiring that minimum wages be paid "free and clear," *i.e.*:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and

> unconditionally or "free and clear." The wage requirements of the [FLSA] will not be met where the employee "kicks-back" directly or indirectly to the employer or another person for the employer's benefit the whole or part of the wage delivered to the employee.

29 C.F.R. § 531.35. Plaintiffs attempt to resurrect their claim that the TCRP effectively functioned as a kickback. Defendants counter that this is just a repackaged version of the arguments that the Court rejected in *Bland I*. Defendants are correct. The Court held in *Bland I* that (a) Plaintiffs lacked standing to sue because Defendants had not collected (or even really tried to collect) the outstanding fees and (b) that the TCRP allegations would fail to state a claim for violations of the wage-and-hour laws anyway. *Bland I*, 375 F. Supp. 3d at 972–78. Plaintiffs' Second Amended Complaint includes no new allegations that negate the Court's detailed analysis in *Bland I*.

First, Plaintiffs have not alleged sufficient facts from which the Court can infer that they were in fact injured and therefore have standing to sue in federal court. Article III of the Constitution confines federal courts to adjudicating actual cases or controversies. U.S. Const. art. III, § 2. Under Article III, a plaintiff must allege: (1) an injury in-fact; (2) fairly traceable to the defendant's action; that is (3) capable of being redressed by a favorable decision from the court. *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 514 (7th Cir. 2010) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The asserted injury must be both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. Moreover, a plaintiff must demonstrate standing separately for each form of relief sought. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

The Court previously explained that an allegation "that Defendants sent some form of communication stating that they owe or demanding that they pay $75,000 as provided for by the TCR Provision" did not make out an actual or imminent harm. *Bland I*, 375 F. Supp. 3d at 974. The Court provided some examples of allegations that would push the threat of litigation from

speculative to imminent: "Plaintiffs have not alleged any facts suggesting that Defendants have (1) taken any steps to bring litigation against them, (2) ever actually collected money from individuals pursuant to the TCR Provision, or (3) even expressly threatened to file suit." *Id.* (distinguishing *Ketner v. Branch Banking and Trust Company*, 143 F. Supp. 3d 370 (M.D.N.C. 2015)).

In the SAC, Plaintiffs include additional allegations to bolster their allegation of standing: (a) that the letters demanded Plaintiffs remit $75,000 so that they can resolve the dispute "without resort to adversarial legal proceedings," *e.g.*, [79, ¶ 130], and (b) Defendants have arbitrated four disputes over TCRP fees in the last fifteen years.[6] These additional allegations do not enhance the "tenuous" nature of Plaintiffs' standing. See *Bland I*, 375 F. Supp. 3d at 973. The allegation that Defendants said they sought to resolve the dispute without resort to adversarial legal proceedings does not address any of the factors the Court outlined in *Bland I*, and there is still no indication that Defendants took any step to bring litigation or that it even expressly threatened to file suit. See *id.* at 974. To be sure, Plaintiffs allege that Defendants have arbitrated the TCR Provision and collected (at least some) fees from at least four people over fifteen years, suggesting that Defendants *sometimes* initiate adversarial proceedings. This is not enough, on its own, to show that litigation was any more than speculative here, especially since at least one Plaintiff waited almost two years to file suit after receiving the letter. Compare [79, ¶ 87 (demand letter sent in spring 2016)], with [1 (initiating suit in 2018)]. Moreover, the Court continues to be wary that the

---

[6] Plaintiffs also point to language from Defendants' letter to Bland regarding his alleged theft of trade secrets, which suggested that litigation was imminent. But the TCRP and trade secrets issues are distinct, and, even viewing the complaint in the light most favorable to Plaintiffs, the explicit threat of litigation was related to the latter not the former. See [79, ¶ 87]. In any event, the allegation that Bland feared that litigation was imminent and actual, and not merely speculative, is belied by the fact that he did not file the instant suit until almost *two years* after receiving the demand letter in question. Compare [*id.* (demand letter sent in spring 2016)], with [1 (initiating suit in 2018)].

instant litigation is "'a tactical device whereby a party who would be a defendant in a coercive action may choose to a be plaintiff by winning the proverbial race to the courthouse.'" *Bland I*, 375 F. Supp. 3d at 974 (quoting *Hyatt Intern. Corp. v. Coco*, 302 F.3d 707, 712 (7th Cir. 2002)). Indeed, as discussed in greater detail below, Plaintiffs effectively admit to trying to shoe-horn a contract defense into an FLSA claim in an attempt to avoid arbitration. See [92 at 10–11 n.4, 18–21]; *cf. American Exp. Co. v. Italian Colors Restaurant*, 570 U.S. 228, 236–39 (2013) (requiring putative class members to individually arbitrate their claims, even though the costs of arbitration were greater than any member's individual damages).[7]

In any event, as explained in *Bland I*, the alleged problems with the TCRP cannot give rise to an FLSA claim. Notwithstanding the Court's thorough discussion of the relevant caselaw, including Seventh Circuit precedent, Plaintiffs have doubled down on this theory. Briefly, the Seventh Circuit has explained that an employer must pay the minimum wage and overtime to all employees—but it may also enter into de-facto loans with employees for the costs of training. *Heder v. City of Two Rivers, Wisconsin*, 295 F.3d 777, 778–79, 782–83 (7th Cir. 2002). If an employee leaves, the employer may not withhold pay to recoup these de-facto loans, but may seek repayment for these training costs via other avenues. *Id.* Thus, this Court previously held that any of Defendants' later attempts to recoup training costs—no matter how unreasonable those costs were in relation to the training received—does not have anything to do with whether the wages

---

[7] Because the Court lacks jurisdiction, Plaintiffs' Count X for declaratory judgment regarding the validity of the TCRP is also dismissed. Given that the Supreme Court has held that "the 'actual controversy' requirement of the Declaratory Judgment Act is coextensive with the 'case or controversy' standard for determining whether the Court has jurisdiction under Article III," see *Deutsche Leasing USA, Inc. v. Hamps Enterprises*, LLC, 2015 WL 536010, at *3 (N.D. Ill. Feb. 6, 2015) (citing *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 549 U.S. 118, 126–27 (2007)), Plaintiffs' declaratory judgment claim falters for the same reasons. Likewise, for the reasons set forth in Section III(B)(1), the Court lacks (or otherwise declines to exercise) supplemental jurisdiction over the declaratory judgment count, which essentially seeks a declaration that the $75,000 penalty is unenforceable under state law. 28 U.S.C. § 2201; see also, *e.g.*, *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 673–74 (1950).

were paid "free and clear." *Bland I*, 375 F. Supp. 3d at 977. Notwithstanding this holding, Plaintiffs loaded the SAC with further allegations of the unreasonableness of these fees, arguing that the training was "paltry" as compared to the steep reimbursement costs. But, as the Court wrote in March 2019, "[a]ll the arguments that Plaintiffs raise against the TCR Provision—that $75,000 does not bear a rational resemblance to the costs Defendants actually incurred in their training, that Defendants used the threat of the TCR Provision to force Plaintiffs to work extra allegedly uncompensated time, *etc.*—are either potential defenses to the enforcement of the contract that Plaintiffs could raise if and when Defendants attempt to enforce the provision or possible reasons to invalidate the contract as a matter of state law." *Bland I*, 375 F. Supp. 3d at 977–78 (citation omitted).

Plaintiff's additional legal arguments are also unpersuasive. First, Plaintiff cites to a Missouri breach-of-contract case, in which the court invalidated a liquidated damages provision as an unenforceable penalty. See [92 at 15 (discussing *Kansas City Live Block 139 Retail, LLC v. Fran's K.C. Ltd*, 504 S.W.3d 725 (Mo. App. Ct. 2016).] To the extent this case is relevant at all, it merely underscores the Court's prior conclusion that these arguments are best raised under state contract law, not the FLSA.[8] Second, Plaintiffs attempt to distinguish *Heder* by arguing that in that case, the training fees at issue were reasonable, whereas those at issue here are not. But this argument misses the point—what matters for the FLSA is not the reasonableness of the fees, it is whether wages were paid in full. *Bland I*, 375 F. Supp. 3d at 977–78. Third, Plaintiffs argue that *Heder* is distinguishable because federal regulations do not require public employers to pay

---

[8] Plaintiffs relatedly argue that the size of the penalty was so large that it rendered their professional licenses non-portable. That is, they were afraid of using their portable credentials, lest they be slapped with a huge lawsuit. This argument, however, concedes that the licenses are portable, and instead fashions the TCRP as a non-compete clause. Again, even if this *were* a non-compete clause, Plaintiffs would have to pursue that theory under state law as opposed to the FLSA. See *Heder*, 295 F.3d at 782.

employees during the training but do require private employers to do so. See 29 C.F.R. § 553.226. The applicability of these regulations to the situation at hand is not entirely clear, because *Heder* explained that (a) an employer may not withhold wages such that they fall below the statutory minimum, but (b) may seek recoupment of costs pursuant to a contract. *Heder*, 295 F.3d at 779, 781–83. Because Defendants did not do the former and (if anything) are seeking to do the latter, *Heder* controls and Plaintiffs have not stated a claim under the FLSA. See *Bland I*, 375 F. Supp. 3d at 977. Finally, Plaintiffs dispute the Court's analogy between these training fees and a "loan," because Defendants did not observe the procedural formalities concomitant with loan-making. To be clear, the Court did not hold that the training costs were, in fact, a loan—just that they operated *like* a loan. See *Bland I*, 375 F. Supp. 3d at 977; see also *Heder*, 295 F.3d at 781–82 (analogizing repaying training costs to another case in which a bona-fide loan was at issue). In any event, Plaintiffs spend an entire page of their brief discussing a case that held that something that had been mischaracterized as a loan during bankruptcy was in fact liquidated damages. [92 at 17 (discussing *In re Killian*, 422 B.R. 903, 906 (Bankr. N.D. Ill. 2009))]. That distinction is of no moment here, as neither would constitute a kickback. *Bland I*, 375 F. Supp. 3d at 976–978 (comparing cases); see also *Park v. FDM Group (Holdings) PLC*, 2017 WL 946298, at *4 (S.D.N.Y. Mar. 9, 2017) (holding that liquidated damages imposed following the termination of employment are not kickbacks under the FLSA).

In sum, Plaintiff's allegations are no doubt troubling, but they simply have no place in an FLSA claim, given that (with the exceptions discussed below) they were paid minimum wage and overtime. As before, the TCRP claim remains an non-starter and must again be dismissed.

## 2. Uncompensated Overtime (Training Period)

In its previous opinion, the Court explained that general allegations of having worked uncompensated overtime[9] are insufficient to state an FLSA claim. It granted Plaintiffs leave to file an amended complaint and encouraged them "to provide more details about what they were or were not paid, and at least one example of a pay period in which their pay was insufficient given the number of hours they worked." *Bland I*, 375 F. Supp. 3d at 981. In response, the SAC includes more specific allegations of uncompensated overtime. These allegations are (mostly) sufficient to make out a case for an overtime violation.

This Court, other courts in this district, and several courts of appeals have instructed that to state a claim for failure to pay overtime, "'a plaintiff must sufficiently allege forty hours of work in a given workweek as well as some uncompensated time in excess of forty hours.'" *Parks v. Speedy Title & Appraisal Review Servs.*, 318 F. Supp. 3d 1053, 1069 (N.D. Ill. 2018) (quoting *Silver v. Townstone Fin., Inc.*, 2015 WL 1259507, at *2 (N.D. Ill. Mar. 17, 2015) ); see also *Trujillo v. Mediterranean Kitchens, Inc.*, 2017 WL 2958240, at *1 (N.D. Ill. July 11, 2017); *Hughes v. Scarlett's G.P., Inc.*, 2016 WL 4179153, at *3 (N.D. Ill. Aug. 8, 2016); *DeJesus v. HF Management Services*, 726 F.3d 85, 89 (2d Cir. 2013) (allegations that plaintiff worked over forty hours in "some or all weeks" insufficient because at least one given week must be alleged); *Pruell v. Caritas Christi*, 678 F.3d 10, 12 (1st Cir. 2012) (allegation that plaintiffs "regularly worked" more than 40 hours a week insufficient). In contrast, allegations that a plaintiff *always* worked unpaid overtime over a longer period of time are sufficient to state a claim. See *Brown v. Club Assist Rd. Serv. U.S., Inc.*, 2013 WL 5304100, at *6 (N.D. Ill. Sept. 19, 2013) (plaintiffs adequately pled an overtime

---

[9] Plaintiffs concede that their "minimum wage claims rest on Defendants' efforts to collect $75,000 from them." [92 at 25.] For the reasons set forth above, they have failed to state a claim for the failure to pay the minimum wage.

claim where they asserted that "since July 2009, they have worked an average of 85 hours per week but have not been properly compensated for that time."); *Diaz v. E&K Cleaners, Inc.*, 2018 WL 439120, at *2 (N.D. Ill. Jan 16, 2018) (plaintiffs adequately pled an overtime claim when they alleged that they worked between 60–72 hours per week but were always paid for fewer).

Here, Durkiewicz and Reyes have stated claims for FLSA overtime violations related to their training period.[10] First, Durkiewicz claims to have worked 80-85 hours per week during self-study (July 13–September 4, 2015) and 72-76 hours per week during the door knocking period (September 26–October 30, 2015). She claims that during these respective time periods, she was not compensated for 25-30 and 12-16 hours of overtime per week. She has therefore identified several weeks where she was not compensated for her overtime hours. *Brown*, 2013 WL 5304100, at *6.

Reyes, likewise has identified several weeks where he worked uncompensated overtime. He alleges that he worked between 55 and 60 hours per week during self-study (October 26–December 23, 2015), of which 10–15 hours per week were uncompensated. And he claims to have worked 68–70 hours per week during door knocking (January 16–February 20, 2016), of which 12–16 hours per week were uncompensated. Again, Reyes has provided notice of several weeks during which he claims to have been underpaid.

Defendants' arguments that these are insufficiently specific are unconvincing. First, they focus extensively on alleged discrepancies between the Plaintiffs' allegations and their purported timecards, which they attached to the motion to dismiss. See generally [84-3]. Even assuming that

---

[10] The Court previously dismissed Bowles's FLSA claims with prejudice as time barred. *Bland I*, 375 F. Supp. 3d at 986. Bland now concedes that he completed his training no later than March 7, 2015. Suit was not filed until more than three years later, March 13, 2018. For the reasons set forth in *Bland I*, Bland's claims related to his uncompensated overtime during *training* must be dismissed with prejudice. *Bland I*, 375 F. Supp. 3d at 985–86 (citing *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003)). Bland's only counterargument rests exclusively on the TCRP and is therefore unavailing. *Id.* at 986.

the Court may review these documents on a motion to dismiss, the timecards largely corroborate Durkiewicz's and Reyes's respective versions of events.[11] For example, Durkiewicz claims to have been not compensated for 25-30 hours per week during the self-study, suggesting that she was compensated for 55 hours per week. Defendant's attachment shows that she was in fact compensated for between 48 and 54 hours per week during the self-study period. In other words, Durkiewicz's claim that she should have been compensated for a total of ~80 hours per week of self-study but was only compensated for ~55 hours per week holds up. So too with her allegations regarding the door-knocking period, where her time-cards show her clocking exactly 60 hours a week, although she claims to have worked more. Likewise, taking Defendant's timesheets as true, Reyes still appears to have been uncompensated for up to eight hours per week for the first seven weeks of self-study, and for the entirety of the door-knocking program. Because the Court must take the Plaintiffs' allegations as true, and Defendants' submission largely corroborates those claims, Durkiewicz and Reyes have stated an overtime claim.

Second, Defendants argue that Plaintiffs logged all of their time, so their claims about not being able to bill during the door knocking phase should be disregarded. But the fact that Durkiewicz and Reyes appear to have logged at least some of their time does not doom their claims. Plaintiffs allege that Defendants "discourage[] non-exempt FA Trainees from accurately reporting all of the hours they work." [79, ¶ 37.] Plaintiffs then provided some examples of this, such as the threats warning to be "reasonable" in reporting hours worked, [*Id.*, ¶ 96], and admonitions to bill less than fifty hours per week coupled with exhortations to work even harder. [*Id.*, ¶ 65.] Moreover,

---

[11] Both parties spend much of their briefing disputing whether the Court may properly consider the timecards and paystubs—that is, whether they were mentioned in the complaint and central to Plaintiffs' claims. See *188 LLC v. Trinity Indust., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). The Court need not determine the centrality of these documents to Plaintiffs' claims because they are not inconsistent with those of Plaintiffs' claims that are not time barred. Indeed, most of the alleged inconsistencies concern Bland's billing—but his claims are time barred, so the issue is moot.

even taking as true Defendant's contention that each of the Plaintiffs accessed the timecard system, Plaintiffs have pled several facts from which the Court can infer that Defendants make it, at the very least, difficult to override the pre-populated number of hours, particularly during labor-intensive door-knocking. [*Id.*, ¶¶ 37, 100.] In sum, Durkiewicz and Reyes have added sufficient additional allegations giving notice to Defendants about the nature of their overtime claim.

### 3. Misclassification

*Bland I* identified two defects in Plaintiffs' misclassification claims. First, Plaintiffs had failed to identify which weeks they worked uncompensated time. Second, Plaintiffs pleaded themselves out of court by alleging facts leading to the inevitable conclusion that they should be treated as exempt administrative employees.

Plaintiffs easily rectified the first defect by explaining that they worked uncompensated overtime in *every* week after they had achieved can-sell status. Defendants quibble with this, but the SAC has met the low bar of providing notice about which weeks are in issue. See *Brown*, 2013 WL 5304100, at *6; *Diaz*, 2018 WL 439120, at *2. And unlike with the training period, all three of the remaining Plaintiffs—Bland, Durkiewicz, and Reyes—allege overtime violations during the limitations period.

Second, as explained above, the FLSA generally requires employers to pay employees overtime pay for any time worked over forty hours in a given week. 29 U.S.C. § 207(a). That requirement does not apply, however to employees working in "a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Here, the parties dispute whether Plaintiffs and those similarly situated qualify for the "administrative exemption." The administrative exemption exempts employees

> (1) [who are] [c]ompensated on a salary or fee basis at a rate not less than $ 455 per week * * * exclusive of board, lodging or other facilities;

(2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) [w]hose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1)–(3). Plaintiffs allege that they fail both of the duties tests, in that their primary duty was not managerial or operational and did not include the exercise of discretion or independent judgment. Plaintiffs also claim that they do not pass the salary basis test, but that claim cannot succeed because it is based on their TCRP allegations. See Section III(A)(1); see also *Bland I*, 375 F. Supp. 3d at 982–83.

Determining whether an individual's actual job duties meet the requirements of the administrative exemption is a factually intense process. See, *e.g.*, *In re Morgan Stanley Smith Barney LLC Wage & Hour Litig.*, 2017 WL 772904, at *7–8 (D.N.J. Feb. 28, 2017) (examining the exact details of the plaintiffs' responsibilities on a motion for summary judgment); *Tsyn v. Wells Fargo Advisors, LLC*, 2016 WL 612926, at *4–17 (N.D. Cal. Feb. 16, 2016) (same); *Hein v. PNC Fin. Services Grp.*, Inc., 511 F. Supp. 2d 563, 566, 570–75 (E.D. Pa. 2007) (same). Likewise, the exemption status of an employee is an affirmative defense that employers bear the burden of proving. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, (1945); *Jackson v. Go-Tane Servs.*, Inc., 56 Fed. Appx. 267, 270 (7th Cir. 2003).

"A Rule 12(b)(6) motion should not be granted based on an affirmative defense unless a plaintiff alleges facts establishing an 'impenetrable defense' to the claim." *Brechbill v. Home Invest LLC*, 2018 WL 4384297, at *13 (N.D. Ill. Sept. 14, 2018) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008)); see also *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005) ("Although the statute of limitations is ordinarily an affirmative defense that must be pleaded under Fed. R. Civ. P. 8(c), a district court may dismiss under Rule 12(b)(6) something that is *indisputably*

time-barred.") (emphasis added and quotation marks and citation omitted). Nonetheless, if a complaint "thoroughly anticipate[s]" a defense, a district court may properly "reach that issue"— so long as it "consider[s] any factual allegations in the light most favorable to plaintiffs." *Hecker v. Deere & Co.*, 556 F.3d 575, 588 (7th Cir. 2009).

Here, as in *Bland I*, Plaintiffs' complaint does thoroughly anticipate the issue of whether New Financial Advisors were exempt from the overtime provisions as administrative employees, so the Court may properly consider the sufficiency of the pleading. *Bland I*, 375 F. Supp. 3d at 982 (quoting *Hecker*, 556 F.3d at 588). Unlike in *Bland I*, however, all of the allegations in the complaint, taken in the light most favorable to Plaintiffs, establish that they were plausibly non-exempt.

An employee's primary duty is defined as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). In determining whether a duty is "primary" the Court must consider "all the facts," including "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* Time spent performing exempt work is an important factor, and generally employees who spend more than half their time performing exempt work are exempt, but nothing "requires that exempt employees spend more than 50 percent of their time performing exempt work." *Id.* at 541.700(b).

Work directly related to management or general business operations means work that is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from * * * selling a product in a retail or service establishment." *Id.*, 541.201(a).

Providing financial consulting to an employer's customers qualifies as managerial or operational work, and is, in fact, a quintessential example of such work. *Id.*, 541.201(b)&(c). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision," but regulations "do not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." *Id.*, 541.202(c). At its core, the discretion requirement involves "the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." See § 541.202(a).

Finally, the regulations expressly contemplate that some forms of customer-facing financial workers may not be exempt:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

Sec. 541.203(b).

The "definitive piece of guidance," *In re Morgan Stanley Wage and Hour Litigation*, 2017 WL 772904, at *5 (D.N.J. Feb. 28, 2017), regarding the applicability of the administrative exemption to licensed financial advisors is a Department of Labor letter. See generally U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter (Nov. 27, 2006), 2006 WL 3832994 ("DOL Letter"). The letter first distinguished between quotidian "sales" roles and those of a bona-fide financial advisor who provides "individualized investment advice that is suited" to a particular client's specific needs. *Id.* at *5 & n.3 ("Of course if, based on all the facts in a particular case, a [licensed financial advisor]'s primary duty is selling investments to clients, the [licensed financial advisor]

19

will not qualify for the administrative exemption."). The letter then explained that the provision of individualized investment advice necessarily requires the use of discretion. *Id.* at *6. Finally, the letter distinguished between various uses of computer software, noting that the mere use of financial software to inform financial advisors' decision-making does not rob the advisors of discretion, unless the program "select[s] the particular investment alternative for the client" without any input from the advisor. *Id.* at n.4.

Here, Plaintiffs allege sufficient details to survive a motion to dismiss. For starters, they allege that they spent a majority of their time trawling for sales leads, which is likely enough in and of itself to plausibly suggest that their primary duty was non-managerial. See *Bland I*, 375 F. Supp. 3d at 984 (discussing *Blum v. Merrill Lynch & Co.*, No. 15-cv-1636, ECF. No. 1, ¶¶ 26, 29, 39, 67, 75, 2015 WL 971734 (S.D.N.Y. March 5, 2015); *Blum*, ECF No. 86; *Blum*, ECF No. 84).[12] Next, Plaintiffs allege that they were given a very short menu of financial products to sell, further undercutting any inference that they were truly providing "individualized" financial consulting services or meaningfully weighing competing alternatives. Likewise, in collecting client information, Plaintiffs claim to have merely input that information into a computer, which spat out short lists of investment alternatives for the client—depending on the client's risk tolerance, the interface (mediated through the supervisor's instructions) might suggest but a single preferred product. Plaintiffs allege that they were instructed to push a single investment vehicle onto all clients, regardless of the client's stated risk tolerance and assets. Plaintiffs also allege that any advisors who strayed from the very short list of approved products were promptly reprimanded,

---

[12] Defendants attempt to distinguish *Blum*, arguing that that the *Blum* plaintiffs' "inside sales" for financial firms is different than being a licensed financial advisor. But this begs the question—the DOL letter does not treat licensure as dispositive, and therefore the Court must consider Plaintiffs' allegations regarding their actual duties, as opposed to titles and credentials. See DOL Letter, 2006 WL 3832994, at *1, 5–6. Plaintiffs allege that they predominantly engaged in outside sales and data entry, which the Court declines to sharply distinguish from inside sales and customer service, particularly at the motion-to-dismiss stage.

suggesting that Defendants severely constrained their advisors' ability to make discretionary decisions. To top it all off, Plaintiffs did not even have dedicated office-space, further corroborating their allegations that they were more analogous to door-to-door salespeople than bona-fide managers. Based on these allegations, it is plausible that Plaintiffs' primary duty was not operational or managerial or did not involve the use of discretion. That is, Plaintiffs were plausibly salespeople first-and-foremost.

The Seventh Circuit's recent decision in *Bigger v. Facebook*, 947 F.3d 1043 (7th Cir. 2020), is instructive, as it concerned the application of the administrative exception to a tech consultant who worked at Facebook. The employee was a "Client Solutions Manager," who split her time between analyzing advertising data to determine sales strategies and actually selling advertising to Facebook's clients. *Id.* at 1047. The Seventh Circuit held that summary judgment was inappropriate because, "the submitted evidence obscures the extent to which Bigger performed analytical, consultation work as opposed to salesperson work." *Id.* at 1054. That is, although the Department of Labor identifies "marketing" and "advertising" as quintessentially managerial or operational roles, 29 C.F.R. § 541.201(b), evidence that the employee was subject to "sales quotas," conducted sales with existing clients, and "identified * * * upsell opportunities" sufficed to foreclose summary judgment. *Bigger*, 947 F.3d at 1053–54. Likewise, the record was not clear as to whether she used discretion when she used an analytical tool to develop recommendations and selected from amongst the available options based on the input of other Facebook teams. *Id.* at 1055. Here, Plaintiffs have made several specific allegations suggesting that that they were primarily salespeople as opposed to financial consultants, including that they spent most of their time going door-to-door trying to meet their sales quotas, and when they found a client, they were instructed to upsell from a limited pool of products. They have also suggested that their discretion

was constrained by using Defendants' portal and further winnowed by their supervisors' instructions about which products to hawk. If summary judgment is inappropriate under these facts (see *Bigger*, 947 F.3d at 1053–55), then dismissal surely is as well.

Defendant's arguments to the contrary are unavailing. First, Defendants' attempt to analogize the detailed allegations here to those in *Schneider v. Space Systems/Loral, Inc.*, 2011 WL 4344232, at *3 n.5 (N.D. Cal. Sept. 15, 2011), misses the mark, as the complaint in that case included little beyond verbatim recitations of the regulations at issue, and thus contained nothing more than legal conclusions. Second, Plaintiffs cite *Hein*, 511 F. Supp. 2d 563 (E.D. Pa. 2007), for the proposition that *any* sale of financial products by a licensed employee renders that employee exempt from the FLSA. But *Hein* is inapposite. In fact, *Hein* extensively compared the activities of different types of licensed financial advisors and concluded that the plaintiff, himself a supervisor, was exempt, in contrast to his subordinate "Licensed Financial Sales Consultants," whom everyone treated as non-exempt. See *Hein*, 511 F. Supp. 2d at 574–75 ("PNC classifies LFSCs as non-exempt employees under the FLSA and pays them overtime.")[13] Third, Plaintiffs' concessions that they recommended financial products to clients do not doom their claims, because these allegations must be taken in light of the allegation that they exercised little (if any) discretion in making those recommendations. And, in any event, Plaintiffs allege that they spent most of their time trawling for clients, not making recommendations in the first place. See *Hein*, 511 F. Supp. 2d at 573 (whether "cold calling" clients is an exempt activity is a fact-intensive question hinging on what kinds of information is elicited from potential clients and to what ends that information is put). Fourth, Defendants criticize Plaintiffs for not "submit[ing] a declaration detailing their day-

---

[13] To be sure, *Hein* did explain that "sales" are not definitionally non-exempt. Even high-touch financial consultants providing bespoke investment advice engage primarily in the selling of financial products. The question is to what extent the financial advisors in question use their judgment in selling products to their clients. See *Hein*, 511 F. Supp 2d at 570, 573.

to-day duties" as the plaintiffs did in *Lloyd v. J.P. Morgan Chase*, 2013 WL 4828588 (S.D.N.Y. Sept. 9, 2013), in support of their motion for conditional certification. [92 at 21]. But Plaintiffs need not submit a detailed affidavit to survive a Rule 12(b)(6) motion—rather, they need only allege sufficient factual matter from which the Court can infer that they are *plausibly* entitled to relief. See *Twombly*, 550 U.S. at 555, 557.

Finally, Defendants attempt to distinguish *Bigger* on the ground that the marketing professional in that case was not subject to a licensure requirement and ethical obligations, whereas Plaintiffs here were. Defendants have not cited (and the Court could not locate) any case holding that, as a matter of law, any licensed financial advisor is per se exempt from the FLSA. Indeed, courts have spilled rivers of ink ruling on summary judgment motions that painstakingly reviewed the record and applied the Department of Labor regulations to the employees' duties. See *Bland I*, 375 F. Supp. 3d at 984 (collecting cases involving indisputably licensed advisors that nonetheless engaged in "factually intensive" analysis of the DOL regulations). And as explained above, the Department of Labor contemplates that *licensed* financial advisors, such as Plaintiffs, may primarily be engaged in sales, as opposed to managerial or operational financial consulting. DOL Letter, 2006 WL 3832994, at *1, 5 n.3. In this vein, *Bland I* did not hold that all licensed hawkers of financial products are necessarily exempt; rather, the regulations create a strong presumption of exemption that Plaintiffs' FAC failed to address at all. *Bland I*, 375 F. Supp. 3d at 985. The SAC remedies that omission with specific factual allegations as to how Plaintiffs spent their time and how their discretion was bounded. Similarly, the Court did not hold that the misclassification claim lived or died on Plaintiffs' express abnegation of their FINRA ethical obligations—rather, the Court was not prepared to accept a conclusory disavowal of these obligations as the sole basis for letting an otherwise inadequately pled misclassification claim go through. See *id.* Now, Plaintiffs

have provided explanation as to what their duties were and how they carried them out—the computer widget narrowed their choice, and Defendants instructed them to select a single preferred product per risk level—which is enough to show that they are at least plausibly entitled to relief.[14]

## B. State law claims

Because at least some federal claims survive, the Court may exercise supplemental jurisdiction over those state law claims form part of the same case or controversy. See 28 U.S.C. § 1367(a). First, the Court must determine which, if any, state claims it retains jurisdiction over, and second, considers the motion to dismiss with regard to those claims.[15]

### 1. Supplemental jurisdiction

Where a district court has original jurisdiction over one claim, it may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United State Constitution." 28 U.S.C. § 1367(a). Supplemental jurisdiction is a "doctrine of discretion, not of plaintiff's right," *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), but "judicial power to hear both state and federal claims exists where the federal claim has sufficient

---

[14] That is not to say that Plaintiffs' allegations regarding their conduct in recommending financial products to prospective clients are not still troubling in light of FINRA's ethical obligations. See, *e.g.*, FINRA Rule 2111(a) (requiring members or associated persons to "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the member or associated person to ascertain the customer's investment profile."). But, whether Plaintiffs' purported reliance on Defendants' representations regarding the suitability of various investments was "reasonable" is not before the Court. Likewise, viewing the allegations in the light most favorable to Plaintiffs, their reliance on the computer widget and supervisors' recommendations regarding preferred products is not necessarily inconsistent with either the FAC or FINRA's suitability requirement—they allege that they recommended preferred products that the financial software told them were suitable for different risk levels. Thus, even if they did not *themselves* consider risk, suitability, or individual needs, they did not necessarily make unsuitable recommendations.

[15] Plaintiffs have effectively conceded that the Court lacks diversity jurisdiction over the breach of contract claims. See [92 at 31 n.7.]

substance to confer subject matter jurisdiction on the court, and the state and federal claims derive from a common nucleus of operative facts." *Ammerman v. Sween*, 54 F.3d 423 (7th Cir. 1995) (citing *Gibbs*, 383 U.S. at 725). "A loose factual connection between the claims is generally sufficient" to confer jurisdiction on the related state claims. *Sanchez & Daniels v. Koresko*, 503 F.3d 610, 614 (7th Cir. 2007) (quoting *Baer v. First Options of Chicago, Inc.*, 72 F.3d 1294, 1299 (7th Cir. 1995), and *Sween*, 54 F.3d at 424). However, it is not enough that the claims be tangentially related. *Hernandez v. Dart*, 635 F. Supp. 2d 798, 814 (N.D. Ill. 2009) (citing *Chaney v. City of Chicago*, 901 F. Supp. 266, 270 (N.D. Ill. 1995)). Furthermore, the "facts linking state to federal claims must be 'operative,' *i.e.*, they must be 'relevant to the resolution of' the federal claims." *U.S. v. Clark*, 2010 WL 476637, * 1 (N.D. Ill. 2010) (citing *Berg*, 372 F. Supp. 2d at 1093); see also *General Auto Serv. Station v. The City of Chicago*, 2004 WL 442636, at *12 (N.D. Ill. 2004) (state law claim that provided "factual background" for federal constitutional claim was not sufficiently related to give rise to supplemental jurisdiction).

Moreover, district courts may exercise "broad discretion * * * in making judgments concerning the retention of supplemental claims." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). "[I]f it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." *Gibbs*, 383 U.S. at 726–277; 28 U.S.C. § 1367(c); see also *Green Valley Investments v. Winnebago Cty., Wis.*, 794 F.3d 864, 869–70 (7th Cir. 2015).

Here, Plaintiffs bring the following state law claims:

- Violation of the Illinois Wage Payment and Collection Act, Count II

- Violation of the Illinois Minimum Wage Law, Count III

- Violation of the Missouri Minimum Wage Law, Count IV

- State law fraudulent inducement related to the quality of training provided through the TCRP, Count V

- State law breach of contract related to the quality of training provided through the TCRP, Count VI

- Rescission of the contract pursuant to state law, Count VII

- Unjust enrichment for Defendant's retention of client accounts following Plaintiffs' alleged constructive discharge, Count VIII;

- Violations of the Illinois Consumer Fraud and Deceptive Practices Act, related to the quality of training, Count IX.

- Declaratory Judgment that the contract penalty is unenforceable, Count X.

Preliminarily, with one exception discussed below, the Illinois wage and hour claims rest on the same nucleus of operative facts as the FLSA claim, so supplemental jurisdiction is warranted. The Missouri wage and hour claim is also discussed below. But all of the other state law claims—which pertain to the $75,000 TCRP fee or Defendants' post-discharge conduct—do not arise from the same nucleus of operative facts. All of the overtime claims related to the training period will hinge exclusively on how many hours each Trainee worked during each pay period, how much each Trainee was compensated, and whether Defendants knew they were undercompensating the Trainees. This inquiry will have nothing to do with the quality of instruction provided, enforceability of the $75,000 TCRP, or legality of retaining client accounts.

Likewise, the Plaintiffs' claims regarding misclassification are not based on the same nucleus of operative facts as those related to the $75,000 fee. Plaintiffs' contracts claims primarily concern the promises that were made before signing, the text of the contract itself, and the resource-

intensiveness of the instruction provided. In contrast, the misclassification claim deals exclusively with what Plaintiffs did *after* their training was complete. Plaintiffs' allegedly inadequate training may provide "factual background" for their limited duties as FA's, but that is not enough to confer supplemental jurisdiction. *General Auto Serv. Station*, 2004 WL 442636, at *12. Indeed, the "operative" facts that underlie the misclassification and contract claims come from different time periods and involve different people doing different things. Likewise, the alternative unjust enrichment claim simply has nothing to do with Plaintiffs' alleged classification.

Moreover, even if the FLSA and contract claims did arise out of the same nucleus of operative fact, the Court would decline to exercise its jurisdiction over the state claims as they would dominate the federal claims. Indeed, Plaintiff's extensive attempt to resurrect the TCRP FLSA claims notwithstanding their explicit rejection in *Bland I* suggests that the scope of recovery for these claims dwarfs the relatively circumscribed overtime claims that remain. In any event, deciding these issues would require a wide-ranging choice-of-laws analysis, followed by a significant foray into various Illinois and/or Missouri state laws. These issues include questions related to contract formation, fraud, the elements of a contract claim, and remedies. Discovery would also be wide-ranging as it would require determining who exactly made what representations (and when) and the costs of providing each component of training. These issues, which the Court has not yet expended any resources in researching, would predominate over the distinct factual and legal questions presented in the surviving FLSA claims. Accordingly, even if the Court has jurisdiction over the state law claims, it declines to exercise it here. See *Dargis v. Sheahan*, 526 F.3d 981, 991 (7th Cir. 2008) (concluding that district court did not abuse its discretion in declining to exercise supplemental jurisdiction over plaintiff's seven state law claims,

on which no other judicial resources had been expended). Counts V–X are dismissed without prejudice to refiling in state court.

## 2. State law wage and hour claims

The parties more or less treat the state law wage and hour claims as coterminous with the FLSA, and therefore the motion to dismiss Counts II and III is granted to the extent discussed above. The parties dispute, however, two further issues: (a) whether Bowles has stated a claim for the violation of any state's minimum wage law, and (b) whether Missouri law can apply.

First, Defendants argue that Bowles's state law wage and hour claims must be dismissed as inadequately pled and time barred.[16] Bowles has apparently abandoned this claim in response to the motion to dismiss, however, so dismissal is warranted. See [92 at 5–8 ("Plaintiffs Bland, Durkiewicz, and Reyes Worked Unpaid Overtime")]; *Lee v. Northeast Illinois Regional Commuter Railroad Corporation*, 912 F.3d 1049, 1053–54 (7th Cir. 2019) ("[E]ven a complaint that passes muster under the liberal notice pleading requirements of Federal Rule of Civil Procedure 8(a)(2) can be subject to dismissal if a plaintiff does not provide argument in support of the legal adequacy of the complaint.").

Next, Plaintiffs attempt to bring a Missouri wage and hour suit, premised on the fact that the Employment Agreement provides that Missouri law applies to the contract. Neither party, however, has properly briefed the conflicts of law issue. Federal courts apply the conflicts of laws rules of the states in which they sit—thus, this Court applies Illinois conflict of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). The question, then, is whether an

---

[16] In a footnote, Defendants raise at least the specter of a subject matter jurisdiction challenge in light of the Court's dismissal of Bowles's federal claims. See [84 at 21 n.25]. This contention is troubling: Courts look with disfavor on raising serious arguments in footnotes, and frequently consider such gestures waived. But subject matter jurisdiction cannot be waived. The Court need not broach this issue here, as it dismisses Bowles' claims for other reasons, but the Court notes that if Defendants locate further dispositive and fatal defenses, they should fully brief them in the body of their motions or they will risk waiver.

*Illinois* court would apply Missouri statutes to wage-and-hour claims related to work that was done outside of Missouri based on this purported choice of law clause. Regardless, the statute in question applies to "employees *in this state*," 1990 Mo. Legis. Serv. H.B. 1881 (West) (emphasis added), so the Court is skeptical that the statute applies extraterritorially.[17] Accordingly, Count IV, for violations of the Missouri Minimum Wage Law, is dismissed. If Plaintiffs can find authority that (a) Illinois courts would honor the foreign choice of law provision in a contract executed in Illinois pertaining to work to be performed in Illinois, (b) under Missouri law this statute was incorporated into the contract, and (c) the statute can be applied extraterritorially, then they may file a motion for reconsideration asking the Court to reinstate this Count.

## IV. Conclusion

For the reasons stated below, Defendants' motion to dismiss [83] is granted in part and denied in part. The case is set for further status on May 13, 2020 at 9:00 a.m. Counsel are directed to file a joint status report, including a discovery plan and a statement of whether any settlement talks have occurred and whether the parties request an early settlement conference, no later than May 8, 2020.

Dated: March 30, 2020

_____
Robert M. Dow, Jr.
United States District Judge

---

[17] The Court need not dwell on whether the Missouri minimum wage law applied to the seminars and evaluations that occurred in St. Louis, Missouri, because all of Plaintiffs' work in Missouri was more than two years before they filed suit. See [92 at 7]; see also Mo. Rev. Stat. § 290.527 (1990) (effective through November 5, 2018).